### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

_____

GERALDINE LAUTURE                            :
                                             :
    Plaintiff                              :
                                             :
    v.                                     :        Civil Action No.: CCB-08-943
                                             :
ST. AGNES HOSPITAL                           :
                                             :
    Defendant                              :
_____:

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Geraldine Lauture, ("Plaintiff" or "Ms. Lauture") by and through undersigned counsel, files this Memorandum of Law in Opposition to Defendant 's Motion for summary judgment and states as follows:

## I.    <u>INTRODUCTION</u>

On or about April 15, 2008, Plaintiff, acting pro se, commenced this racial and/or national origin discrimination complaint against Defendant in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. A. § 2000e, et seq. alleging disparate treatment, hostile work environment, and constructive discharge.

On April 7, 2009, Plaintiff, by counsel, has moved the Court for leave to amend Plaintiff's Complaint after Defendant refused to consent to the amendment. The proposed amendment, in addition to formalizing Plaintiff's pro se complaint, added two additional counts of Breach of Contract and Intentional Infliction of Emotional Distress. The Motion for leave is pending.

## II.    PLAINTIFF'S FORECAST OF EVIDENCE

Ms. Lauture is a black and born outside of the United States in Haiti of Haitian Parents. (*Exhibit 1, Plaintiff's Affidavit, ¶ 2.*)  Ms. Lauture has an associate degree in Medical Laboratory Technology. (*Exhibit 4, Lauture's Associate Degree*). She also has a Certificate of Achievement for completion of training in medical laboratory technology in the areas of Chemistry/hematology/Microbiology. (*Exhibit 5, Lauture's Certificate of Completion.*) Prior to her employment with Defendant, Ms. Lauture was employed by Anne Arundel Medical Center, Annapolis, Maryland as a Laboratory Technician. During the time of her employment with Defendant Ms. Lauture continued working for Anne Arundel Medical Center as a Laboratory Technician and did not receive any negative counseling or complaints with her work with Anne Arundel Medical Center.

On or about July 21, 2004, Ms. Lauture was employed by Defendant as a Medical Laboratory Technician working the evening shift, Monday through Friday at the Defendant's Microbiology Lab. (*Exhibit 1, Plaintiff's Affidavit.*) Defendant's Position Description for Ms. Lauture's required education and training equivalent to an associate degree in laboratory science or medical laboratory technology. (*Exhibit 3, Defendant's Position Description for Medical Lab Technician, page 3.*) Ms. Lauture was hired, and was supervised after her employment, by Ms. Sally Ondiek, the then Supervisor in the Microbiology lab. (Exhibit 1, Plaintiff's Affidavit.)

When Ms. Lauture started her employment with Defendant, Ms. Lauture was working the evening shift. She worked the evening shift alone by herself without any direct supervision. (*Exhibit 2, Lauture's Deposition, p. 42, lines 1-21.*)

2

On or about October 2004, a Competency Performance assessment was conducted for Ms. Lauture. Ms. Lauture was assessed to have all met all criteria on which Ms. Lauture was assessed. (*Exhibit 6, Defendant's Microbiology Laboratory Training for Ms. Lauture.*)  Furthermore, in January 2005, a New Associate Review was conducted for Ms. Lauture. The overall performance rating for Ms. Lauture in that evaluation was a 1.04 which means a "Completely Acceptable Performance" under Defendant's rating system. (*Exhibit 7, Defendant's Evaluation for Ms. Lauture.*) This evaluation is the last official evaluation on file for Ms. Lauture.

In addition, a Competency Assessment for Ms. Lauture show Ms. Lauture earning very high scores in the areas assessed. (*Exhibit 8, Defendant's Competency Assessment for Ms. Lauture.*) Yet another "Planter Bench Competency Test" shows Ms. Lauture scoring 97.5%. *(Exhibit 9, Planter Bench Competency Test for Ms. Lauture.)*

Based on Ms. Lauture's good work performance, Ms. Lauture was asked to train two new Medical Technologists, Mr. Ben Roberts and Mr. Oye Oyebode. (*Exhibit 2, Lauture's Deposition, p. 47*). Ms. Lauture's testimony that she trained the two mentioned gentlemen is corroborated by the record. (*Exhibit 10, Evening Planter Duties/Training Checklist for Mr. Roberts by Ms. Lauture; also Exhibit 33, Roberts Deposition, p.28)*. In addition, both Mr. Roberts and Mr. Oyebode confirmed to the Baltimore Community Relations Commission investigator that they were trained by Ms. Lauture. (*Exhibit 2.*)

During the above-stated period of Ms. Lauture's employment in July 2004 up to December 2005, there was no problem with Lauture's work performance and neither Ms. Ondiek, Lauture's supervisor at the relevant time, nor Ms. Jo Oliver, the Lab Director,

informed Ms. Lauture of any performance issues. (*Exhibit 2, Lauture's Deposition, pp. 46-47.*)

On or about December 5, 2005, upon Ms. Lauture's request, Ms. Lauture was transferred to the day shift. The reason for the request was to allow Ms. Lauture to be home with her two school children. (*Exhibit 2, Lauture's Depo. P. 50, lines 16-21.*) When Plaintiff transferred to the day shift, Plaintiff came under the direct supervision of Jane Weiger and Margaret Kinch. Both Ms. Weiger and Ms. Kinch are Caucasians and American born. (*Exhibit 1, Plaintiff's Affid..; also, Exhibit 2, Lauture's Depo. P. 52.*)

In December 2005 when Lauture transferred to the day shift, also working in the Laboratory Department as a Laboratory Assistant was Ms. Stephanie Rutter, a Caucasian American born individual. (*Exhibit 1, Lauture's Affid.*) While Ms. Rutter was required to assist Plaintiff, Ms. Rutter refused to do so and Plaintiff's complains against Ms. Rutter to Defendant were completely disregarded. (*id.*)

On January 5, 2006, Ms. Lauture was given a verbal warning for an alleged violation of code of conduct policy by not getting along with Ms. Rutter.  The write-up further went on to state that Ms. Lauture and Ms. Rutter were dragging others into their "Mexican stand-off" and that the code of conduct been violated was not treating co-workers with respect. (*Exhibit 11, January 5, 2006 Counseling Report.*)

On February 2, 2006, Ms. Lauture was given a Documented Verbal Warning. (*Exhibit 12, February 2, 2006 Counseling Report.*) Ms. Lauture did not agree with all the accusations against her and stated so on the Counseling Report. (*id.*) According to the Counseling Report, Ms. Lauture will be retrained for a period of 2 weeks from February

4

16, 2006 to March 3, 2006 and that failure to meet standards listed will result in additional disciplinary action up to and including termination. (*id.*)

On February 6, 2006, after receiving the February 2, 2006 verbal warning, Ms. Lauture complained to Defendant's Human Resources about the verbal warning. (*Exhibit 13, February 14, 2006 Email from Sherry Beubendorf.*) In that complaint, Ms. Lauture stated several grounds of complaint against Ms. Weiger and Ms. Kinch including the ground that Ms. Rutter refused to assist her and that the supervisors took Ms. Rutter's side. (*id.*) Ms. Lauture never heard anything back from Ms. Beubendorf or anybody else from Defendant regarding Ms. Lauture's complaint.

