# EXHIBIT
# 2

1  of 2005, correct?

2     A.  Yes, evening shift.

3     Q.  Now, how many people worked on the evening

4  shift?

5     A.  Just one person, me.

6     Q.  There was very little supervision on the

7  evening shift, correct?

8     A.  I've been trained during the day shift to

9  do -- to work the evening shift.

10    Q.  But Ms. Lauture, that wasn't my question.  It

11  wasn't about your training, I wasn't trying to

12  establish anything, I was just asking you a direct

13  question.  There was very little supervision on the

14  evening shift at St. Agnes Hospital, correct?

15    A.  Correct.

16    Q.  I mean, in fact in the microbiology

17  department, you were the only one in there, correct?

18    A.  Correct.

19    Q.  So in fact, from August of 2004 until

20  December of 2005, on the evening shift in the

21  microbiology department you worked without any direct

1   supervision?

2      A.   Correct.

3      Q.   It's true, is it not, that the evening shift

4   also has a slower pace than the day shift, correct?

5      A.   It was very busy in the evening shift.

6      Q.   It's your testimony then that you believe the

7   pace on the evening shift was faster than on the day

8   shift?

9      A.   Yes.

10     Q.   Okay.   Now, there are a number of lab tests

11  that are not performed on the evening shift but are

12  performed on the day shift, correct?

13     A.   Yes.

14     Q.   So for that period that you were working on

15  the evening shift at St. Agnes from August of 2004 to

16  December of 2005, there were lab tests that you

17  yourself had not been performing during that period

18  that were being performed on the day shift?

19     A.   Correct.

20     Q.   And in fact, there were numerous procedures

21  that were performed on the day shift that weren't

1    performed on the evening shift?

2        A.   I'm trying to think.   That's not correct.

3    What we do during the evening shift we also do during

4    the day shift and more than the day shift, yes.

5        Q.   Well, we'll come back to that.   Now, while

6    you were on the evening shift from August of 2004

7    until December of 2005, you reported to Sally Ondiek?

8        A.   Ondiek, yes.

9        Q.   And what was Ms. Ondiek's title?

10       A.   She was the supervisor of microbiology at

11   that time, yes.

12       Q.   Now, Ms. Ondiek worked during the day,

13   correct?

14       A.   Correct.

15       Q.   So --

16       A.   And sometimes she would come at night to

17   check on me, yes.

18       Q.   In the papers, Exhibits 1 through 4, that we

19   went through, you allege that your work performance

20   under Ms. Ondiek was quite good, correct?

21       A.   Correct.

1    evening shift?

2        A.   No, I don't.

3        Q.   Do you recall issues on the evening shift

4    where you ignored alarms and didn't report problems

5    that were occurring in the lab?

6        A.   I was the only one working there, and I

7    have -- basically I didn't have a break.   And I don't

8    recall all these things.   My work -- the -- sometimes

9    they would come during evening shift and they said

10   that I'm working -- I believe Jo Oliver came in twice

11   and looked and I was working.   I was doing everything

12   by myself, and it was a very heavy load.

13       Q.   But my question was about clinical problems

14   and errors on the evening shift while you were

15   working the microbiology department.   And you just

16   said that you were very busy and you don't recall,

17   so --

18       A.   Nobody came to me and told me that I had

19   those problems.

20       Q.   Is it possible that you were having these

21   problems and you don't recall them at this point?

1      A.   If I had a problem, if somebody would come to

2    me and say, "Geraldine, this is the problem we're

3    having right now," yes, of course I would recall it,

4    yes.  But I don't recall that.

5      Q.   So it's your testimony then that neither

6    Ms. Ondiek nor Ms. Jo Oliver spoke with you about

7    clinical errors and other problems on the evening

8    shift in the microbiology department?

9      A.   No.

10      Q.   Okay, fair enough.  If you'll turn to Exhibit

11    2, paragraph one where you talk about your work on

12    the evening shift at St. Agnes Hospital where you say

13    that your good performance resulted in management

14    giving you the responsibility of training two new

15    medical technologists; is that correct?

16      A.   Correct.

17      Q.   And those two technologists were Ben Roberts

18    and Oye Oyebode?

19      A.   Yes, correct.

20      Q.   And it's your testimony that you trained

21    those two?

1    Q.   Okay.   Well, let me just ask the follow up

2    question.   Isn't it true that the only reason that

3    Mr. Roberts and Mr. Oyebode were placed on the

4    evening shift with you was for them to get a bit of

5    practical experience, because nights were much slower

6    than days?

7         MR. SULEMAN:   For the record, I think I'm

8         going to object to that.   You're calling for

9         Ms. Lauture to speculate as to the reason.

10   BY MR. NICCOLINI:

11   Q.   That's a fair objection, I'll withdraw the

12   question.   Now Ms. Lauture, in December of 2005, you

13   were transferred to the day shift in the microbiology

14   department at St. Agnes Hospital, correct?

15   A.   Correct.

16   Q.   And that was a transfer that you had

17   requested, correct?

18   A.   Correct.

19   Q.   Why did you request the transfer?

20   A.   Because I have two children and they go to

21   school during the day, and I wanted to be home with

1    Q.  Ms. Kinch and Ms. Weiger were responsible for

2    making the decision to transfer you to day shift,

3    correct?

4    A.  Correct.

5    Q.  So it was only because of Ms. Kinch and

6    Ms. Weiger that you received the transfer that you

7    yourself wanted, correct?

8    A.  I believe it started with Ms. Ondiek, the

9    transfer to the day shift.  Because when I was --

10   when I've been in training for the day shift, that's

11   the time that she left, she resigned, Ms. Ondiek

12   resigned.  So that started really with Ms. Ondiek.

