# EXHIBIT 14

# St. Agnes Hospital
## Counseling Report

*St. Agnes Hospital*

**ASSOCIATE NAME:** Geradine Lauture

**DATE:** 2/7/06

**DEPARTMENT:** Microbiology Lab

**JOB TITLE:** Medical Lab Technician

☐ Documented Verbal Warning   ☐ Written Warning   ☑ Suspension   ☐ Termination

**INSTRUCTIONS**

The basic premises of corrective action are as follows: (See Progressive Action Policy for details)
- Corrective action is progressive and should be tailored to the infraction and is designed to be constructive in nature and should provide specific expectations for improvement.
- Corrective action is to be taken in a timely manner.
- Detail facts and allow employee the opportunity to respond.
- Supervisors should review the policy being violated and be able to discuss with the associate. A copy of the policy should be provided to the associate.
- Documented verbal warnings must be completed and reviewed with associate prior to being placed in the Human Resources file.
- Suspensions require the Director of Human Resources signature prior to implementation.
- The Director of Human Resources and appropriate Vice President must approve all terminations prior to implementation.

Note: Associates who have completed their introductory period may file a grievance.

1. Identify Specific Problem Requiring Counseling/Corrective Action & dates of occurrence(s) (Attach any additional documentation)

    Following corrective action received on February 2, 2006 several possible performance issues have been identified that warrant further investigation. An investigation will be conducted and documented under separate cover.

2. Why is this a problem for the organization or Department? Which policy is being violated?

    Potential patients and SAH could be at risk.

3. Identify specific changes in performance or behavior that must occur (including dates for compliance).

    Pending Investigation.

4. Failure to meet standards listed above will result in additional disciplinary up to and including termination.

5. Associate Comments

*Refusal to Sign*  2/8/06  cro

Associate's Signature   Date

Supervisor's Signature: *Reg Kinch*   *Jane M Weig* 2/7/06   AR 2/7/06

Vice President's Signature   Date
Signature Required for Termination

Human Resources Director: *Jones* 2/7/06
Signature Required for Suspension and Termination

Date 2-23-09
DEPOSITION EXHIBIT# 15
Weiser
SUZANNE GILES, CVR
COMPOFELICE REPORTING SERVICES, INC.
(301) 596-2019  FAX (410) 290-7249

Feb. 7, 2006

Geraldine Lauture was counseled on Feb. 2, 2006 for previous performance related issues involving: correctly following procedures, QC documentation, problem solving and attention to details.

Since then it has come to our attention by several associates that her job performance has deteriorated to the extent that it has impacted fellow associates safety, patient care and has put St. Agnes and patients at risk.

The issues involved show a fundamental lack of knowledge and the resolutions to correcting these issues cannot be imparted by additional training.

In the afternoon of 2/2/06, the same day she had been counseled, she incorrectly processed two bronchial lavages for PCP staining. She digested these samples, which according to procedure does not have to be done. She informed the lead tech that she didn't have time to stain the slides. When asked about the Legionella smears, she did not even realize that they even existed, even though she was told that morning that the evening tech had already made the direct slides for PCP and Legionella tests. These slides are left for the day shift to stain. Since it was now to late to stain and read the slides, the results were delayed one day. (Accession # P24 and P25 and M3136)

AFB slides for staining were labeled with Accession number and name using a non-industrial black marker. They should have been labeled using a pencil, so the writing doesn't come off in the staining process. We also have an industrial permanent black marker for Laboratory use. However, she used the non-industrial black marker and the writing washed off from one of the slides. We had to deduce which sample it belonged to.

On 01/30/06 Geraldine recorded the temperature of our 56° C water bath as 60.3°C. Her corrective action was to decrease the temperature. No documentation that she rechecked the temperature adjustment. Again on 2/2/06 the temperature was out of range (too low) 52°C. She increased the temperature. Again, there was no documentation that she rechecked the temperature adjustment. On 02/03/06 the temperature was recorded as out of range 48°C. She increased the temperature and there was no documentation that she rechecked the temperature adjustment. It was later discovered by another Tech who needed to use the water bath that day, that there was no water in it. The other Tech added water. But when the other Tech rechecked the temperature and it still was too high, it was discovered that Geraldine had turned the incorrect knob to adjust the temperature in the morning. She turned the Upper Limit set point knob instead of the Temperature adjust knob. This caused the water bath to overheat to 68°C. The upper limit set point knob was readjusted and the temperature eventually returned to be in range (58°C). This delayed testing approximately an hour and one half.

