# EXHIBIT 24

# WHITEFORD, TAYLOR & PRESTON L.L.P.

210 WEST PENNSYLVANIA AVENUE
TOWSON, MARYLAND 21204-4515
TELEPHONE 410 832-2000
FAX 410 832-2015

20 COLUMBIA CORPORATE CENTER
10420 LITTLE PATUXENT PARKWAY
SUITE 495
COLUMBIA, MARYLAND 21044-3528
TELEPHONE 410 884-0700
FAX 410 884-0719

SEVEN SAINT PAUL STREET
BALTIMORE, MARYLAND 21202-1626
410 347-8700
DIRECT FAX 410 223-4166
www.wtplaw.com

1025 CONNECTICUT AVENUE, NW
WASHINGTON, D.C. 20036-5405
TELEPHONE 202 659-6800
FAX 202 331-0573

115 ORONOCO STREET
ALEXANDRIA, VIRGINIA 22314-1685
TELEPHONE 703 836-5742
FAX 703 836-5558

MELISSA M. SHOREY
DIRECT NUMBER
410 347-8746
mshorey@wtplaw.com

MAY 3 0 2006

May 26, 2006

**Via Hand Delivery**

Ms. Monica Wilson
Staff Representative
Baltimore Community Relations Commission
Suite 915, Equitable Building
10 North Calvert Street
Baltimore, Maryland 21202

    Re:    Geraldine Lauture v. St. Agnes Healthcare, Inc.
            Community Relations Commission File No. E06C056(R/NO)-029
            EEOC Charge No. 12B-2006-00504

Dear Ms. Wilson:

    As you are aware, I and the firm of Whiteford, Taylor & Preston, represent St. Agnes Healthcare, Inc. ("SAH"), in the above-referenced matter. Accordingly, please direct all further correspondence and communication regarding this investigation to my attention. Moreover, I also request that you please not contact my client or any of its officers, managers or employees about this claim without my prior consent.

    This letter constitutes a Statement of Position for SAH in response to the Charge of Discrimination filed against SAH by former employee Geraldine Lauture.

    SAH adamantly denies that it has violated Title VII of the Civil Rights Act of 1964 ("Title VII"), Article 49B of the Annotate Code of Maryland or Article 4 of the Baltimore City Code. Ms. Lauture resigned her employment as a Medical Laboratory Technician II in SAH's Microbiology Laboratory ("Micro Lab") on March 10, 2006.

Date 3-17-09
Married
DEPOSITION EXHIBIT# 4
SUZANNE GILES, CVR
COMPOFELICE REPORTING SERVICES, INC.
(301) 596-2019   FAX (410) 290-7249

STA 00443

Ms. Monica Wilson
May 26, 2006
Page 2

Prior to that time, Ms. Lauture had demonstrated inappropriate clinical skills by making several errors in processing specimens that posed a threat to patient care and to coworkers. Ms. Lauture's supervisors attempted to improve Ms. Lauture's clinical skills by placing her on an improvement plan that included review of written materials and two weeks of re-training with an experienced lab tech. Despite these efforts, Ms. Lauture continued to make basic mistakes in a job in which errors could jeopardize the health and safety of patients, co-workers and the public.

In addition, Ms. Lauture and her co-worker Stephanie Rutter, had engaged in open conflict at work, to such an extreme that it interfered with the duties of co-workers. Both Ms. Lauture and Ms. Rutter received identical disciplinary action for this behavior and were referred to SAH's Employee Assistance Program ("EAP"). Despite these efforts by management, the difficulties continued to the point where Ms. Lauture refused to acknowledge Ms. Rutter when Ms. Rutter attempted to communicate with her about work-related matters. In response to a complaint by Ms. Rutter that she was being subjected to a hostile environment by Ms. Lauture, management met with the two individuals. At this meeting, Ms. Lauture belittled Ms. Rutter and told her she was "nothing more than a secretary." She also refused to acknowledge or accept her supervisors' clarification that Ms. Rutter is not a secretary and that some of her duties are supposed to be shared by Ms. Lauture. The day after this meeting, Ms. Lauture resigned.

Ms. Lauture was not subjected to unlawful race or national origin discrimination, rather, SAH attempted to work with her to improve her deficient clinical skills and her interpersonal relationship with her co-worker.

### Background

SAH operates a 350-bed acute care hospital facility in Baltimore. Ms. Lauture began her employment at SAH on July 21, 2004, on the night shift in the Micro Lab. Her direct supervisor at the time was Laboratory Supervisor, Sally Ondiek.[1] Following Ms. Ondiek's resignation in November 2005, Team Leaders Peg Kinch and Jane Weiger became Ms. Lauture's supervisors. While Ms. Lauture worked the night shift, she had no supervisor on shift with her to directly observe her clinical skills.