Without any feedback from Defendant regarding Ms. Lauture's complaint against the February 2, 2006 verbal warning, and before the scheduled retraining day of February 16, 2006, on February 8, 2006, Ms. Lauture was suspended from work for 3 days pending an alleged investigation. (*Exhibit 14, February 8, 2006 Suspension Counseling Report.*) While the specific performance issues raised in this report will be addressed shortly, two issues stand out in bold relief. First, in the Report, Ms. Weiger and Ms. Kinch stated:

> **"the issues involved show a fundamental lack of knowledge and the resolutions to correcting these issues cannot be imparted by additional training."**

(*id., p. 2, third paragraph.*)

Second, while the report accused Ms. Lauture of causing a meningitis scare in the hospital, Ms. Weiger and Ms. Kinch were later forced to admit that their allegation against Ms. Lauture was unfounded. (*Exhibit 15, February 21, 2006 retraction note.*) However, despite the retraction and the lame apology, Defendant never rescinded the

5

suspension and Ms. Lauture was not paid for the three days period of suspension.

(*Exhibit 1, Plaintiff's Affidavit.*)

Again, on or about February 17, 2006, Ms. Lauture submitted a written complain to Defendant. (*Exhibit 16, Plaintiff's "Letter to St. Agnes Hospital."*) In this letter, copied to not only Ms. Weiger and Ms. Kinch, Ms. Lauture copied the Director of Human Resources, the Lab Director, the Hospital Director and the Sisters of St. Agnes, Ms. Lauture, after addressing the unfounded performance issues against her, stated that she believed that she has been discriminated against and her human rights seriously violated (id.) However, Ms. Lauture went on in her said complaint, that she has not sought legal advice at that time and would prefer St. Agnes meet with her to redress the issues. (id.) Unfortunately, not one person responded to Ms. Lauture's complaint and Defendant failed to investigate Plaintiff's complaints of discrimination against Ms. Weiger and Ms. Kinch. (*Exhibit 1, Plaintiff's Affidavit*)

Meanwhile, in compliance with Defendant's counseling against her, Ms. Lauture started her retraining with Ms. Parikh and successfully completed the training. (*Exhibit 17, March 9, 2006 Planter Duties/Training Checklist for Ms. Lauture.*) According to Ms. Parikh:

> **"Geraldine knows her duties well. I went over the whole checklist of duties with her. She has performed all duties."**

(id.)

Furthermore, in compliance with the January 2006 counseling, Ms. Lauture attended the EAP PRIME and the program not only confirmed Ms. Lauture's attendance, it was confirmed that Ms. Lauture attended sessions when requested and was able to

discuss and take responsibility for some of the problems on the job. (*Exhibit 18, EAP PRIME Confirmation for Ms. Lauture.*)

The last straw that broke the camel's back in Ms. Lauture's employment with Defendant occurred on March 9, 2006 when suddenly, after all of Ms. Lauture's above-stated efforts, Ms. Lauture was summoned into Defendant's Human Resource's office on an alleged complaint by Ms. Rutter. Ms. Rutter's complain was on the ground that Ms. Lauture was not responding to her or acknowledging her. (*Exhibit 19, March 7, 2006 note.*) Ms. Rutter also complained against Ms. Lauture because Ms. Rutter did not like Ms. Lauture calling her a "secretary." (*Exhibit 30, Weiger Depo. P. 150, lines 19-20.*) This is the same Ms. Rutter whose initial application for employment with Defendant was for a "unit secretary." (*Exhibit ---Ms. Rutter's Employment Record, Application for Employment.*), While Ms. Lauture denied calling Ms. Rutter a secretary, (*Exhibit 2, Lauture's Depo. Pgs. 67-68*), Ms. Lauture did not see anything wrong with been a secretary which she considers to be a good occupation and considers herself a secretary. (*id. at 64.*)

At the March 9, 2006 meeting, Ms. Lauture's direct supervisors, Ms. Weiger, Ms. Kinch, were present. Also present was the Lab Director, Jo Oliver, Human Resources personnel, Aimee Ringgold, and Colleen Meegan, and were present. (*Exhibit 20, March 12, 2006 E-mail Report by Colleen Meegan.*) All the aforementioned Defendant's personnel at the meeting are Caucasians and/or American born. (*Exhibit 1, Plaintiff's Affidavit.*) At the said meeting of March 9, 2006, Plaintiff was intimidated, frightened and felt ganged upon by aforesaid Defendant supervisors and managers when they took Ms.

7

Rutter's side against Plaintiff without any reasonable basis. For instance, when Ms. Lauture was talking, Ms. Meegan told Ms. Lauture to "Be quite because whatever you say is going to be against you." *(Exhibit 2, Lauture's Depo. p. 170, lines 1-7)*. At one point Ms. Lauture was so upset that she cried. (*id. at 173, lines 16-17; see also Exhibit 20.*)

On March 10, 2006, next day after the meeting, due to the unbearable work environment, Ms. Lauture resigned her employment by giving Defendant a two week notice in accordance with Defendant's policy. Ms. Lauture resigned because she felt the workplace was not a safe place for her anymore and that everything that she said was ignored, and there was no investigation and that she has been discriminated against. Declaring, "I cannot work in that condition anymore." (*Exhibit 2, Lauture's Depo. p. 174, lines 13-17.*)

In her resignation letter, Ms. Lauture stated in part as follows:

**"this unpleasant situation at work is taking a toll on my health in the form of insomnia, anxiety and overwhelming stress. In a previous letter, I afforded St. Agnes the opportunity to address and correct the injustice and unbearable situation at work. They have declined to do so and the prejudice, discrimination and blatant lies continue to manifest against me as a team working on a mission.**

(*Exhibit 21, March 10, 2006 Resignation Letter.*)

Furthermore, while Ms. Lauture gave Defendant a two-week notice of Plaintiff's resignation as required under Defendant's policy handbook, Defendant did not allow Plaintiff to remain on the job for the two weeks period and Defendant made Plaintiff's resignation effective immediately. Not only did Defendant made Plaintiff's resignation

8

effective immediately, without any provocation or disturbance whatsoever by Plaintiff,
Defendant instructed Plaintiff to be escorted out of the building by security guards on the
same day that Plaintiff gave the notice of resignation. (*Exhibit 1, Plaintiff's Affidavit.*)
Meanwhile, even though Ms. Lauture resigned her employment, Plaintiff's employment
record with Defendant shows that Plaintiff's employment was terminated instead of
reflecting that Plaintiff resigned her position. (*Exhibit 22, March 13, 2006 Personnel
Action Request for Ms. Lauture.*) The said Personnel record was created by Ms. Kinch,
one of the supervisors against whom Ms. Lauture complained of discrimination and
harassment (*id.*)

In addition, Ms. Colleen Meegan, one of the principal actors in the March 9, 2006
meeting who told Ms. Lauture to keep quite, was the very same person who made Ms.
Lauture's resignation effective immediately. (*Exhibit 20.*)

Of Course, consistent with the levity and disdain with which Defendant treated
Ms. Lauture's complaints, there was no investigation done by Defendant into Ms.
Lauture's resignation. (*Exhibit 32, Harrid Depo., Defendant Corporate Designee, p. 39,
line 3-7.*)