13   Q.  Ms. Ondiek resigned before December of 2005,

14   correct?

15   A.  No, it was after I believe.

16   Q.  Do you recall when Ms. Ondiek resigned?

17   A.  I don't recall.

18   Q.  Do you recall who Ms. Ondiek's replacement

19   was?

20   A.  Yes.

21   Q.  Who?

1   Ms. Weiger told you they were transferring you to day

2   shift because you had been doing a good job?

3       A.   Correct.

4       Q.   When did they tell you that?

5       A.   Right before I transferred to the day shift.

6       Q.   Isn't it true Ms. Kinch and Ms. Weiger told

7   you that there had been some issues on the evening

8   shift?

9       A.   No.

10      Q.   Isn't it true that Ms. Kinch and Ms. Weiger

11  thought that you might do better under a bit more

12  direct supervision?

13      A.   No.   The only thing I know they would tell me

14  on the evening shift is, "You're doing a great job,

15  everything is fine.   You're going to be really good

16  at evening shift."

17      Q.   Going to be really good at evening shift?

18      A.   On the day shift when I transfer to the day

19  shift, so you're doing a great job.

20      Q.   Now Ms. Lauture, obviously there's going to

21  be a written record created, so it's necessary for me

1  to create a record of things that can't be seen for

2  someone reading the transcript.  You are black,

3  correct?

4      A.  Correct.

5      Q.  You are also Haitian?

6      A.  Correct.

7      Q.  You were born in Haiti?

8      A.  Correct.

9      Q.  And you immigrated to the United States?

10     A.  Correct.

11     Q.  When did you immigrate to the United States?

12     A.  In 1998 -- no, actually, sorry, 1989, I

13  reversed that.

14     Q.  And did you become a naturalized citizen?

15     A.  Correct.

16     Q.  When did you become a citizen?

17     A.  I think it was in 2003.

18     Q.  Now, Ms. Kinch is white, correct?

19     A.  Correct.

20     Q.  And she is -- she was born in America?

21     A.  I don't know.

1    Q.   They have some clerical responsibilities,

2  correct?

3    A.   Yes.

4    Q.   Actually, medical technologists have data

5  entry responsibilities, correct?

6    A.   Correct.

7    Q.   Medical technologists have clinical

8  responsibilities in completing paperwork, correct?

9    A.   Yes, correct.

10   Q.   So a medical technologist is a secretary?

11   A.   Part of the work that we do, yes.

12   Q.   So you consider yourself a secretary?

13   A.   Secretary also.  Also, yes.

14   Q.   You don't find being called a secretary after

15  all the training you went through to be slightly

16  insulting?

17   A.   No, secretary's a very decent job.

18   Q.   You had some difficulties with Ms. Rutter in

19  terms of interpersonal relationships, correct?

20   A.   I wouldn't say personal relationship, a work

21  related relationship, yes.

1    not become so defensive or critical about daily work

2    activities, correct?

3        A.   Yes, correct.

4        Q.   It was also indicated that you should make an

5    appointment with EAP which is the employee assistance

6    program for counseling, correct?

7        A.   Yes.

8        Q.   And finally it was indicated that failure to

9    meet these requirements could result in further

10   disciplinary action up to and including termination,

11   correct?

12       A.   Correct.

13       Q.   What, if anything, do you dispute about

14   Exhibit 5?

15       A.   Basically when I was working with Stephanie

16   and she would not perform her work, and I would go to

17   Peg and Jane to complain about her work duty, okay,

18   this is what she's doing, does she have a right to do

19   this, and this is -- and what was going on between

20   Stephanie and I.  And they ignored me completely.

21   And Stephanie will go and discuss the same thing, and

1  that, correct?

2      A.   Correct.

3      Q.   In fact, she had been working on the day

4  shift substantially longer than that, correct?

5      A.   I have no idea.

6      Q.   That's fine.  And you have no idea if

7  Ms. Rutter had had any difficulties with any other

8  medical technologists prior to you, do you?

9      A.   Yes, I do.

10     Q.   And who was that?

11     A.   Several coworkers were complaining about

12 Stephanie.  One of them I spoke to -- what's her name

13 again, Jackie.

14     Q.   Jackie who?

15     A.   Jackie -- I don't know her last name.  We

16 usually go by first name over there.  And that

17 Therese and several others --

18     Q.   Would it be Jackie Amato?

19     A.   No.  It started with a W, the last name.

20     Q.   Would it be Jackie Wilson?

21     A.   Yes, Jackie Wilson.

1   that Ms. Oliver counseled both you and Ms. Rutter

2   about the issues and your communication skills,

3   correct?  I mean, she counseled both of you, correct?

4        A.  Yeah, both of us, but that the end result was

5   not -- it was mostly on my side telling me that I was

6   gossiping with -- about Stephanie which was not true.

7   And she mostly was taking Stephanie's side that you

8   have to do this, you have to do that, certain

9   things -- like I said, I cannot remember everything

10  that she was saying, but a lot of things that she was

11  saying from what I recall was -- we were talking and

12  all of a sudden Stephanie would tell her things, and

13  she will -- from what she was telling her, okay, how

14  come she was doing this.  She was mostly taking

15  Stephanie's side.

16       Q.  So it's your opinion that Ms. Oliver was

17  taking Stephanie's side?

18       A.  It was definitely what she was doing, because

19  I believe it was on paper when she said that I

20  gossiped, that I was gossiping with the other

21  employees about Stephanie -- which Stephanie wasn't

 1    doing her job and it was all over.