During this time, the reason we needed to use the water bath was to run a confirmation test (Meningitis Screen) on a patient that had a potentially pathogenic organism (Neisseria meningitidis) in their blood culture. If the test were negative, we

would need to wait until Saturday when the organism was growing to confirm the identification of the bacteria by other methods. If the test were positive, it would confirm that the organism was indeed a serious pathogen. This would involve notifying the infection control department that we had an infectious disease exposure. Infection Control would be responsible for identifying associates that would need prophylactic antibiotic treatment. The meningitis screen was positive for Neisseria meningitis antigen. Unfortunately the patient had expired the day before. We were concerned that an autopsy would possibly be performed on this patient. Upon notifying the pathology office, it was discovered that the autopsy was already in progress. Upon notifying the Pathology Assistant of the potential infectious exposure, we were told they had just finished and that numerous personnel had observed this autopsy.

The exposure of the pathology staff and others present during the autopsy may have been prevented had we been able to perform the test in a timely manner. Since we had to wait for an hour and one half to use the water bath to confirm that it was indeed a potentially infectious pathogen, this greatly impacted our ability to notify the proper personnel. Infection control determined that up to 140 associates had to be offered prophylactic treatment. Again because of the delay in notification, (Change of Shift on a Friday afternoon) Associates were asked not to leave St. Agnes until Infection Control told them to report to EHS.

The seemingly minor issue of QC documentation and incorrect temperature adjustment turned into a major safety issue.

On Monday, 2/6/06 upon returning to work the lead techs were left a copy of the temperature chart for the Immunology refrigerator. The temperature was too high on 1/31/06 thru 2/3/06. (See attached chart) No documentation of any corrective action taken by Geraldine. This refrigerator holds patient's specimens and some testing kits. We have repeatedly spoken to the Departmental staff about recording QC and the Corrective action if QC is out of range. This was also discussed with Geraldine individually several times and in her counseling session of 2/2/06.

On Monday 2/6/06 the tech who was in charge over the weekend came to us and said that their were several problems with specimens that Geraldine had processed on Friday 2/3/06. Right Lung Bronch Wash (M3305, F 91 and TB 146) although had been received and labels would have printed to do these tests, they had not been set up at all. They were reset on Monday 2/06/06. This specimen had a potential pathogen that needed to be identified and sensitivity testing performed. This final testing was delayed until 2/7/06 the final results won't be ready until 2/8/06 or 2/9/06 depending on the identification of the organism. This has caused a delay of at least 3 days for the final results thus impacting patient care. The Left Bronch Wash (M3306, F92 and TB147) had evidence that plates and tubes had been set up. However, when the original OR specimens were retrieved from our specimen storage, the Right Bronch wash specimen had scant specimen left in the container. And the Left specimen had very little specimen left also. Because of this confusion, both specimens were reset except for the AFB test on the Right Lung due to insufficient sample quantity.

On 02/07/06 it was brought to our attention that Geraldine had processed a Synovial fluid improperly. (M 3575) It had been order for a gram stain, however it was planted as a urine specimen, and no gram stain was performed. (Which has different plates, different set up processing) Specimen was found in daily save 2/6 bucket of specimens. It was not saved in the weekly fluid bucket as per protocol. Specimen was retrieved, orders corrected, and labels printed to reprocess the specimen. However some fastidious organism will not be recovered due to the refrigeration of the sample. Later our lab assistant was going crazy looking for the specimen to make sure that it was going to be reprocessed. She came to the Lead tech and the specimen was found in today's 2/7/06 already processed daily bucket. The labels for reprocessing the specimen were under the Bio-safety cabinet. Again Geraldine did not pay attention to details and had she double-checked her labels and plates, she would have perhaps recognized her errors on 2/6/06. This has delayed patient results and has put the hospital at potential risk.

On 2/07/06 still another Tech came to the Lead Techs about another error with Geraldine's processing of a Pleural fluid for fungus culture on 2/3/06. (F93) This specimen was set up in duplicate according to the specimen labels on the tubes. However the tubes were hand labeled with our numbering system 2-3- 2F and 2-3-3F, which tells us that they are different specimens. This is another example of her lack of basic attention to detail required in order to perform her job properly.

On 2/7/06 yet another tech told the leads techs she had several problems with Geraldine's job performance that day. Geraldine again asked about the controls used for the Kinyoun stain. She couldn't find them. She was counseled on 2/2/06 about her inability to comprehend that the same control slides are used for two different staining procedures. This has been explained to her several times in the past two weeks. When we have a positive AFB Bottle three different slides are made in order to perform three different stains on the sample. The slides are kept in the hood with the other new AFB Slides to be stained. Geraldine asked the tech involved what to do with them since she didn't make the slides. It was pointed out to her that they were from the positive bottles and needed to be stained with her other new slides for today. This has been explained to her several times by more than one Tech.

These above examples demonstrate an obvious lack of basic skills and knowledge of Laboratory Science needed to perform this job. She has made numerous errors in basic clinical practices that have potential to put patients, associates and St. Agnes Hospital at risk. Unfortunately, none of the efforts to explain basic procedures and processes to her has resulted in an improvement or changes that sustain good clinical practices.

Respectively,

*Peg Kinch, MT/ASCP*
Peg Kinch

*Jane M Weiger MT(ASCP)*
Jane Weiger