In general, Ms. Lauture's job required her to test specimens, including blood, urine, stool samples and sputum for bacteria, fungus and other microbes indicating

---

[1] Ms. Ondiek resigned her employment effective November 1, 2005, when her supervisor asked her to explain discrepancies between Ms. Ondiek's requests for days off and her entries in the time entry system for those days.

Ms. Monica Wilson
May 26, 2006
Page 3

infections and conditions such as meningitis and legionella. Specifically, Ms. Lauture's job duties included, among other things:

> 1) consistently demonstrating the ability to complete simple to complex testing under supervision and to report the results to the appropriate care givers by: a) determining specimen integrity, receiving and processing specimens according to written instruction and bringing to a resolution any questionable circumstances regarding specimens; b) completing routine and STAT procedures according to departmental instructions and standards; c) recognizing questionable instrument performance and/or questionable laboratory results and following laboratory guidelines for resolution of the same; d) verifying results calling critical values and other pertinent information on processed specimens to the appropriate caregiver; e) being familiar and current with reference ranges, expected deviations from same, taking appropriate actions when "delta checks" occur; f) advising supervisor of suspect or adverse circumstances are present; 2) consistently demonstrating sound judgment that produces best possible outcomes, good organizational and prioritization skills by : …c) communicating with peers and supervisor to keep information flowing regarding the status of the assigned section and specimen status…4) consistently demonstrating the ability to participate in quality improvement processes and quality control by: a) strict adherence to the quality control processes/procedures for the assigned bench with no deviations….6) consistently demonstrating the abiity to be flexible and insure appropriate use of resources to include scheduled working hours by: a) performing other job assignments as might be required or necessary; willingly helping co-workers to complete workloads with out prompting from supervisors; …and performing testing correctly on the right specimen the first time having few no repeats in testing …and 7) consistently demonstrating the willingness and ability to perform other job duties as might be required.   **Exhibit A.**

As is clear from above, Ms. Lauture's job duties directly affected patient care and the safety and health of coworkers, as her core job duties required handling blood and other specimens to test for hazardous bacterial infections and other conditions. Improper handling and processing of specimens could lead to misdiagnosis of patient conditions as well as exposure to others of communicable diseases. Her job duties also required her to willingly help co-workers to complete work loads.

STA 00445

Ms. Monica Wilson
May 26, 2006
Page 4

Per Ms. Lauture's request, in December, 2005, she was transferred to the day shift.

Almost immediately upon transferring to the day shift, Ms. Lauture and Lab Assistant Stephanie Rutter began having difficulties working together due to disagreements over job responsibilities. The conflict had become so severe that it was disrupting co-workers and delaying the work of the lab. Micro Lab Team Leaders Ms. Kinch and Ms. Weiger issued identical Verbal Warnings to both Ms. Lauture and Ms. Rutter and referred them both to EAP to improve their communication skills. **Exhibits B and C.**

In addition to the interpersonal conflict that had immediately developed between Ms. Lauture and Ms. Rutter, several clinical errors by Ms. Lauture came to the attention of Ms. Kinch and Ms. Weiger. For example, she frequently improperly prepared slides and cultures and demonstrated that she did not know how to properly prepare them. On February 2, 2006, Ms. Weiger and Ms. Kinch issued a documented verbal warning to Ms. Lauture due to these various clinical errors which placed patient care and her co-workers at risk. **Exhibit D.**

Despite this verbal warning, several other clinical errors were either observed by Ms. Kinch and Weiger or reported to them by colleagues and she was issued a suspension pending investigation. **Exhibit E.** For example, on February 2, 2006, later during the very same day that Ms. Lauture had been counseled about previous clinical errors, she incorrectly processed two bronchial samples. During that week, Ms. Lauture improperly labeled specimens and was responsible for several failures in appropriate temperature for a water bath used to test specimens. It was originally thought that these improper water temperatures caused a delay in testing which resulted in the exposure of several individuals in the hospital to meningitis, but upon further investigation after speaking with Ms. Lauture, it was determined that a different bacteria was at issue and this particular claim was withdrawn from her warning. **Exhibit F.** In addition, and among other things, specimens had not been set up causing a delay of several days for testing for a potential pathogen. Again on February 7, 2006, three additional errors and/or issues were brought to the attention of Ms. Kinch and Ms. Weiger, leading to serious concerns about her clinical skills and the safety of SAH patients. **Exhibit G.**

On February 8, 2006, Ms. Lauture was placed on an Action Plan which required her to, among other things, read SAH's Microbiology procedure manual, read two relevant chapters from the reference book, DIAGNOSTIC MICROBIOLOGY, and undergo two weeks of retraining by experienced Microbiology Technician Mainaki

Ms. Monica Wilson
May 26, 2006
Page 5

Parikh. **Exhibit H.** The Action Plan specified that Ms. Lauture was required to demonstrate proficiency in each area of the Planter training checklist by March 3, 2006, with Ms. Parikh signing the checklist as each task was mastered by Ms. Lauture. Ms. Lauture was warned that if she continued to make errors during her training, she may be subject to corrective action, up to and including termination.