On or about April 7, 2006, Ms. Lauture filed employment discrimination charges
against Defendant for employment discrimination on the basis of race and national origin
with the Baltimore Community Relations Commission, Baltimore, Maryland. (*Exhibit 23,
Charge of Discrimination.*) On or about May 26, 2006, Defendant filed a Position
Statement. (*Exhibit 24, May 26, 2006, May 26, 2006 Defendant's Position Statement.*)

9

The Baltimore Community Relations Commission, "BCRC", conducted an interview into Ms. Lauture's Charge of Discrimination and as part of that process, interviewed some of Ms. Lauture's co-workers in the microbiology lab at that time. (*Exhibit 25, Baltimore Community Relations Commission's Report of Person Interviewed.*) At the interview, Mr. Oyebode confirmed that in his opinion, Ms. Lauture was very qualified and did a good job training him. (*id.*) Another witness, Ms. Wilson, also informed the investigator that Ms. Rutter would not do work for Ms. Lauture; that management was very "nurturing to Stephanie" and that other Techs complained that Ms. Rutter would not do her job. (*id.*) yet another witness, Mr. Ben Roberts, informed the investigator that Ms. Lauture was very professional, very knowledgeable and a good trainer and did a good job training him. (*id.*) Ms. Parikhi also confirmed to the Relations Commission investigator that Ms. Lauture complained that Ms. Lauture had not been trained properly for the day shift and that TB/AFB tests were not performed at night. On the contrary, the investigator, based upon the interview, stated that it appears that Ms. Kinch had a bias against Ms. Lauture. (*id.*)

Subsequently, the Commission informed Ms. Lauture and Defendant that even though a determination has not been made, the evidence reviewed seemed to suggest that Ms. Lauture may have been subjected to disparate treatment, retaliation and possibly constructive discharge. (*Exhibit 26, October 25, 2006 Baltimore Community Relations Commission's Letter.*) The Baltimore Community Relations Commission's file on Ms. Lauture's charge show that the investigator planned to issue a probable cause finding. (*Exhibit 27, September 17, 2007 Memo.*) On November 17, 2007, Ms. Lauture requested

10

for a Notice of Rights to Sue, (*Exhibit 28*), and on or about February 5, 2008, based upon

Plaintiff's request, the U.S. Equal Employment Opportunity Commission issued a Notice

of Right to Sue to the Plaintiff. (*Exhibit 29, Notice of Right to Sue.*)

On April 15, 2008 within ninety (90) days of receiving the Notice of Right to Sue,

Plaintiff commenced this action against Defendant.

### III.     STANDARDS REGARDING SUMMARY JUDGMENT MOTIONS

Fed. R. Civ. P. 56(c) provides the general standard for determining a motion for

summary judgment. It provides that "the judgment sought shall be rendered forthwith if

the pleadings, depositions, answers to interrogatories and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law. F.R.Civ.P. 56(c).

Thus, it is well established that a defendant moving for summary judgment

bears the burden of showing the absence of any genuine issue of material fact and that it

is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

250 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Barwick v. Celotex

Corp., 736 F.2d 946, 958 (4th Cir. 1984). Where, as in the case at bar, the nonmoving

party will bear the ultimate burden of persuasion at trial, the moving party must

demonstrate to the court that there is an absence of evidence to support the nonmoving

party's case. Celotex Corp. v. Catrett, *supra,* at 325 (1986).

Moreover, the allegations in plaintiff's complaint and his forecast of evidence

must be taken as true, and all inferences there from must be drawn in his favor.

Anderson, at 255. As the Supreme Court also indicated in Anderson, determining

11

credibility, weighing evidence and drawing inferences are matters reserved exclusively for the finder of fact at trial, not on summary judgment. 477 U.S. at 255.

Finally, summary judgment is an extreme remedy which should not be entered except where movant is entitled to its allowance beyond all doubt. City Nat. Bank of Fort Smith, Ark. V. Vanderboom, 422 F.2d 221 cert. denied 90 S.Ct. 2196, 399 U.S. 905, 26 L.Ed.2d 560. Also, the Eight Circuit has cautioned that summary judgment should seldom be used in employment discrimination cases because they often depend on inferences rather than direct evidence. Crawford v. Runyon 37 F3d 1338 (1994).

Furthermore, the court "must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996) and the court may "deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

## IV.    STANDARDS REGARDING PROOF OF UNLAWFUL EMPLOYMENT DISCRIMINATION

Plaintiff bears the initial burden of proving a prima facie case of discrimination by raising an inference that the employer acted with unlawful discriminatory intent prohibited under Title VII. Wileman v. Frank, 979 F.2d 30, 33 (4th Cir. 1992). A plaintiff may prove disparate treatment with either with direct evidence of discrimination under the mixed-motive proof scheme or may proceed under the burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Fuller v. Phipps, 67 F.3d 1137, 1141 (4th Cir. 1995).

12

To establish a prima facie case of unlawful employment discrimination under the McDonnell Douglas frame work, plaintiff has the burden of proving a prima facie case by a preponderance of the evidence. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981). The burden of such a prima facie case is not onerous, Burdine, at 253 and as stated in Young v. Lehman, 748 F2d 194, 197 (4th Cir. 1984), it is a "relatively easy test."

If a plaintiff establishes a prima facie case, the defendant's burden of production is to articulate, through admissible evidence, a legitimate and nondiscriminatory reason for its actions. While the defendant does not have the burden to persuade the court that it was actually motivated by the proffered reasons, it must produce enough admissible evidence to raise a genuine issue of fact. Burdine, 254-255; Ross v. Comm. Satellite Corp. 759 F.2d 355, 365 (4th Cir. 1985).

Thereafter, the burden shifts to the complaining party to prove that the reasons offered by the employer for the action taken amounted to a pretext for intentional discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

## V.   ARGUMENT

### A.   PLAINTIFF HAS PRODUCED SUFFICIENT EVIDENCE OF EMPLOYMENT DISCRIMINATION AND PRETEXTUAL NATURE OF DEFENDANT'S ALLEGED NON-DISCRIMINATORY REASONS

Ms. Lauture asserts a claim of disparate employment discrimination on the basis of race and national origin against Defendant on the ground that Defendant disparately disciplined, suspended and ordered Ms. Lauture to be retrained.

Defendant, in its motion for summary judgment, argues that Ms. Lauture cannot establish a prima facie case of discrimination on the ground that Ms. Lauture cannot

show that she was meeting Defendant's legitimate performance expectations and because Ms. Lauture cannot show that she has suffered adverse employment action.

Ms. Lauture disagrees with Defendant's statement of the prima facie proof required of Ms. Lauture in this case. Specifically, Ms. Lauture disagrees that a plaintiff such as Ms. Lauture in a disparate discipline case is required to show that he or she was meeting the employer's legitimate expectations. While it is beyond dispute that the order of proof laid out under <u>McDonnell Douglas</u> is an orderly way of evaluating evidence, the elements of a prima facie case depend on the facts of the particular case. Thus, a prima facie case cannot be established on a one-size-fits-all basis, <u>Jones v. School Dist. Of Phila</u>. 198 F.3d 403 (1999) and as it was observed in <u>Page v. Bolger,</u> 645 F. 2d 227 (4th Cir. 1981), the <u>McDonnell Douglas</u> proof scheme is not to be given a wooden application that loses sight of its essential purpose as a sensible, orderly way to evaluate evidence.