 2         Q.   Let's talk for a minute about your feeling

 3    that Ms. Oliver said you were gossiping, okay?

 4         A.   Uh-huh.

 5         Q.   Gossiping means talking about someone behind

 6    their back, correct?

 7         A.   Correct.

 8         Q.   I mean, you'd agree with that definition?

 9         A.   Yes.

10         Q.   Isn't it true that in December, January and

11    February of 2005 and then 2006 you spoke with

12    numerous other employees about Ms. Rutter and the

13    issues you had with her performance; isn't that true?

14         A.   No.

15         Q.   Did you ever speak with Ms. Debbie Sanchez

16    about Ms. Rutter's performance?

17         A.   Was Debbie -- Debbie --

18         Q.   Did you ever complain to Ms. Sanchez about

19    Ms. Rutter's performance saying she didn't know what

20    she was doing?

21         A.   No, it was obvious everybody was complaining

1    about it.

2         Q.   Okay.   It was your belief that everybody in

3    the microbiology department was complaining about

4    Ms. Rutter's performance?

5         A.   Yes, exactly.

6         Q.   Tell me exactly who was complaining about

7    Ms. Rutter's performance, give me names.

8         A.   Debbie Sanchez, Oye Oyebode, Benjamin Roberts

9    and Jackie Wilson, Therese.   Everybody was

10   complaining about her performance, yes.

11        Q.   And you were talking with all these people

12   about her performance and the problems she was

13   having, right?

14        A.   I heard them.   At one point they would not

15   talk to me, I was like stayed away from.   Yes -- no,

16   at one point I would not -- yeah, they don't talk to

17   me.   I mean, I was very repositioned in the lab.   She

18   would go and talk --

19        Q.   But wait a second, Ms. Lauture, a minute ago

20   you just said everybody was complaining and talking

21   about it, but then you were saying that no one would

1    A.   Yes.

2    Q.   Now, I understand you disagree with some of

3  this, but I'm just trying to establish that's what's

4  in the counseling report that was given to you,

5  correct?

6    A.   Uh-huh, correct.

7    Q.   It also indicates that you will go through a

8  period of two week retraining from February 16th,

9  2006 to March 3rd, 2006, correct?

10    A.   Correct.

11    Q.   If you'll take a minute, there are two pages

12  of specific clinical errors that Ms. Weiger and

13  Ms. Kinch cite, and you indicate that you don't agree

14  with everything in those comments.  So can you tell

15  me what you disagree with or dispute?

16    A.   I disagree with the first one.  Yes, it was

17  in January -- usually in the lab when you're not sure

18  about something, you ask the supervisor or you ask a

19  coworker.  If I found something -- like they said I

20  found that there were not enough WBCs in there.  If

21  you enter the answer in the computer, there's a CBC.

1   If the CBC -- as a lab tech, you should know this

2   stuff.  Like when the CBC shows a lot of WBCs and I'm

3   doing a CSF, that should show the same amount of CBCs

4   in the CSF and it's not there -- or some CBCs with a

5   CSF and it's not there, then I have the right to go

6   to another coworker.  At that time, yes, I went to

7   Peg and said, "Okay, this is what I realize, that

8   there is no CBC there to check it."  And I am the

9   only one that has been treated that way by not

10  putting the result.  Instead of putting a wrong --

11  entering a wrong result in the computer that would

12  enter into the patient, I decided to go to my

13  supervisor.  And she has the right to tell me this is

14  what we were supposed to do like she does for the

15  other white people over there.

16      Q.   Now Ms. Lauture, let's be real specific about

17  this, because what I hear you saying is that you saw

18  that there was something wrong and you have the right

19  to go to your supervisor to figure it out?

20      A.   Correct.

21      Q.   But what Ms. Kinch and Ms. Weiger in this

1   with this.  Because AFBs -- which is TB tests, I

2   didn't do it when I was working evening shift.  I

3   never done that when I was working evening shift

4   there.  And this was January 12 actually, and I've

5   been in training.  I have been -- this is a training

6   part for me in the lab.

7        Q.  Okay.  Is it --

8        A.  Yes, I had the right to ask questions.  Yes,

9   I have the right to, yes.

10       Q.  Ms. Lauture, let's take a minute to figure

11  out what we're talking about here, okay.  These

12  laboratory tests are giving doctors information about

13  patients, correct?

14       A.  Uh-huh.

15       Q.  That information relates directly to their

16  ability to provide good and sound patient care,

17  correct?

18       A.  Correct.

19       Q.  So any time there is an error in the lab,

20  that can negatively and potentially devastatingly

21  impact patient care, correct?

1     A.   Correct.

2     Q.   So we're not just talking about your feelings

3   here, we're talking about potentially the lives of

4   patients.  Do you understand that?

5     A.   Yes.

6     Q.   Okay.  Now understanding how serious this is,

7   what I'm asking you about is whether or not you made

8   clinical errors and whether or not you understood

9   procedures, okay.  So let's turn back to number two.

10  Are you saying that on January 12th, 2006, that was

11  the first time that you had done this procedure?

12    A.   I do not recall the first time that I've done

13  this procedure.  And I was still learning the day

14  shift.  And when they tell me to do something, I know

15  I'm supposed to use -- I don't know where she got

16  that from.  You're supposed to use a negative and

17  positive control.

18    Q.   Right, but didn't you just say a minute ago

19  that this sort of test wasn't being done on the

20  evening shift?

21    A.   No.

1    Q.   So you weren't familiar with this, correct?

2    A.   Correct.

3    Q.   So you needed more training on this issue,

4    correct?