On February 8, 2006, after Ms. Lauture received her counseling report and action plan, she complained to SAH's Diversity Manager that she felt that she was being "treated unfairly." **Exhibit I.** Ms. Lauture complained, among other things, that she had not received adequate training, that Ms. Rutter did not support her and management seemed to "take Stephanie's side." Ms. Lauture reported to Ms. Beubendorf that she didn't "know if it is racial." *Id.* Ms. Beubendorf investigated Ms. Lauture's complaint and concluded that she was unable to state that Ms. Lauture was subjected to discrimination. She forwarded her report to the Director of Human Resources on February 14, 2006. *Id.* On February 17, 2006, Ms. Lauture submitted another letter to Human Resources in which she "answered" the "charges." **Exhibit J.** While Ms. Lauture claimed "bias" and "prejudice," she again offered no evidence to substantiate any discrimination.

Ms. Lauture began training with Ms. Mainaki during the two-week time period allotted and it was hoped that her clinical skills would improve. However, Ms. Lauture continued to make clinical errors and she failed to complete several aspects of her training. **Exhibit K.**

On March 8, 2006, Stephanie Rutter complained to her supervisors and to Human Resources that Ms. Lauture was subjecting her to a hostile work environment. Specifically, Ms. Rutter complained that upon Ms. Rutter's recent return from Family and Medical Leave, Ms. Lauture refused to acknowledge her or communicate with her, even in connection with work-related issues. As a result, on March 9, 2006, Rutter, Lauture, Weiger, Kinch and Human Resources employees Aimee Ringgold and Colleen Meegan met to discuss the interpersonal issues. During this meeting, Rutter explained to Ms. Lauture how badly that it made her feel when Ms. Lauture did not speak to her or acknowledge her and she dreaded coming to work due to Ms. Lauture's treatment. In response, Ms. Lauture called Ms. Rutter a liar and said that Ms. Rutter was "just a secretary." When Ms. Weiger and Ms. Kinch attempted to explain that Ms. Rutter was not a secretary and that Ms. Lauture's duties included covering for Ms. Rutter, such as answering the lab phone when Ms. Rutter was busy performing other job duties, Ms. Lauture refused to accept it. At one point in the discussion, Ms. Lauture's treatment of Ms. Rutter was so demeaning and abusive, that Ms. Meegan had to interrupt and advise Ms. Lauture if she continued, she would be subject to discipline.

The next day, March 10th, Ms. Lauture submitted a letter of resignation. **Exhibit L.** In the letter she claimed that she claimed "outright prejudice" and discrimination.

### Ms. Lauture's Allegations

Ms. Lauture was not subject to discriminatory treatment due to her race or national origin. SAH maintains and vigorously enforces policies prohibiting unlawful discrimination.

SAH's Equal Employment Opportunity Policy states:

**Equal Employment Opportunity Policy**

St. Agnes is committed to the principle of equal employment opportunity. Our policy is to recruit, hire, train and promote individuals, and administer all personnel actions without regard to race, color, religion, creed, age, sex, national origin or ancestry, marital status, veteran status, or disability in accordance with all applicable laws, including the Americans With Disabilities Act.

Personnel actions such as compensation, benefits, training, upgrades, transfers, promotions, service calculations, retirement and seniority will be administered without regard to the factors listed above. Harassment based on sex, race, or any other characteristic listed above will not be tolerated.

**Exhibit M.**

When Ms. Lauture was transferred to day shift in December 2005, it was the first time during her employment at SAH that she had a supervisor on the same shift with her to directly observe her performance. Indeed, even though Ms. Lauture worked the night shift without direct supervision, Ms. Ondiek, her prior supervisor, did note clinical errors by Ms. Lauture and addressed them with her. **Exhibit N.** After Ms. Lauture was transferred to the day shift it became immediately apparent that her clinical skills were deficient and jeopardized patient care. Ms. Lauture was appropriately counseled about these clinical issues and she was provided a two-week re-training period to improve her performance. In addition, when it was determined that one of the several errors did not result in a potential exposure of co-workers to a

pathogen, the error was corrected and a statement placed in her file to document the error and correction.

Moreover, upon her transfer to the day shift, Ms. Lauture immediately engaged in openly confrontational behavior with Ms. Rutter. Both Ms. Lauture and Ms. Rutter were issued identical disciplinary action for these interpersonal disputes and both were referred to EAP for counseling.

There is simply no evidence that Ms. Lauture was subject to discrimination based on her race or national origin. Rather, she was appropriately disciplined for serious performance deficiencies.

### Conclusion

Accordingly, SAH requests that Ms. Lauture's Charge of Discrimination be dismissed in its entirety.

Should you have any further questions concerning this matter, or if I can assist you in bringing this matter to an expeditious and final resolution, please contact me. Thank you for your consideration.

Very truly yours,

Melissa Menkel Shorey

Enclosures

STA 00449