According to the Fourth Circuit, to establish a prima facie case of racial discrimination in the discriminatory discipline, the plaintiff must show: (1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees. See, <u>Cook v. CSX Transp. Corp.</u> 988 F.2d 507 (4th Cir. 1993) citing <u>Moore v. City of Charlotte</u>, 754 F.2d 1100 (4th Cir.), cert. denied, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). See also, <u>Newman v. Giant Food</u>, Inc., 187 F.Supp.2d 524 (D. Md. 2002).

Further, if the plaintiff succeeds in proving a prima facie case, the burden of

going forward shifts to the employer, who must articulate a non-discriminatory reason for

the difference in disciplinary enforcement. Should the employer articulate such a non

discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the

employer's reasons are not true but instead serve as a pretext for discrimination. See,

Cook v. CSX Transp. Corp., supra.

1.      **Plaintiff Has Shown A Prima Facie Case Which Defendant Has Failed
        To Rebut**

Under the above-stated frame work, Ms. Lauture can show a prima facie case

which Defendant has failed and cannot rebut. Defendant concedes that Plaintiff is a

member of the protected class by virtue of her race, (black) and national origin (Haiti)[1]

Ms. Lauture can readily meet the remaining two elements of her prima facie case.

Thus, Ms. Lauture can show that the conduct for which she was disciplined was

comparable in seriousness to misconduct of employees outside the protected class and

that she was disciplined more severely.

The basis of the discipline against Ms. Lauture were based on alleged

interpersonal problems with Ms. Rutter, alleged clinical errors by Ms. Lauture, and

alleged lack of QC documentation. A comparison of other employees not within Ms.

Lauture's protected class is glaring. Each will be addressed in turn.

1.      **Ms. Deborah Sanchez:**

Ms. Sanchez is Caucasian and U.S. born. (*Exhibit 43.*)

(i) In November 2005, there was a report by other co-workers that Ms. Sanchez

---

1 Defendant's Memorandum, p.10., footnote 3.

stated loudly to the hearing of other co-workers in the Lab that she wish she could take a

shotgun and shoot everyone in the lab. (*Exhibit 44*.)  Ms. Sanchez was not disciplined for

this incident. (*Sealed Weiger Deposition attached as part of Exhibit 44*). (ii) July 2006,

Ms. Sanchez failed to perform monthly QC and maintenance for July 2006. (*Exhibit 44*.)

(iii) In the same month, Ms. Sanchez failed to document QC for Rotator and the Bench

Top. (*id*.) (iv) May 2006, several clinical errors including alert value not called

misidentification of specimen, microscan performed not documented, etc., Ms. Sanchez

was not issued a written warning, was not ordered retrained, and was

not suspended for these incidents.

2.      **Therese Dalrmple:**  Dalrymple is Caucasian and U.S. born. (*Exhibit 43).*

        (i) September 5, 2008, QC for probetec not recorded. (ii) September 2, 2008,

Specimen was from a cervical wound and Dalrymple reported a normal vaginal flora as a

final report. (iii) January 2008, several QC issues. Dalrymple was not given a written

warning, ordered retrained or suspended. (*Exhibit 45*.)

3.      **Christina Graves:** Graves is Caucasian and U.S. born. (*Exhibit 43*.)

        (i) January 23, 2008, Graves failed to perform test on 13 specimens. (ii) January

2008, failure to record, (iii) July 2006, QC not performed for July 2006, (iv) August

2006, incorrect report sent out. (*Exhibit 46*.) Graves was not given a formal written

warning, not ordered retrained, and not suspended for these incidents.

4.      **Sally Turner**: Ms. Turner is Caucasian. (*Exhibit 43*.)

        (i) August 2006, QC not performed for the month of July 2006. (ii) June 2007,

reports of Turner failing to document her work and sending out incorrect or incomplete

reports, etc., (iii) March 2008, several clinical errors, (iv) June 2008, lack of QC documentations. Ms. Turner was not given any formal written warning, was not ordered retrained, and was not suspended for any of the above incidents. Indeed, for the Annual performance conducted for Ms. Turner in July 2007, Ms. Turner's performance was rated as having achieved Defendant's expectations. *(Exhibit 47.)* (v) September 2008, Ms. Turner was issued a documented verbal warning for several performance issues. However, Ms. Turner was not ordered retrained or suspended for those incidents. (*id.*) (vi) Subsequent to her documented verbal warning of September 4, 2008, on September 8, 2008, Ms. Turner failed to document a corrective action, and (vii) October 10, 2008, clinical errors were reported against Ms. Turner. No disciplinary action was taken against her. (id.)

5.      **Stephanie Rutter:** Ms. Rutter is Caucasian. (*Exhibit 43*.)

(i) March 12, 2006, a report of Ms. Rutter's failure to do her work, (ii) September 2005, another report of Ms. Rutter not doing her job. No disciplinary action was taken with respect to those reports. (*Exhibit 48.*)

6.      **Jackie Wilson:** Though Ms. Wilson is black, she was born in the U.S. (Exhibit 43). As such she is not within the protected class of national origin discrimination as Ms. Lauture. (i) August 28, 2008, failure to document corrective action, (ii) May 20, 2008, planting bench cleaning not documented, and (iii) March 2008, failure to document various actions. (*Exhibit 49)* Ms. Wilson was not given any formal verbal warning, not retrained or suspended for any of the above infractions.

7.      **Ms. Weiger and Ms. Kinch:** Both are Caucasian and U.S. Born. While Ms.

Kinch and Ms. Weiger disciplined Ms. Lauture for alleged failure to document eyewash

chart in January, 2006. On that occasion, Ms. Kinch admitted that she told Ms. Lauture to

back date the chart. Ms. Kinch was not disciplined by Defendant for this incident.

(*Exhibit 31, Kinch Depo. p. 141.*)

8.      **Defendant Has Failed to Provide All its Relevant Personnel Files:** In addition

to the above, Ms. Lauture informs the Court that Defendant has failed to provide all the

relevant personnel files in this case. Defendant failed to provide the personnel files of

Sally Ondiek, Jean Bateman, Abdolahassan Chini, and Wendy Dillon on the ground that

the files are lost. Apart from Ms. Ondiek who may not be a proper comparator because

she was a supervisor, Jean Bateman, Abdolahassan Chini, and Wendy Dillon, are all

proper comparators and are all Caucasians. Ms. Lauture is therefore in the dark as to

contents of the stated employees' files and as such Ms. Lauture has not had full discovery

on this issue.

In any event, the above comparison clearly show that Ms. Lauture has been

severely disciplined over and above the co-workers identified above for the same alleged

misconduct. While Ms. Lauture was given a formal warning, ordered retrained, and

suspended the identified other co-workers who had similar issues were not so disciplined

but received merely internal lab counseling. As such, Ms. Lauture has established her

prima facie case of disparate discipline.