5    A.   I don't know what time exactly.  I don't know

6    if I started doing it on January the 10th or

7    January the 2nd.

8    Q.   Right, but Ms. Lauture, this is a procedure

9    you didn't have a lot of experience with, correct?

10   A.   Correct.

11   Q.   You needed more training on this procedure,

12   correct?

13   A.   I was in training.

14   Q.   And in fact, after this, you were put in a

15   two week training period, correct?

16   A.   Yes, I believe so.

17   Q.   But looking specifically at number two,

18   understanding that you may not have had a lot of

19   experience with this, understanding that you may not

20   have understood it, the fact of the matter is that

21   what you were doing was another clinical error,

1   wasn't it?

2       A.   No.

3       Q.   I'm not trying to place blame, I'm just

4   trying to point out that you weren't doing the

5   correct procedure, were you?

6       A.   That was not me.

7       Q.   That was not --

8       A.   No, I don't know why she came in with this --

9   or whoever wrote it, why they came in with this.

10  That's not me.  When she showed me the test and this

11  is exactly how I do it -- and that's not the first

12  test, you have to do positive and a negative control.

13  And this is basically what we do in the lab.

14      Q.   But Ms. Lauture, you just said that's not me.

15  So who was it?

16      A.   I don't know.  I don't know.  I have no idea,

17  but that's not -- I didn't make that error.  I didn't

18  make that error.

19      Q.   So even the next day when you came back to

20  Ms. Kinch to talk about this, you're saying that

21  wasn't you either?  I mean, you see where she says,

1   "The next day when staining again, she came to me and

2   was confused again"?

3        A.   I did not talk to Ms. Kinch about this

4   mistake.  I don't know where she get it from.

5        Q.   So she's just making this up out of thin air?

6        A.   Exactly.

7        Q.   Okay.  Let's go to number three.  Do you

8   dispute that on January 23rd, 2006 you did a plating

9   stool culture with an incorrect media?

10       A.   I don't recall this mistake either.  No, we

11  have lists -- I don't know where she get -- this is

12  incorrect, because we have a list in front of us.

13  This is -- when you have a CSF, this is the media

14  you're supposed to use.  When you have urine -- it's

15  right there in front of me, how would I make a

16  mistake.  No, I don't know where she get it from.

17       Q.   Ms. Lauture, I don't know how you made the

18  mistake, but the fact of the matter is the lab had to

19  go out -- I mean, Ms. Kinch and Ms. Weiger had to go

20  out and find the specimen the next day and replate

21  it, because the specimen that you did had -- you

1  plated it with the incorrect media.  Are you just

2  denying that that even happened?

3      A.  Exactly.  I don't know where they have this

4  from, I don't know.

5      Q.  All right, that's fine.  Let's go on to

6  number four.  January 23rd, 2006, in setting up TB

7  specimens, the sterile body fluids were not processed

8  properly, not digested, had to reprocess the

9  specimens.  Do you dispute that?

10     A.  Same thing, I don't know where that comes

11 from.  Can you -- they have these things right

12 after -- this is unbelievable.  They have these

13 things right after another accusing me of doing

14 things that I'm not doing.

15     Q.  So once again, you're denying that on

16 January 23rd, 2006 you didn't process the sterile

17 fluids properly on that test?

18     A.  I do not recall doing this.  I do not recall

19 that.

20     Q.  And once again, Ms. Kinch and Ms. Weiger had

21 to get this reprocessed?

1    A.   I don't know where that specimen is.   And

2  this is what I'm telling you, nobody -- I only see

3  this on paper.   Nobody came up to me and said

4  Geraldine -- at one point, they weren't talking to me

5  at all.

6    Q.   But Ms. Lauture, we're talking specifically

7  now about January and up to February 2nd of 2006.

8  So let's focus on that time period, okay?

9    A.   Okay.

10    Q.   And in fact, on February 2nd, 2006,

11  Ms. Weiger and Ms. Kinch specifically sat down with

12  you to counsel you about these issues, correct?

13    A.   In January -- when was that again?

14    Q.   On February 2nd, 2006, they sat down with

15  you to counsel you about these issues, correct?

16    A.   They gave me this paper and I read it over

17  and signed it.

18    Q.   Right.   So they were expressing to you all

19  the problems that they had had over the last month

20  with your clinical errors, correct?

21    A.   Not expressing -- when you say expressing,

1    Q.   I understand you maintain that they said --

2    A.   It's like my mind's so -- I cannot even be

3  retrained for that job.

4    Q.   Ms. Lauture, I understand that's how you feel

5  about this, but the fact is that Ms. Weiger and

6  Ms. Kinch did put you in for two weeks of retraining,

7  didn't they?

8    A.   They put me in for two weeks of retraining.

9  They did not investigate anything and they just put

10  me for two weeks of training.  Can you explain that

11  to me?  I don't understand how accusing me of doing

12  such important things in my job and now telling me I

13  cannot be retrained and then still you have me

14  retrained for another -- wait for somebody which is

15  not a white person, wait for that person who works in

16  that bench for eight months prior from what she told

17  me and could not even remember anything and she was

18  asking me what to do.  And I have to wait for another

19  non Caucasian person to train me.

20    Q.   But Ms. Lauture, my question was very simple.

21  February 2nd, 2006, Ms. Weiger and Ms. Kinch told

1   you that they were specifically going to put you in

2   for two weeks of retraining, correct?

3        A.   After telling me I could not be retrained,

4   yes, they did put me for two weeks of retraining.

5        Q.   And you weren't terminated, you weren't let

6   go, were you?