Because Ms. Lauture has succeeded in proving a prima facie case of disparate

discipline, the burden of going forward shifts to Defendant who must articulate a non-

discriminatory reason for the difference in disciplinary enforcement. See, Cook v. CSX

18

Transp. Corp., supra.

The nature of defendant's burden of  production is to articulate, through admissible evidence, a legitimate and nondiscriminatory reason for its actions. While the defendant does not have the burden to persuade the court that it was actually motivated by the proffered reasons, it must produce enough admissible evidence to raise a genuine issue of fact. Burdine, 254-255; Ross v. Comm. Satellite Corp. 759 F.2d 355, 365 (4th Cir. 1985).

In this case, Defendant, in its motion for summary judgment, has woefully failed to meets its burden to come forward with a non-discriminatory reason and Defendant's motion for summary judgment on Plaintiff's disparate claim must be denied on that basis.

   2.    **Plaintiff Can Show She Meets Defendant's Legitimate Expectations and that She Suffered Adverse Action.**

Furthermore, Ms. Lauture can show that she was meeting Defendant's legitimate expectation and that she suffered adverse action. Clearly, Ms. Lauture was meeting Defendant's expectation. First, the formal Defendant evaluation on file for Ms. Lauture with Defendant shows that Ms. Lauture's overall performance rating was for "completely acceptable performance." (*Exhibit 7*). In addition to this evaluation, other competence assessments for Ms. Lauture show high performance scores. (*Exhibits 6, 8, 9.*) Further, evidence on the record show that Ms. Lauture trained two other employees for the evening shift.

Furthermore, during discovery, Ms. Weiger, one of Ms. Lauture's supervisors, was deposed as a corporate designee. (*Exhibit 30, Weiger depo. p. 41, lines 1-15.*) When

19

Ms. Weiger when and why Ms. Lauture is not qualified, Ms. Weiger merely stated that

the determination was made after Ms. Lauture left and the reason was because Ms.

Lauture failed to provide documentation that she graduated from an MLT Program. (*id.,*

*at pp. 33, 34, 35, 38*).

In <u>Warch v. Ohio Casualty Ins. Co</u>., No. 04-2354, 2006 U.S. App. LEXIS 2242, it

was stated that nothing prohibits employees from countering an employer's assertion

with evidence to demonstrate or at least create a question of fact that the proffered

"expectation" is not in fact legitimate at all. *See id.* In this case, Defendant did not even

articulate any expectation that Ms. Lauture failed to meet. Furthermore, Defendant

cannot show its legitimate expectation because other co-workers who had similar clinical

errors and failure to document quality controls received a rating of meeting expectation

in their evaluation. (*Exhibit 44-49.*)

In a futile attempt to show that Ms. Lauture cannot show adverse action,

Defendant now claims that Ms. Lauture was paid for the three days when Lauture was

suspended. This is not true and patently misleading. When Ms. Lauture filed her

discrimination charge, she stated the she was suspended without pay. (*Exhibit 23*.) Ms.

Weiger, the corporate designee, was also asked if Ms. Lauture was paid for the period of

suspension, Ms. Weiger stated, "I don't think so." (*id., p. 131, lines 12-17*).

Defendant now claims that Ms. Lauture was paid for the three days suspension.

However, the very same document that Defendant tries to rely upon to show that Ms.

Lauture was paid for the suspension contradicts Defendant's assertion and shows its

duplicity. The payroll record, clearly show that Ms. Lauture was not paid for the three

20

days period. Defendant pays its employees biweekly every other Friday with a week in arrears. For instance, Defendant's first pay day in March 2006 was March 10, 2006, a Friday, and the pay was for period ending March 4, 2006. (*Exhibit 39*.) Thus, the pay period that Ms. Harrid was referring to, while the pay was posted on February 4, 2006, the employees were paid on February 10, 2006 and it was for the period ending on February 4, 2006. Ms. Lauture's suspension was from February 8, 2006 and thus not within that pay period. The relevant pay period was the next one on Exhibit 40 which is the February 24, 2006 pay day for the period ending on February 18, 2006. The pay period for that time show that Ms. Lauture was paid only for 57 hours instead of her regular 40 hours. In sum Defendant's assertion that Ms. Lauture was paid for the suspension period is meritless and should be discountenanced by the Court.

In addition to the suspension, the other disciplinary action against Lauture, the written warnings and ordered retraining, contrary to Defendant's assertion, are adverse actions within the precedents of the Fourth Circuit. It is not in dispute for substantive discrimination claims, an adverse employment action is one that negatively affects the "terms, conditions or benefits" of employment. See, Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001). Nevertheless, it is also recognized that adverse action is not limited to ultimate employment decisions and may include formal letter of reprimand where a plaintiff can show that the letter was an intermediate step to discharge. See, Toulan v. DAP Products, Inc., No. CCB-05-2254, 2007 U.S. Dist. LEXIS (D. Md. 2007). see also, Newman v. Giant Food, Inc. 187 F. Supp.2d 524 (D. Md., 2002). In Ms. Lauture's case, the disciplinary warnings against Ms. Lauture clearly make clear that any

further infraction by Ms. Lauture may lead to termination of her employment. (*Exhibits 11, 12, and 14.*)

In sum, Defendant failed to cite any competent legal authority within the Fourth Circuit to show that the adverse retraining ordered against Ms. Lauture was adverse action when it was clearly stated on the retraining report that her work performance will be monitored to determine improvement. Any future errors or demonstration of lack of basic clinical knowledge to perform her duties will be documented and finally that:

> "failure to meet standards listed above will result in additional disciplinary action up to and including termination."

(*Exhibit 12.*)

### 3.     **Ms. Lauture Has Sufficient Evidence to Show Pretext**

If the employer successfully proffers a legitimate nondiscriminatory reason for its adverse action against the employee, the burden returns to the employee to show that the proffered reason is a pretext for impermissible discrimination. See, <u>Cook v. CSX Transp. Corp.</u>, supra. See also, <u>St. Mary's Honor Center</u>, 509 U.S., at 507-508.

Assuming, for the sake of arguments only, that Defendant is deemed to have offered a legitimate nondiscriminatory reason, Ms. Lauture submits that she can show pretext because there is abundant evidence that the proffered reasons are merely a cover for unlawful discrimination.

### 1.     <u>The Allegations Against Lauture Remain Unsubstantiated.</u>

The pretext in Defendant's action is shown by lack of support in the record for the allegations against Ms. Lauture. Each will be addressed in turn.

(a) January 5, 2006 Verbal Warning. (*Exhibit 11*.) Lauture was accused of not getting along with Ms. Rutter. Ms. Lauture was specific in her complaint against Ms. Rutter that Ms. Rutter failed to assist her and was not doing her job. (*Exhibit 2, Lauture Depo. p. 76, lines 13-21)*. Defendant could not state the substance of the code of conduct allegedly violated by Lauture to warrant the warning. (*Exhibit 30, Weiger Depo., p. 107, lines 10-15.*)

(b)     February 2, 2006 Ordered Retraining: (*Exhibit 12*). This documentation blames Lauture for TB and PCP processing. The dates the incidents are alleged to have occurred were in January 2006, not more than a month after Lauture transferred to the day shift. It is not disputed that these test were dayshift tests and were not done in the evening when Ms. Lauture was working the evening shift. (*Exhibit 25*, BCRC; see also *Exhibit 13*.) When Ms. Lauture transferred to the day shift, she had not been trained for these tests by that time. (*Exhibit 16*.) In addition, some of the events for which Lauture was disciplined included occasions when Lauture went to Ms. Kinch for clarification and guidance and no patient care were involved. (*Exhibit 12,* incidents of January 2, 2006 and January 12, 2006.)