7        A.   No.

8        Q.   Okay, thank you.   Turning back to Exhibit 6,

9   the last page, items six, seven and eight, do you

10  dispute any of those?

11       A.   Yes, I remember number six where I was in the

12  TB room doing the AFB slides.

13       Q.   What is AFB?

14       A.   That's TB, that's another name.

15       Q.   Tuberculosis?

16       A.   Yes.   And we have a heater under the hood,

17  and there are the slides that we put there.   So it

18  was flooded, there was no more room.   I took the

19  previous one that was in the heater -- and we have a

20  carrier also, a book that we put the specimen in and

21  you close it in order for me to put it in there.   And

1   I've seen other employees do that too, and this is

2   what I did.  And I put it in the -- the previous one

3   that was already dry so there should not be any

4   contamination.

5       Q.  Okay.  What about --

6       A.  I transferred it there.

7       Q.  What about number seven, do you recall

8   leaving those autopsy specimens under the hood?

9       A.  I don't recall this, no.

10      Q.  Number eight, about the documentation for

11  eyewash check, you indicated that Stephanie should

12  have put up the chart.  Do you recall this?

13      A.  Yes, I did.  Okay, it was -- I did mention

14  it, I went there and mentioned it to Jane and Peg

15  telling them we don't have a chart for the eyewash,

16  and they ignored me.

17      Q.  And when did you tell them and they ignored

18  you?

19      A.  When did I tell them?

20      Q.  Uh-huh.

21      A.  Right before this incident happened.  They

1  told me -- then I went there the next day, the next

2  day, and asked them again we have no chart for the

3  eyewash.  They say Stephanie will do it, will do the

4  chart, because I did not know how to do it.  This is

5  one of -- like I tell you, Stephanie does the

6  paperwork mostly.  And she would hang them up

7  everywhere in the lab.  And Carol -- I don't know her

8  last name, was present there too.  And she said --

9  and I spoke to her in front of Stephanie and I said,

10  "I need this chart to the" -- we call it the eyewash.

11  And in front of Carol she said she would do them.

12  It's not been done and it was ignored.  Like I said,

13  the supervisors ignored me, my complaint.

14          MR. NICCOLINI:  All right, let's go off the

15      record.

16      (Lunch recess was taken at 12:37 p.m.)

17          (Deposition Exhibit 7 marked.)

18          (Deposition resumed at 1:31 p.m.)

19  BY MR. NICCOLINI:

20      Q.  Ms. Lauture, I'm going to hand you what's

21  been marked as Deposition Exhibit 7.  And let's go

1      Q.  Turning to Exhibit 8 which is the amendment

2   where Ms. Kinch and Ms. Weiger admit that there had

3   not been a meningitis exposure and that they

4   specifically apologized for implying that you were

5   involved in a safety issue.  They also indicated

6   that, "Nevertheless, there were still failures to

7   perform proper corrective action for the maintenance

8   of the 56 degree Celsius water bath"?

9      A.  That's incorrect.

10      Q.  So all of those instances that they've

11   documented in Exhibit 7, each one is false; is that

12   what you're saying?

13      A.  False.

14      Q.  Okay, that's fine.  Let's turn back to

15   Exhibit 7.  If you'll turn to page three.

16      A.  You say all these indicated in Exhibit 8 are

17   false?  Just repeat it for me again.

18      Q.  Sure.  All the instances referred to in

19   Exhibit 8 in Exhibit 7 -- I mean, in Exhibit 8

20   they're talking about your failure to perform proper

21   corrective action for the maintenance of the 56

1    Jane.

2       Q.   I'm not asking about paper you received, I'm

3    saying do you have any evidence to dispute that fact?

4       A.   I don't recall that I do.

5       Q.   Turning to the next page of Exhibit 7, there

6    are three instances described all on February 7th,

7    2006 of different techs in the microbiology

8    department coming to either Ms. Kinch or Ms. Weiger

9    and complaining about errors in your work.  Do you

10   have any evidence to dispute that on February 7th,

11   2006, in fact three different technicians in the

12   microbiology department, three of your coworkers,

13   complained to your supervisors about errors in your

14   work?

15      A.   My coworkers complained about my supervisors

16   about --

17      Q.   Coworkers coming to your supervisors --

18      A.   I don't recall this, sir.

19      Q.   Okay.  So you don't know one way or the

20   other, right?

21      A.   Because they don't come to me and say

1    anything.  Whatever you see here, this is what I

2    received from the supervisors.  No one talked to me

3    at a certain point in the lab.

4        Q.  So you don't have any evidence to dispute

5    that that occurred, do you?

6        A.  I don't recall this.  I don't recall that.

7        Q.  Okay, that's fine.  Now once again, even

8    after this write up on February 7th, 2006, your

9    employment was not terminated, was it?

10       A.  No.

11       Q.  In fact, Ms. Kinch and Ms. Weiger instead

12   prepared an action plan for you, correct?

13       A.  Yes.

14       Q.  Let's mark this as Exhibit 9.

15           (Deposition Exhibit 9 marked.)

16       Q.  I'm going to hand you what's been marked as

17   Exhibit 9.  Is this the action plan that you were

18   presented in February of 2006?

19       A.  Correct.

20       Q.  Is that a yes?

21       A.  Yes.

1    A.   It's been a long time.  The only -- I recall

2  I was called downstairs to HR for a meeting.  At

3  first they were asking me questions and everything is

4  going -- I said, "Okay, I'm working, I'm

5  concentrating, I'm doing my work.  And Stephanie is

6  doing her work, and basically this is what was going

7  on."  And they were asking me questions and I would

8  answer them.  I don't remember the questions.  And

9  then they would call Stephanie to come in, and she

10  was saying that I do not communicate with her, I

11  ignore her, I threatened her -- yes, I threatened

12  her.  I don't know how, because if I don't -- if I

13  don't communicate with you, how can I threaten you.