(c)     February 8, 2006 suspension: (*Exhibit 14)*: The pretext in Defendant's actions is made apparent by Ms. Lauture's suspension for allegedly causing a meningitis scare. While Defendant eventually discovered its error in accusing Ms. Lauture, (*Exhibit 15*), Defendant did not retract the suspension and Defendant still maintained its discipline against Lauture. (id.)

2.      Similarly Situated Employees Not in Lauture's Protected Class were not
         Disciplined.

Furthermore, as shown above, the pretext in Defendant's action is shown by the

fact that other Defendant's employees not in Lauture have protected class of

discrimination were not disciplined as Lauture.

While it is not arguable that the Fourth Circuit will not question a business

decision of an employer, it is also clear that the proffered employer reason must be bona

fide and not fabricated. As shown above, Defendant cannot show it honestly believes in

the reason it gives for its actions when the basis for its reasons are so patently false,

fabricated and unsubstantiated and when other employees guilty of the alleged

misconduct were not disciplined.

Consequently, Ms. Lauture submits that she has sufficient evidence to show

Defendant's pretext and thus create a jury issue. As stated in St. Mary's Honor Center v.

Hicks, 509 U.S. 502, the fact finders disbelief of the reasons put forward by the defendant

(particularly if disbelief is accompanied by a suspicion of mendacity) may, together with

the elements of plaintiff's prima facie case, suffice to show intentional discrimination.

The rejection of the defendant's preferred reasons will permit the trial of fact to infer the

ultimate fact of intentional discrimination and upon such rejection, no additional proof of

discrimination is required. St. Mary's Honor Center, at 511.

Further, the U.S. Supreme Court, in Reeves v. Sanderson Plumbing Products,

Inc., 530, U.S. 133, granted certiorari to resolve a conflict among the Courts of Appeals

as to whether a plaintiff's prima facie case of discrimination combined with sufficient

24

evidence for a reasonable fact finder to reject the employer's nondiscriminatory explanation, is adequate to sustain a finding of a liability for intentional discrimination. It held that it does, noting however, that it does not always do so as there may be instances where no rational fact finder could conclude that discrimination occurred.

The Fourth Circuit decision in <u>Rowe v. The Marley Co.,</u> 233 F.3d 825 (2000), is in accord with <u>Reeves.</u> While the <u>Rowe</u> court also observed that even though a plaintiff establishes a prima facie case and pretext, it does not automatically create a jury question. That court however recognizes that it may do so and only state that such a plaintiff's case should not be submitted to the jury if there is "evidence that precludes a finding of discrimination." <u>Rowe</u>, at 830.

In this case, however, no other evidence precludes a finding of discrimination against Defendant. Instead, in addition to the jury issue created by a combination of Lauture's prima facie case and rebuttal of Defendant's reason for its actions, there is no evidence in the record whatsoever which preclude a finding of discrimination against Defendant. On the contrary, evidence of unlawful discrimination abounds against Defendant and they are as follows:

(1)     <u>Delay in Ms. Lauture's Enforced Retraining:</u>

Though Defendant disciplined Ms. Lauture for performance issues on February 2, 2006, and Ms. Lauture was to be retrained, Ms. Lauture's retraining was scheduled to begin on in 2 weeks, February 16, 2006, to await Ms. Parikh, who is of Indian origin. (Exhibit 40). Defendant failed to give any reasonable reason to wait for two week to start the training except for saying that Ms. Parikh was chosen for the training because Ms.

Parikh was not around during the alleged issues between Ms. Lauture and Ms. Rutter.

The connection between the two beats the imagination.

      (2)      <u>Caucasian Employees Refused to train Black employees</u>

As another evidence of discriminatory attitude in the microbiology lab and

casting doubt on Defendant's explanation for waiting for two weeks for Ms. Parikh to

come back from India to train Ms. Lauture, is that there is some evidence on the record

that other Caucasian medical technologist have refused to train other black people in the

lab and Ms. Kinch and Weiger did nothing about it. (*Exhibit 25; see also, Exhibit 33*.)

      (3)      <u>Other Evidence Suggests Discriminatory Bias Defendant</u>

In the deposition of Mr. Roberts, (Exhibit 33) Mr. Roberts described an incident

with Ms. Kinch and Ms. Weiger which suggests discriminatory bias by Ms. Kinch and

Ms. Weiger against Ms. Lauture. On that occasion, both Ms. Kinch and Ms. Weiger

stated to Mr. Robert with respect to Ms. Lauture, "how could she know that?" (id., p. 53.)

      (4)      <u>Defendant Does Not Have a Clearly Stated Prohibition Against Racial and National Origin Discrimination.</u>

Defendant does not have a clear policy prohibiting racial and national origin

discrimination. The totality of the evidence of Defendant's prohibition of discrimination

on the basis of race and or national origin produced by Defendant was that contained in

its employee handbook. (*Exhibit 36)*. There is no evidence of whether and/or in what

manner Defendant ensures its employees have knowledge of the provision in the

handbook. Second, while Defendant has a code of conduct prohibiting sexual harassment,

(*Exhibit 41*), there is no such clear cut policy prohibiting race and national origin

discrimination.

Not only that, Defendant clearly did not provide any evidence of anti-discriminatory training for its supervisors. According to Ms. Harrid, Defendant no longer does diversity training. (*Exhibit 32, Harrid Depo. p. 60*). During their deposition both Ms. Kinch and Ms. Weiger failed to articulate any specific training they attended on anti-discrimination. Also, Defendant was requested to produce documentation of its supervisors' training on Defendant's anti-discrimination policies. The documents produced by Defendant were not responsive and only dealt with cultural training.

Finally, Defendant, in its motion for summary judgment, stated that it is undisputed evidence that Aimee Ringgold made the decision to suspend Ms. Lauture.2 Nothing could be further from the truth and Defendant's assertion contradicted by the evidence. The only evidence cited by Defendant for this proposition that it was Ms. Ringgold who made the final decision to suspend Ms. Lauture is the testimony of Ms. Harrid. The totality of Ms. Harrid's testimony on this issue was: "To the best of my recall, it was Aimee Ringgold." However, Ms. Ringgold did not have any personal knowledge of this issue because Ms. Harrid was not even at the Human Resources at that time. In any event, the clear evidence on the record, Exhibit 14, record of the suspension itself, show it was signed by Ms. Jones from Human Resources and not Ms. Ringgold. Furthermore, the clear evidence on the record shows that Ms. Lauture's suspension was instigated by Ms. Kinch and Ms. Weiger. In deed, Ms. Kinch confirmed at her deposition that "we had asked for suspension." (*Exhibit 31, Kinch, Depo. p. 25.*) Also, according to

Ms. Weiger, it was a group decision. (*Exhibit 30, Weiger Depo. p. 15-126*).