14    Q.   Well, isn't it true that you can be hostile

15  with someone without even talking with them?

16    A.   I'm saying I don't recall what she said that

17  I said to her that was a threat.  And at one point as

18  she was talking -- I don't know exactly the whole

19  thing, I don't keep notes, I don't know exactly, but

20  what really -- I really remember was Ms. Colleen I

21  think --

1    Q.   That would be Colleen Meegan?

2    A.   Yeah, when I was talking, I said, "No, I

3    didn't do all this."  She said, "Be quiet because

4    whatever you say is going to be against you,"

5    something like this.  "You better be quiet, let her

6    talk, because whatever you say will be" -- something

7    will be against you.  It was very rude.

8    Q.   Let me ask you a question.  After Ms. Rutter

9    accused you of refusing to communicate, it's true, is

10   it not, that you called her a liar?

11   A.   I did not say the word liar.

12   Q.   Let me just be real specific, because we're

13   talking about a meeting that a number of different

14   people were at, okay?

15   A.   Yes.

16   Q.   So I want to make sure we're very clear on

17   the record.  At any time on this March 9th, 2006

18   meeting at which you, Ms. Rutter, Ms. Ringold,

19   Ms. Meegan, Ms. Kinch and Ms. Weiger were present, at

20   any time during that meeting did you call Ms. Rutter

21   a liar?

1   A.   I did not call liar.  And I may say -- I can

2   say that she lied about this, that's not true --

3   that's something -- you're a liar, that's not my

4   word.  I said no, what she said isn't true and I

5   explained what I did.  If you want to call it that

6   way liar, but I do not use the word like liar to her

7   face.

8   Q.   Did you use the word lie repeatedly as in

9   this is a lie, this is a lie, this is a lie?

10   A.   Basically what I said was -- no, that's not

11   true what she said, this is what I did.  No, that's

12   not what she said -- no, this is basically -- like I

13   said, the word lie, I don't really use it much.  I

14   don't go in somebody's face and go you're a liar, no.

15   This is what she said, no, that's not true.  I didn't

16   threaten her, I didn't do this, I didn't do that.

17   Q.   So let me make it clear for the record that

18   at no time during this meeting it's your testimony

19   under oath did you ever call Ms. Rutter a liar?

20   A.   No.

21   Q.   At no time during this meeting did you ever

```
 1    was a lie -- I mean wasn't true.  And when I --

 2    because they would not want me to talk, they tell me

 3    to be quiet.

 4        Q.  At this March 9th meeting, isn't it true

 5    that you told Ms. Rutter she was nothing more than a

 6    secretary?

 7        A.  No.

 8        Q.  Okay.

 9        A.  I never said that to her, never.

10        Q.  Isn't it true that toward the end of this

11    meeting, you began to raise your voice above a normal

12    talking voice, you began to raise your voice?

13        A.  I started crying.  To tell you the truth,

14    yes, I was crying that day.

15        Q.  Okay.  Were you raising your voice?

16        A.  No, I wasn't raising my voice, I was really

17    upset about it and I cried.

18        Q.  Now, you said before that you recall

19    Ms. Meegan saying something like, "Be quiet, what you

20    say can be used against you"?

21        A.  Against me, yes.
```

1    Q.   Is it possible that what Ms. Meegan said was,

2    "You should be quiet because you could be facing

3    sanctions for what you're saying"?

4    A.   No, it wasn't that way.

5    Q.   Okay, that's fine.  Now, you resigned your

6    employment at St. Agnes the next day, correct?

7    A.   Correct.

8    Q.   That would be March 10th, 2006?

9    A.   Correct.

10   Q.   You were not terminated?

11   A.   No.

12   Q.   Okay.

13   A.   I feel like it wasn't a safe place for me to

14   work.  Everything I say was ignored.  There was no

15   investigation.  Everything was -- yes, I've been

16   discriminated against.  I cannot work in that

17   condition anymore.

18   Q.   Ms. Lauture, let's talk about those

19   allegations in a little bit more detail, okay.  Let's

20   turn back now to Exhibits 1, 2, 3 and 4 which is your

21   complaint, the supplement, charge and the answers to

1   Q.   Now let's talk about your claim of

2   discrimination.  When I talk about your claim of

3   discrimination, I'm talking about race, national

4   origin and also color.  Who at St. Agnes Hospital

5   discriminated against you?

6   A.   Peg Kinch -- Ms. Weiger and Ms. Kinch, Ms. Jo

7   Oliver and the people in HR.

8   Q.   What people in HR?

9   A.   The supervision, because I wrote them a

10  letter and they didn't reply to me about that too.

11  Q.   But who in HR?

12  A.   HR -- the HR --

13  Q.   Amy Ringold?

14  A.   Yeah, yeah.  The Sisters, because I sent them

15  a letter.  As a person, I went to there and gave a

16  letter to the Sisters of St. Agnes, the lab -- the HR

17  director.  And there were no answer -- I had no

18  answer from them.

19  Q.   Well now, you do -- I mean, we talked before

20  about what you were aware of in terms of any

21  investigation by Ms. Ringold and Ms. Beubendorf,

1    correct?

2         A.   Yes, you say that, but I don't consider it to

3    be an investigation.   There was no investigation made

4    really.