Based on the above, Ms. Lauture respectfully submits that because she has made out a prima facie case of disparate discipline against Defendant, established Defendant's pretexts for unlawful discrimination, and showed lack of any evidence precluding a finding of intentional discrimination, Ms. Lauture has created a genuine jury issue and Defendant is therefore not entitled to summary judgment as a matter of law.

**B.      PLAINTIFF HAS SUFFICIENT EVIDENCE TO ESTABLISH RACIAL AND NATIONAL ORIGIN BASED HOSTILE WORK ENVIRONMENT WHICH PLAINTIFF AND ANY REASONABLE PERSON WILL FIND UNREASONABLE AND ABUSIVE.**

Title VII prohibits employers to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race or national origin. An employer's work environment is a term or condition of employment and as such Title VII creates a hostile working environment cause of action. See, E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306 (4th Cir. 2008), citing E.E.O.C. v. R&R Ventures, 244 F.3d 334, 338 (4th Cir. 2001).  In Meritor Savings Bank v. Vinson, 477 U.S. 57 and reaffirmed in Harris v. Forklift Systems, Inc., 114 S. Ct. 367, 371 (1993), it is stated that Title VII is violated when the acts of employees were severe and pervasive enough to create a hostile environment that a reasonable person would find hostile or abusive and that the Plaintiff subjectively perceived the environment as abusive.

In  Harris v. Forklift Systems, Inc., supra, the Court, once again reaffirming the

---

2  Def. Memorandum, p.14.

principles stated in <u>Meritor</u>, held that while the test to be applied in such cases is not mathematically precise, whether an environment is "hostile" or "abusive" can be determined by looking at all the circumstances. Thus, Title VII is violated when the acts of employees were severe and pervasive enough to create a hostile environment that a reasonable person would find hostile or abusive and that the Plaintiff subjectively perceived the environment as abusive. In addition, while the Court recognizes that certain conducts are not sufficiently severe to be actionable under Title VII, Title VII does come into play before the harassing conduct leads to a nervous breakdown.

In this case, Defendant's argument on Lauture's hostile work environment claim are that Ms. Lauture cannot show that any unwelcome conduct she received was based on her race or national origin or that any such conduct was severe or pervasive enough to alter the conditions of her employment. Defendant, for instance, does not argue that there is no basis to basis to impose liability on Defendant.

The evidence on the record show that the hostile work environment she suffered was based on her race and national origin. The first evidence of course is on the ground that Lauture was subjected to disparate discipline compared to other similarly situated employees not within Lauture's protected class of discrimination.

Second, evidence of the neglect of Lauture's complaint of discrimination by Defendant is evidence of discriminatory animus creating adding to the hostile work environment. Evidence on the record show that Defendant completely failed to investigate Lauture's complaints against Ms. Weiger and Ms. Kinch. For instance, Defendant admitted, as it must, that Ms. Lauture made a complaint of discrimination on

February 8, 2006 to Defendant's Human Resources. While Ms. Beubendorf claimed to have investigated this complaint of Ms. Lauture, both Ms. Kinch and Ms. Weiger, the very people Ms. Lauture complained against, stated that Ms. Beubendorf. According to Ms. Weiger, she did not know Ms. Lauture complained against her to Defendant's Human Resources. (*Exhibit 30, Weiger Depo. p. 158, lines, 3-9.*) Ms. Weiger was not contacted by Human Resources until after Lauture left Defendant's employment. (*id., p. 162-163.*) Same thing with Ms. Kinch who stated that Ms. Beubendorf did not say anything about discrimination. (*Exhibit 31, Kinch Depo. p. 183, lines 1-21.*) In addition, even though now Defendant concedes that Lauture made complaints of discrimination on two occasions, Ms. Harrid, its corporate designee stated that Ms. Lauture only mad one complaint. (*Exhibit32, Harrid Depo. p. 28; see also p.23*). In any event, even if Defendant claimed to have investigated Ms. Lauture's complaint of discrimination against Ms. Kinch and Ms. Weiger, Defendant did not inform Ms. Lauture that there was no basis for the complaint.

Furthermore, while Defendant failed to investigate Ms. Lauture's complaint of discriminatory discipline including suspension, when Ms. Rutter complained to Human Resources that Ms. Lauture was not communicating with her and was creating hostile work environment for her, Defendant summoned Ms. Lauture to a meeting on March 9, 2006 in response to Ms. Rutter's complaint.

In addition to showing that the hostile work environment was based on her race and national origin, Ms. Lauture can show that the work environment is both subjectively and objectively unreasonable and abusive.

30

According to the Fourth Circuit, "the severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." E.E.O.C. v. Sunbelt Rentals, Inc., supra, citing Ocheltree v. Scollon Prods. Inc., 335 F.3d 325, 333 (4th Cir. 2003) (en banc) (citing Harris, 510, U.S. at 21-22.

Clearly, Ms. Lauture subjectively found the work environment to be hostile. (*Exhibit 2, Lauture Depo. p. 241, lines 13-18; see also id., at 242, lines 1-10).*  In any event, Defendant does not dispute that Ms. Lauture subjectively found the work environment to be hostile and the only remaining issue is whether the work environment was objectively unreasonable.

The objective inquiry, however, "is not, and by its nature cannot be, a mathematically precise test" See, E.E.O.C. v. Sunbelt Rentals, Inc., citing Harris, supra. To determine the objective severity of the work environment therefore, the court must look "at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. See, id.

The totality of the circumstances in this case clearly show objective hostile work environment. The totality of the discriminatory discipline, failure and/or refusal to investigate complaints of discrimination, demonstrated favoritism to a another employee not within her protected class and to cap it all up, apart from the "Mexican standoff" language, Ms. Kinch and Ms. Weiger's statement that the issues involved "show a fundamental lack of knowledge and the resolutions to correcting these issues cannot be

31

imparted by additional training." (*Exhibit 14*). This statement by Ms. Kinch and Ms.

Weiger is clearly humiliating within the contemplation of <u>Harris,</u> supra. Defendant's case

clearly is over and above petty slights and work place teasing and objectively unbearable.

### C.    PLAINTIFF HAS PROFFERED SUFFICIENT EVIDENCE TO ESTABLISH A CLAIM OF CONSTRUCTIVE DISCHARGE

Plaintiff also asserts a Count of constructive discharge against Defendant. The

required elements of a constructive discharge claim was stated in by the court in

<u>Amirmokri v. Baltimore Gas and Electric Co.,</u> 60 F. 3d 1126 (4th Cir. 1995) to include (1)

deliberate action of the employer and (2) intolerability of the environment by the

employee. See also, <u>Martin v. Cavalier Hotel Corp.,</u> 48 F.3d 1343 (4th Cir. 1995).