5         Q.   Well, you weren't aware -- made aware of an

6    investigation, correct?

7         A.   That's what they said they were going to do.

8         Q.   But you don't know what the result of their

9    investigation was or what they did, correct?

10        A.   Correct.

11        Q.   Okay.   Now, you're claiming that HR including

12   Amy Ringold and Sherry Beubendorf discriminated

13   against you, correct?

14        A.   Yes, correct.

15        Q.   Now, Ms. Ringold and Ms. Beubendorf are

16   black, correct?

17        A.   Uh-huh, correct.

18        Q.   So do you still maintain that they

19   discriminated against you on the basis of your race

20   and color?

21        A.   Can be, because they didn't answer.   Like I

1   get a list of what you claim constituted hostile work

2   environment.  You just -- you gave a rather long

3   answer there, but what I heard was ultimately the

4   fact that St. Agnes ignored your complaint

5   contributed to your hostile work environment?

6       A.   Yes.

7       Q.   So that's one thing.  What else?

8       A.   They told me I was --

9       Q.   Untrainable?

10      A.   Yes, they told me I was untrainable, and they

11   retrained me after that which was -- and to come in

12   with that Mexican -- I don't know what that word was.

13   You do not say that to --

14      Q.   Say that --

15      A.   Mexican -- there's a word that --

16          MR. SULEMAN:  Mexican standoff.

17          THE WITNESS:  Standoff, okay.  I don't know

18      what that word was.  You don't say that to a

19      person.  You don't say that to an employee.

20   BY MR. NICCOLINI:

21      Q.   Listen, stop for a second, Ms. Lauture.

1   We've been going a long time and we're going to be

2   going until late tonight unless we can bring this to

3   some sort of understanding.  And I understand that

4   you're tired and I also understand that you're upset,

5   but we've got to take this a step at a time, okay?

6       A.   Okay.

7       Q.   So what I've got then is what contributed to

8   your hostile work environment is first that they

9   ignored your complaint?

10      A.   Uh-huh.

11      Q.   Secondly that you were told that you were

12  untrainable?

13      A.   Untrainable.  The third one was they were

14  going to investigate and they did not do so.

15      Q.   So failure to investigate?

16      A.   Failure to investigate.

17      Q.   Isn't that the same as ignoring your

18  complaint?

19      A.   No.  There's an investigation that was

20  supposed to be made that they told me they were going

21  to make an investigation, they didn't do it.  It's a

1    complaint but that's different.

2        Q.   Okay.  So that's three things that

3    contributed to your alleged hostile work environment,

4    ignoring the complaint, I'm going to say second

5    failure to investigate and I'm going to say third

6    told you that you were untrainable?

7        A.   And that's the one where I myself see when

8    somebody else like a white person make a complaint,

9    they value it more than I do.

10        Q.   So value a white person's complaint more?

11        A.   Correct.

12        Q.   What else contributed to your hostile work

13    environment?

14        A.   Basically that's what it is.

15        Q.   So now I want to go back and talk about these

16    four things specifically.  First you said that they

17    ignored your complaint.  And there was a letter that

18    you wrote and sent to a large number of people,

19    specifically that was a letter that was sent on

20    February 17th, 2006.  And you sent it to Ms. Kinch,

21    Ms. Weiger, the director of human resources who at

1      A.  Sally Turner.

2      Q.  Sonny Turner?

3      A.  Sally, S-A-L-L-Y, Turner.

4      Q.  Any others?

5      A.  Yeah, there are others.  But this one was one

6  incident --

7      Q.  Ms. Lauture, I'm sorry, I don't mean to

8  interrupt you, but what I'm trying to do is go

9  through this systematically.  It's very difficult if

10  we shoot off.  So what I'd like to do is let's get a

11  list of all the individuals who you claim are white

12  who St. Agnes valued their complaints more than you,

13  and then we can go back through to make sure we hit

14  them all.  So the first would be Sally Turner, then

15  you said there are others.  Who else?

16      A.  Yes, there are others.  It's because I have a

17  fresh example of what happened with Sally Turner.

18  Most of the lab techs were there, most of them make

19  mistake.  I cannot enumerate -- I understand what

20  you're saying, but I cannot enumerate because I don't

21  have any evidence in my hands saying this person,

1    this person, that person.  But I have a fresh memory,

2    especially one of the white people there that was

3    valued more than me, yes.

4        Q.  So Sally Turner and then most of the lab

5    techs made mistakes?

6        A.  Yes, and was valued -- their complaint was

7    valued more than I do.

8        Q.  Okay.

9        A.  Than mine was.

10       Q.  Other than Sally Turner, can you give me any

11   other specific examples by name or by complaint?

12       A.  I cannot.  While I was there, that was one of

13   the examples.  And this is where everything was going

14   on, that's why it just stayed fresh in my mind.

15       Q.  That's fine, we'll come back to Ms. Turner in

16   a minute.  I understand you feel that most other lab

17   techs made mistakes and most of the other white lab

18   techs' complaints were valued more.  I'm saying other

19   than Sally Turner, can you give me any other names or

20   give me specific examples?