Defendant contends that Plaintiff has failed to offer any evidence that Defendant's

actions were intended to cause her resignation. Defendant misapprehends the nature of

the evidence required to show deliberateness of the employer's actions. Contrary to

Defendant's argument, Plaintiff has effectively demonstrated the deliberateness of

Defendant's action in forcing him to quit her job in this case. As the Court recognized <u>in</u>

<u>Cavalier Hotel Corp.,</u> 48 F.3d at 1353, while the Fourth Circuit requires proofs of

deliberate intent of the employer, it has never " insisted on 'smoking gun' evidence of

employer's intent. Thus, in a Title VII action, the Plaintiff may prove his case by direct or

circumstantial evidence. For instance, evidence that the employer failed to take any

remedial action in the face of harassment or disparate treatment of its employees may

create an inference that an employer was attempting to force an employee to resign. In

addition, in determining the deliberateness of an employer's conduct, intent of the

employer may be shown by evidence that an employee's resignation was reasonably foreseeable consequence of the employer's conduct.

In Amirmokri, supra, the employer argued that it did not intend for the employee to resign. That it investigated the employee's allegations, referred him to a psychologist to help the employee deal with his work related stress, and the employer further maintained that it was not required to discipline the employee's supervisor or take any further action on the basis that the employee's claims were unsubstantiated. The Court rejected the employer's argument and held that a genuine factual issue exists whether the employer's actions were sufficient to negate any reasonable inference of intent. The Court further noted that the actions allegedly taken by the employer fell far short of types of responses courts have held adequate in other constructive discharge cases.

Also, in Paroline v. Unisys Corp., 879 F.2d 100 (4th Cir. 1989), an employee was sexually harassed by a co-worker. She complained and her employer launched a formal investigation, disciplined the harasser and required him to seek counseling. Nevertheless, the Court held that a reasonable fact finder could infer that the employer intended the reprimand to be no more than a slap on the wrist and therefore a genuine issue of fact existed about whether the employer's action were calculated to end the harassment.

Compared to the foregoing cases, Defendant's assertion that Plaintiff has failed to prove Defendant's deliberateness in forcing her to resign is patently pathetic. Defendant did not, and cannot, show what action, if any, it took to investigate Lauture complaints of discrimination action not to even mention taking any measure to remedy the situation. Consequently, Plaintiff respectfully submits that Ms. Lauture has produced evidence

33

sufficient to allow a reasonable fact finder to find that Defendant did not make any response reasonably calculated response to end Lauture's intolerable working condition and that Lauture's ultimate forced resignation was a reasonably foreseeable consequence of Defendant's lack of response.

Defendant also argues that Ms. Lauture's constructive discharge claim fails because Ms. Lauture has not demonstrated any objectively intolerable conduct upon which to base the claim. Defendant, also went on to state that Plaintiff's constructive discharge claim is based on the same facts and circumstances as her hostile work environment claim. Defendant is not entirely correct. While Ms. Lauture based her constructive discharge claim on the same facts, a significant fact is the March 9, 2006 meeting which precipitated Ms. Lauture's resignation.

According to Ms. Lauture, the March 9, 2006 meeting was the last straw. Ms. Lauture cried at that meeting and did not feel safe anymore. This March 9, 2006 meeting, (inquisition may be an appropriate description) together with the evidence on the record regarding the hostile work environment, are sufficient to establish Lauture's claim of constructive discharge.

D.    **DEFENDANT HAS FAILED TO SHOW A VALID DISCLAIMER OF CONTRACTUAL LIABILITY BASED ON ITS EMPLOYEE HANDBOOK.**

Defendant does not dispute that it breached the provisions of its own employees' handbook. Defendant next argues that Ms. Lauture's claim for breach of contract fails as a matter of law because of an alleged disclaimer in the handbook. Defendant's argument failed as a matter of law.

34

In the first place, Defendant failed to meet its burden to show by admissible evidence that the employee handbook on which Plaintiff brings her claim is the one for which Plaintiff's acknowledgement was provided. As clearly shown on Exhibit 36, the provision of the handbook pursuant to which Plaintiff' brings this claim was the 2005 handbook. (Exhibit 36.) The acknowledgement relied on by Defendant was signed in 2004 by Lauture.

More important however, is that Defendant has failed to show that the disclaimer is valid to defeat Lauture's claim for two major reasons. First, the alleged disclaimer in Defendant's case is not as explicit as in the cases cited by Defendant. Thus, in Defendant's disclaimer, it merely stated that the handbook was not "intended to set fort either express or implied contractual obligations." The state disclaimer is ambiguous and not as explicit in which the disclaimer has been found to be valid where the handbook clearly states that it is not a "contract." Second, and as a corollary to the above, is that the contract is essentially a contract of adhesion and any ambiguity should be resolved against Defendant.

Finally and as a significant reason to deny Defendant's motion on this ground, id is that the cases where the disclaimer has been upheld sough to modify the well-established and "at-will" principle of employment law. Lauture's case does not seek to chip away at the at-will principle because Lauture is not basing her contract claim on the termination of her employment but rather on the terms and conditions of her employment which does not affect the at-will doctrine.

E.      **PLAINTIFF HAS STATED FACTS SUFFICIENT TO DEMONATRATE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER MARYLAND LAW.**

The tort of intentional infliction of emotional distress involves the causing of severe mental distress to another by one who engages in extremely outrageous and intentional conduct. In Doe v. Doe, 122 Md. App. 295, 712 A.2d 132 the Court, relying on Harris v. Jones, 281 Md. 560, 566, 380 A.2d 611 (1977) stated the four elements necessary to establish a cause of action for intentional infliction of emotional distress as follows; (1) the conduct must be intentional or reckless, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the conduct and emotional distress and (4) the emotional distress must be severe.

Accordingly, when determining whether conduct is extreme and outrageous, "it should not be considered in a sterile setting, detached from the surroundings in which it occurred." Harris at 568.  The personality of the person to whom the conduct is directed is a factor as is the relationship between the parties. Where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized by the courts. Ibid, at 569.

In Moniodis v. Cook, 64 Md. App. 1, 494 A.2d 212 (1985), where the employer terminated some employees for failing to take a polygraph test, upon careful scrutiny, the circumstances were found to be extreme. In Agis v. Howard Johnson Co., 371 Mass. 140, 355 N.E. 2d. 315 (1976), a jury question was created whether the conduct of an employer who made known to his employees his plans to terminate the employees alphabetically until he discovered who was stealing from him was extreme and outrageous.

36

Clearly, by having Lauture escorted out of the building by security guards when Lauture has not done anything to provoke the reaction, Defendant should have known that its conduct will cause emotional distress to Lauture. She was not a criminal and she was treated as such by Defendant. The outrageous nature of Defendant's conduct is also established by the fact that during discovery, Defendant was unable to provide any evidence that any of the previous employees of Defendant who resigned were subjected to the same treatment as Lauture by having them taken out of the workplace.

Further, Lauture's severe emotional distress is demonstrated in the record. She has had to take acupuncture treatments.

## **CONCLUSION**

For all the foregoing reasons, Plaintiff respectfully prays that Defendant's motion for summary judgment be denied in its entirety.

Respectfully submitted,

/s/

_____

Fatai A. Suleman, Esquire (# 14431)
Amity, Kum & Suleman, P.A.
7474 Greenway Center Drive, Suite 650
Greenbelt, MD 20770.
Phone: 301-982-3434.
Fax: 301-982-3411
Email: faslaw@ask-lawyers.net

Plaintiff's Attorney.

37