21       A.  I can't give you any names right now.

```
 1    happened.  Exactly what I was reading was the

 2    procedures when I was in my -- what do you call that

 3    again.  When I was reading -- when I was getting

 4    suspended, I was sitting there where Stephanie was

 5    working.  And there was Kelly that's also a lab tech.

 6    She was working in my bench doing exactly what I was

 7    doing.  And Stephanie came in and spun the blood for

 8    her and everything.  And I'm watching them probably a

 9    couple weeks before that where she comes to me and

10    says, "From now on, you have to do your own blood,

11    process your own blood," with her finger like this

12    right in front of me.  And Benjamin -- what's his

13    last name?

14        Q.  Roberts.

15        A.  Roberts was there, and even he look at me

16    like -- he look at Stephanie, "From now on you're

17    going to do your own blood."  And I stopped

18    everything and I went to the supervisors and I

19    said -- we refer them to by Peg and Jane.  I said,

20    "Do I have to spin the blood or Stephanie has to do

21    it?"
```

1          "Yes, now you have to do it."  That was their

2     answer to me.  I said, "Why didn't you come to me and

3     tell me this is the procedure that's being changed in

4     the lab and this is how it goes.  Why arrogantly come

5     in my face and tell me something like this?"

6          Q.   Okay.

7          A.   That's one example.

8          Q.   Any other examples with Ms. Rutter?

9          A.   There's so many of them, I just -- there's so

10    many.  There's so many.  Like working in the

11    laboratory, I am not supposed to have my -- long

12    nails, the fake nails and she will have them.

13    Sometimes she would have staph infections, she

14    doesn't wear her gloves.  And no supervision there.

15    Where is supervision telling her to wear her gloves.

16    She once had staph infection from the lab, and they

17    babied her also because she was much younger than I

18    am.  And Jane always referred to her as, "My 13 year

19    old.  Stephanie acts like my 13 year old."  And they

20    let her get away with everything by babying her, you

21    know, she's very young.

1    Q.  You --

2    A.  Yes, I sent the papers.

3    Q.  You sent what papers?

4    A.  You have my -- everything that I sent

5   especially about -- it's mostly in my answer from

6   what I've said -- answered.

7    Q.  Answers to interrogatories?

8    A.  Yes, answer to the interrogatories, yes.

9    Q.  And that's fine, I do have those answers.

10  But I'm asking you what evidence do you have that

11  anyone at St. Agnes took any specific illegal action

12  because of your race, color or national origin?

13    A.  Because as a black person, I see that I've

14  been treated differently from the other white people

15  that were there.

16    Q.  Okay.  So basically based on what you've seen

17  and what you've experienced?

18    A.  Experienced.

19    Q.  So -- I mean, and this is completely

20  legitimate, but what you're saying is based on your

21  own experience, your opinion is that these things

1    produced, I'm not asking for any of that.  I'm asking

2    what evidence you have --

3         A.  No, I have no other evidence.

4         Q.  You have no other evidence?

5         A.  No other evidence.

6         Q.  Other than your opinion of course?

7         A.  Not only my own opinion, the papers.  I don't

8    know if I really get it.

9         Q.  So what papers then?

10        A.  What you have, my interrogatories, the

11   letters I received from Jane, the letters --

12        Q.  So let's stop for a second then.  Your

13   answers to interrogatories once again are your own

14   testimony?

15        A.  Correct.

16        Q.  Now you're talking about the letters that you

17   received from Jane.  Which letters?

18        A.  That I did -- written up letters.

19        Q.  The counseling reports?

20        A.  The counseling reports.  They're right here,

21   all the papers here.

1   untrainable?

2       A.   Untrainable.

3       Q.   What other names other than you were called

4   untrainable?

5       A.   I don't have any other names.

6       Q.   That's fine.  So then we've got in the

7   documents Mexican standoff, that you allegedly were

8   called untrainable by Ms. Weiger and Ms. Kinch?

9       A.   Uh-huh.

10      Q.   What other evidence do you have that any

11  action was taken against you because of your race,

12  national origin or color?

13      A.   The false accusation that I received.

14      Q.   And the false accusation --

15      A.   About the meningitis.

16      Q.   -- was about meningitis?

17      A.   Yes.  And other false accusations that

18  followed up to it too.  Yeah, I was added more -- my

19  duties checklist added more tests when I was the one

20  doing the -- the white person before that wasn't

21  doing the tests.

1          MR. SULEMAN:   Okay.

2     BY MR. NICCOLINI:

3          Q.   Now Ms. Lauture, you also indicated in your

4     answers to interrogatories that you are seeking

5     damages for pain and suffering?

6          A.   Yes.

7          Q.   And you indicate in your answers to

8     interrogatories that the only physician you've seen

9     since your resignation appears to have been a

10     coworker who performed acupuncture seven times?

11          A.   Yes.

12          Q.   And when did he perform that?

13          A.   I started going to him on December of '06 --

14     of '05 when the situation started.  And I was

15     really -- too much was going on, stress, all the

16     situation that was going on.  And I felt really sick.

17     And he told me that he does acupuncture, and I went

18     to him.

19          Q.   The pain and suffering that you're seeking

20     damages for, what symptoms physical, mental or

21     emotional have you suffered?

1      A.   Oh, I've been really sick about this.  I

2   could not -- as I say, I worked day shift there

3   because I wanted to take care of my children after

4   that.  This is something I could not do at all.

5   After I worked there and all the stress that I was

6   going through over there, I come home and I was

7   always -- I mean, my mind was always into work and I

8   couldn't work with my children.  You know, headaches,

9   I couldn't sleep at night.  It was really -- it was

10  terrible.

11      Q.   Now, those were the symptoms that you

12  suffered while on the day shift at St. Agnes?

13      A.   Oh, yes.

14      Q.   Have you suffered any symptoms since your

15  resignation?

16      A.   Oh, yes, I'm still trying to cope with the

17  fact that somebody did this to me, that I've been

18  through all this.

19      Q.   I understand.  But you said that your

20  physical, mental or emotional symptoms while you were

21  employed were difficulty sleeping, headaches, it