# EXHIBIT
# 30

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - x
                            :
GERALDINE LAUTURE,          :
                            :
        Plaintiff,          :
                            :
    vs.                     :   Civil Action No. CCB-08-943
                            :
ST. AGNES HOSPITAL,         :
                            :
        Defendant.          :
                            :
- - - - - - - - - - - - - - x

                            Greenbelt, Maryland

                            Monday, February 23, 2009

Deposition of

                    JANE WEIGER,

called for examination by counsel for Plaintiff, pursuant to

Notice, at the offices of Amity, Kum & Suleman, P.A., 7474

Greenway Center Drive, Suite 650, Greenbelt, Maryland,

20770, commencing at approximately 9:53 a.m., before Suzanne

Giles, a Notary Public in and for the State of Maryland,

when were present on behalf of the respective parties:

COMPOFELICE REPORTING SERVICES, INC.
6671 Farbell Row
Columbia, Maryland  21045
(301) 596-2019      (410) 381-2755
(800) 464-3019
FAX (410) 290-7249

2

On behalf of the Plaintiff:

        FATAI A. SULEMAN, ESQUIRE
        Amity, Kum & Suleman, P.A.
        7474 Greenway Center Drive, Suite 650
        Greenbelt, Maryland  20770

On behalf of the Defendant:

        ROBERT R. NICCOLINI, ESQUIRE
        McGuire Woods, LLP
        7 St. Paul Street, Suite 1000
        Baltimore, Maryland  21202

Also present:  GERALDINE LAUTURE, Plaintiff

1      A    Yes.

2      Q    Did she discuss with you what she said in

3  her own deposition?

4      A    No.

5      Q    Apart from Ms. Kinch, did you discuss your

6  coming here today with any employee of St. Agnes?

7      A    I had to tell my superiors that I would be

8  here.

9      Q    Okay.  And who was that?

10     A    Rob SanLuis and Jo Oliver.

11     Q    Rob?

12     A    Robert SanLuis.

13     Q    Who is this?

14     A    My direct manager.

15     Q    And who else?

16     A    Jo Oliver.  She's the administrative

17  director.

18     Q    You were born in what country, Ms. Weiger?

19     A    United States.

20     Q    Can you tell me briefly your educational

21  background?

1    was in 1993.  Is that correct?

2           A    Correct.

3           Q    So you worked as a medical technologist from

4    August of 2000, up to when?

5           A    To May of 2005.

6           Q    And what did your job change to at that

7    time?

8           A    Lead technologist.

9           Q    At the time when you were working as your

10   first position as a medical technologist, who was your

11   immediate manager at that time?

12          A    Excuse me?  I missed the first part.

13          Q    At the time from August of 2000 up to May

14   of 2005, when you were working as a medical

15   technologist, who was your manager?

16          A    The first one was Donna Sullivan.  And when

17   she resigned it was Sally Ondiek.

18          Q    And during the time between August of 2000

19   and May of '05, did you have any medical errors that

20   you made?

21          A    Not that I'm aware of.

29

1          A     In charge of running the operational part

2     of the microbiology lab, budgets, scheduling,

3     administration.

4          Q     So you don't do any testing.  Do you?

5          A     I do, when needed.

6          Q     And how often would that be?

7          A     It depends on the staffing levels.

8          Q     Now, do you know Ms. Geraldine Lauture?

9          A     Yes.

10          Q     When did you have the first contact with

11     Ms. Lauture?

12          A     When she was hired.

13          Q     Do you know when she was hired?

14          A     It was when we started the evening shift,

15     sometime late summer, early fall -- and I don't

16     recollect the year -- probably 2004.

17          Q     So she was hired for the evening shift?

18          A     Yes.

19          Q     Do you know who hired her?

20          A     Sally Ondiek.

21          Q     At that time, do you recall what shift you

1    it to her to deal with.

2          Q    Did you at that time -- and I'm talking

3    about the time when Ms. Lauture was still working the

4    evening shift.  Did you train her at all?

5          A    I don't remember.

6          Q    And for the time when Ms. Lauture was

7    working the evening shift, was any other employee

8    working with her at the lab?

9          A    Not in the microbiology lab.  There were

10   techs in the core lab.

11         Q    Okay.  So Ms. Lauture was the only employee

12   working in the microbiology lab.  Is that correct?

13         A    In the evening?

14         Q    In the evening shift.

15         A    Yes.

16         Q    What is your opinion regarding Ms.

17   Lauture's qualifications for the job as a medical

18   tech?

19         A    Based on her application and the

20   certifications that are in her file or lack thereof, I

21   don't think I would have interviewed her for the

33

1          A    I don't think she was qualified for the

2     position as it was.

3          Q    When did you form that opinion?

4          A    When we had brought her to day shift and

5     experienced her work, reviewing her education and

6     requirements that she had presented when she applied

7     for the job.

8          Q    Well, when specifically did you arrive at

9     that conclusion that she's not qualified?

10              MR. NICCOLINI:   Objection.   Asked and

11    answered.

12              BY MR. SULEMAN:

13         Q    Well, you may answer, ma'am.   When -- I

14    didn't hear any time frame.

15         A    I don't --

16         Q    Give me the specific month of what year that

17    you made that determination or conclusion that she's

18    not qualified.

19              MR. NICCOLINI:   Objection.

20              BY MR SULEMAN:

21         Q    Did you understand the question?

1      A    I don't know that I had a specific month or

2  time that -- that --

3      Q    Okay.

4      A    Upon review after she had left, we found

5  holes in her application.  I do not remember what

6  month that was.

7      Q    So is it your testimony that you made that

8  conclusion when Ms. Lauture was still employed --

9      A    No.

10     Q    -- from St. Agnes or after she left?

11     A    After.

12     Q    That narrows it down.  So can you then give

13  me those information that you relied upon to make your

14  conclusion that Ms. Lauture is not qualified for the

15  position?

16     A    Her application, she never presented a

17  certificate that she graduated from MLT program.  She

18  didn't have the documentation in her file that's

19  required by our governing body.

20     Q    Anything else?

21     A    I'm not sure what you're asking.

1          Q    Well, you made a conclusion that Ms. Lauture

2     is not qualified for that job, and I asked you to give

3     me the basis of your opinion.

4          A    According to the state of Maryland and --

5     it's a legal -- what is it called?  She did not have

6     in her file documentation that supported the acts that

7     came out of the federal laws.

8          Q    Okay.  What are those documents we are

9     talking about, Ms. Weiger?

10         A    What she didn't have?

11         Q    Uh-huh.

12         A    There's no transcript.  There's no evidence

13    that she went to a qualified training school.  There's

14    no proof that she has 60 semester hours of classes.

15    Just there's no documentation in her file.  That's all

16    I can go on.

17         Q    It's very important, Ms. Weiger, and I'm

18    going to ask you again, apart from what you have just

19    stated now, is there any other basis for your opinion

20    that Ms. Lauture is not qualified for her job?

21         A    She was making some basic clinical errors

38

1            MR. SULEMAN:  Okay.  Let's move on.

2            BY MR. SULEMAN:

3       Q    Okay.  So your assumption is based on

4    conclusion that you don't have the documentation of

5    Ms. Lauture's qualifications in her file.  Is that

6    correct?

7       A    Everybody was asked to present their

8    documentation, and hers isn't there.

9       Q    Ma'am, the question is your conclusion is

10   based on the ground that you didn't see those

11   documentations in her file.

12      A    Correct.

13      Q    So you don't know if Ms. Lauture gave those

14   documentation or not.

15      A    I know that Ms. Kinch asked her to present

16   them, and she didn't.

17      Q    So is it fair then, Ms. Weiger, if I take a

18   look at your file, I don't see any documentation of

19   your qualification.  Is it fair for me then to

20   conclude that you're unqualified for the position you

21   are?

40

1      documentation of your qualification, is it fair for me

2      to conclude that you're not qualified for that job?

3              MR. NICCOLINI:  Objection.  Answer to the

4      best of your ability.

5              THE WITNESS:  No.  I guess it's not fair.

6      We had planned, if she was still working, to ask her

7      to present it.

8              BY MR. SULEMAN:

9      Q      Maybe fair isn't a good choice of words.

10     Let's try the word reasonable.  Is it reasonable then,

11     Ms. Weiger, for me to conclude that you are

12     unqualified for the job because I don't see the

13     documentation of your qualification in your file?

14             MR. NICCOLINI:  Objection.  I honestly don't

15     understand what the term reasonable in that context

16     means.  Objection.

17             MR. SULEMAN:  You are presenting Ms. Weiger,

18     not only as a fact witness -- maybe your attorney

19     didn't tell you, but you are here as a quote, unquote

20     "expert witness."

21             MR. NICCOLINI:  Objection.  Let me put this

1    on the record.

2         This witness has not been proffered in any

3    respect as an expert witness.  She has not been

4    designated under the federal rules as an expert

5    witness.  She's not being treated as an expert

6    witness.  We have proffered Ms. Weiger on certain

7    specific issues in a capacity as a corporate designee,

8    which means a factual representative of St. Agnes

9    Hospital.  It does not mean that she is an expert

10   witness in any respect.

11        MR. SULEMAN:  So I guess I take it from

12   counsel then, that Ms. Weiger has not been proffered

13   as an expert witness in this case.

14        MR. NICCOLINI:  At this point, she has not

15   been proffered as an expert witness.

16        MR. SULEMAN:  Thank you.

17                          (Whereupon, the document was

18                          marked as Weiger Deposition

19                          Exhibit Number 3, for

20                          identification.)

21        BY MR. SULEMAN:

1    Q Mr. Weiger, can we please take a look at the

2  document marked as Deposition Exhibit Number 3?  Do

3  you recognize that document, Ms. Weiger?  (Handing

4  document.)

5    A (Perusing document.)  Yes.

6    Q It is the position description for what job?

7    A Medical Laboratory Technician.

8    Q And was that the position occupied by Ms.

9  Lauture?

10    A Yes.

11    Q And if you please go to page 3 of

12  Deposition Exhibit Number 3, under the required

13  education, bullet points number 1 there, what does it

14  say about the education and training requirement?

15    A Which part?

16    Q Page 3, the qualifications.  Can you

17  please read what that says?

18    A The first bullet?

19    Q Yes.

20    A The first bullet?

21    Q Uh-huh.

1          Q    And do you know who did this evaluation?

2          A    It's signed by Sally Ondiek.

3          Q    And overall performance rating is what, Ms.

4     Weiger?

5          A    Excuse me?

6          Q    What was your overall performance rating

7     about the evaluation?

8          A    It's a 1.04.

9          Q    And what does that mean?

10         A    Her performance was acceptable at the

11    six-month period.

12         Q    You did know that there was a time when the

13    competency evaluation was done for Ms. Lauture.   Are

14    you aware of that?

15         A    Was I aware that she had one?

16         Q    Uh-huh.

17         A    Yes.

18         Q    Do you know who did it?

19         A    Sally Ondiek.

20         Q    Okay.  Apart from this -- the one you're

21    talking about, when was it done by Sally Ondiek?

56

1          A     Peg and I.

2          Q     Okay.  To the best of your knowledge, then,

3     do you know if Ms. Lauture was trained by anybody for

4     the day shift job that she was supposed to do?

5          A     For her additional duties, she would have

6     been trained.  The duties that she already knew on the

7     evening, she was already trained.

8          Q     You said she would have been trained.  Was

9     she trained, to the best of your knowledge?

10          A     To the best of my knowledge, yes.

11          Q     By whom?

12          A     That, I cannot attest to without seeing her

13     training checklist.

14          Q     So sitting down here today, you cannot tell

15     me whether or not Ms. Lauture was trained for the day

16     shift, when she moved to the day shift.

17               MR. NICCOLINI:  Objection.

18               BY MR. SULEMAN:

19          Q     Can you?

20               MR. NICCOLINI:  Objection.  You can answer.

21               BY MR. SULEMAN:

57

1          Q     Do you understand the question, Ms. Weiger?

2          A     She should have -- she would have been

3     trained.  I can't tell you who without reviewing

4     documentation.

5          Q     So you were talking about looking at

6     documentation.  What documentation would you have

7     looked at?

8          A     Her training checklist.

9          Q     So for every time before the -- strike that.

10               Whenever you have an employee being trained,

11    there is always a checklist.  Is that correct?

12         A     Yes.

13         Q     So there would be a checklist somewhere in

14    St. Agnes record --

15         A     Yes.

16         Q     -- that Ms. Lauture was trained for the day

17    shift job.  Is that correct?

18         A     There should have been.

19         Q     Should have been.

20         A     Or there should be.

21         Q     Okay.  Now to the best of your knowledge,

58

1      was Ms. Lauture at any time asked to train other

2      employees?

3          A     She was not asked to train them.  They were

4      trained on the day shift.  There were two gentlemen

5      who took her evening position were trained on the day

6      shift, and then they were to work with her in the

7      evening before we moved her to days.

8          Q     And who are these employees that you are

9      talking about?

10         A     Oyeniyi Oyebode and Ben Roberts.

11         Q     Can you please spell the first name?

12         A     O-y-e and I do not -- that's the --

13         Q     That's the first name?

14         A     It's Oyeniyi, and I can't spell that one

15     without looking at it.  But he told us to call him

16     Oye, last name is O-b-h-o-d-e.

17         Q     And the other employee was --

18         A     Ben Roberts.

19         Q     -- Ben Roberts.  So it is your testimony

20     then that Ms. Lauture never trained these two

21     gentlemen?

1          Q     Was that the position that she applied for?

2     Do you know?

3          A     I would assume so.  I did not hire her.

4          Q     Do you know Ms. Rutter?  Do you know any of

5     her family members?

6          A     Her mother worked in marketing -- in

7     marketing for a while as a secretary.

8          Q     Marketing for St. Agnes?

9          A     Yes.  I did not know her on a personal

10    level.  I knew who she was.

11         Q     Do you know her name?

12         A     I don't remember.  Stephanie introduced us

13    once.  I don't remember.

14         Q     So there was a time when Ms. Rutter

15    introduced you to her mother.  Is that correct?

16         A     Yes.

17         Q     Do you recall when was this?

18         A     No.

19         Q     Does Ms. Rutter -- does her mom still work

20    for St. Agnes?

21         A     No.

69

1        A     Sally Ondiek left in June.

2        Q     So you became the lead tech before Ms.

3   Ondiek left St. Agnes?

4        A     Yes.

5        Q     Did you at any time receive any complaints

6   from Ms. Lauture against Ms. Rutter?

7        A     Yes.

8        Q     Do you recall when was the first time you

9   received a complaint from Ms. Lauture against Ms.

10  Rutter?

11       A     To the best of my knowledge, in December of

12  '05.

13       Q     December of '05, that was when Ms. Lauture

14  started the day shift.   Is that correct?

15       A     Yes.

16       Q     Okay.  So what was the complaint that you

17  received from Ms. Lauture?

18       A     I don't remember the exact complaint.   The

19  two of them were having a hard time trying to find a

20  way they could work with each other.

21       Q     So you cannot recall a specific complaint

1    that Ms. Lauture had against Ms. Rutter?

2         A    Not the specific details.  They were having

3    a hard time getting along.  I believe Ms. Lauture went

4    to Ms. Kinch with her complaint.

5         Q    But do you recall what specifically she was

6    complaining about?

7              MR. NICCOLINI:  Objection.

8              THE WITNESS:  They weren't getting along.

9    They couldn't find a way to communicate to help each

10   other do their job.  Stephanie wasn't doing what Ms.

11   Lauture thought she should do.  I mean, I don't

12   remember the specific complaint the first time.

13             BY MR. SULEMAN:

14        Q    So was there any time that Ms. Lauture

15   complained about Ms. Rutter?

16        A    Repeat that, please.

17        Q    You said that you don't recall for the

18   first time.  My question was, was there a second time

19   that Ms. Lauture --

20        A    There were several times they complained

21   about each other.

1        Q    The question, Ms. Weiger -- and I'm going to

2    give you the opportunity to talk about Ms. Lauture.

3    But for now the question is, did you at any time

4    receive any complaint against Ms. Rutter from other

5    employees?

6        A    Outside of just that they were having a hard

7    time doing their work with the interaction that was

8    going on.  I mean, I don't know how to separate the

9    two of them since it was in regards to the situation

10   between the two of them.  Other than that, there were

11   no complaints that I recollect at that time.

12       Q    So is it your testimony then that aside from

13   the issues between Ms. Lauture and Ms. Rutter, you did

14   not receive any other complaints from other employees

15   of St. Agnes against Ms. Rutter?

16       A    I'd have to review.  I mean nothing

17   behavioral during that time period.

18       Q    So say for instance you didn't receive any

19   -- there was no complaint against Ms. Rutter for rude

20   behavior toward other employees apart from Ms.

21   Lauture?

76

1        A    Not that I recollect.

2        Q    And no complaint to the best of your

3    knowledge about Ms. Rutter not doing that job?

4        A    There was a performance issue later on.   I

5    don't remember what that was.

6        Q    Okay.   What was that performance issue

7    about?

8        A    I don't remember.   Just --

9        Q    Around what time was it -- this performance

10   issue you mentioned, around what time was it?

11       A    It would have been after -- it would have

12   been 2006.   I don't recollect the nature of it without

13   reviewing her file.

14       Q    But Ms. Weiger, you knew you were coming

15   today here for the deposition?   Is that correct?

16       A    Uh-huh.

17       Q    And you knew I was going to be asking you

18   some questions.   And you testified this morning that

19   you reviewed some documents before you came here.

20       A    That I was given by Mr. Niccolini.

21       Q    Okay.   So when was this last job performance

79

1    content of that email to you?

2         A    (Perusing document.)  It appears that Debbye

3    had an issue with Kelly and Stephanie.

4         Q    Do you recall receiving that email?

5         A    No.  It was 2005.  I mean obviously I did.

6         Q    Okay.  So did you do anything about it?

7         A    I would have talked to Kelly and Stephanie

8    about not distracting their co-workers and to do their

9    work.  Beyond that, I mean I don't know the specific

10   details.

11        Q    Well, I understand you answered that you

12   would have.  But my question was, did you have any

13   discussions with Ms. Rutter and Kelly regarding this

14   email.

15        A    I don't recollect definitely.  I mean I

16   would hope I did or Peg, since Peg was copied in on

17   the email also.

18        Q    Do you know the other employee that is

19   referenced in this email, Kelly?

20        A    Uh-huh.

21        Q    Do you know the last name?

80

1          A     Ward, W-a-r-d.

2          Q     And what was Ms. Ward's job position at that

3     time?

4          A     At that time, she was a medical

5     technologist.

6          Q     And the Stephanie being referenced in

7     Deposition Number 8 is Ms. Stephanie Rutter.  Is that

8     correct?

9          A     Yes.

10          Q     Ms. Ward, do you know what was her race?

11     Is she white, or is she black?

12          A     She's white.

13                          (Whereupon, the document was

14                          marked as Weiger Deposition

15                          Exhibit Number 9, for

16                          identification.)

17          BY MR. SULEMAN:

18          Q     Can you please take a look at document which

19     has been marked as Deposition Exhibit Number 9.

20     (Handing document.)

21          A     (Perusing document.)

1          A    The email was addressed to Ms. Kinch.   She

2     just forwarded it to me to let me know what was going

3     on.  I do not remember.

4          Q    Ms. Rutter was also under your supervision.

5     Was she not?

6          A    Yes.

7          Q    So do you remember discussing this issue

8     with Ms. Rutter?

9          A    Not definitely.

10          Q    Do you remember discussing this issue with

11     Ms. Kinch?

12          A    Un-uh.  Not definitely.

13          Q    To the best of your knowledge, do you know

14     if Ms. Kinch spoke to Ms. Rutter about this conflict?

15          A    I do not know.

16          MR. SULEMAN:  Can we go off the record?   Do

17     you want to take a break at this time?

18          (Discussion off the record.)

19          (Whereupon, a luncheon recess was taken.)

20          BY MR. SULEMAN:

21          Q    Ms. Weiger, before we broke for lunch, we

105

1    attention back in January.  I thought she had made a

2    correction, but I guess she didn't.

3         Q    Okay.  So the wording in this document,

4    Deposition Exhibit Number 12, alleging that Ms.

5    Lauture created an unpleasant work environment and

6    dragging others, other co-workers into their Mexican

7    standoff -- the word Mexican stand-off, was that your

8    language or whose language?

9         A    No.  Ms. Kinch.

10        Q    Ms. Kinch language.  Did you read this

11   document before you signed it, Ms. Weiger?

12        A    Yes.

13        Q    And you understood what Mexican stand-off

14   meant?

15        A    Yes.

16        Q    What does it mean?

17        A    They both had drawn their lines and weren't

18   willing to -- appeared not to be willing to work with

19   each other anymore.

20        Q    So basically you agree with that statement?

21        A    Well, it probably wasn't the best choice of

106

1    words, but --

2        Q    You signed it none the less.

3        A    As a witness to the meeting.

4        Q    Well, this is a verbal warning that you are

5    giving to Ms. Lauture?

6        A    Correct.

7        Q    And according to this Deposition Exhibit

8    Number 12, you alleged against Ms. Lauture that the

9    kind of conduct being violated is not treating co-

10    workers with respect.  What do you mean by that?

11        A    Her treatment toward Stephanie wasn't -- was

12    not -- could have been more respectful.

13        Q    Like what?

14        A    I don't know if it was this time or later,

15    but she referred to her as a secretary, and they were

16    just both at each other.  I don't remember the details

17    of all of it.  They just could not find a way to

18    communicate.

19        Q    I just want to know if you have any

20    specific information you want to share with me as to

21    what facts you have for you to reach the conclusion to

107

1 give Ms. Lauture a verbal warning that she's not

2 treating co-workers with respect?

3   A We had hoped by giving the verbal warning

4 that they would see the seriousness of the situation

5 and help them and that they would try to work on it.

6   Q That is not an answer to my question, Ms.

7 Weiger.  Was there any specific conduct that you have

8 that Ms. Lauture committed that was a violation of

9 that kind of contact that you mentioned?

10   A Her interactions weren't -- didn't appear to

11 be respectful.  They were picking on each other,

12 tattling on each other like little children at some

13 points.  I do not remember the specific words or

14 statements that were made at the time.

15   Q You signed document number 12 on January 5

16 of '06.  Is that correct?

17   A Yes.

18   Q And Ms. Lauture transferred from the

19 evening shift to the day shift.  If you recall, when

20 was that?

21   A Beginning of December '05.

116

1      A      January 2, 2006.

2      Q      And the last entry date was January --

3      A      23rd, 2006.

4      Q      And this report was not made, according to

5      you, until February 2 of '06.  Is that correct?

6      A      Correct.

7      Q      Now, if you look at page two of Exhibit

8      Number 14, there was an alleged clinical error --

9      that's number three on page two -- that, on January 23

10     of '06.  What information do you have that it was Ms.

11     Lauture that was responsible for that incident?

12     A      Ms. Kinch dealt with this.  I only have what

13     I have here and that she said it.  Her job duty would

14     have been setting up the specimens in January.  So I

15     was not directly involved with this one.

16     Q      Did you make any attempt to verify any of

17     the allegations in this document number 14, or you

18     just took Ms. Kinch's word for it?

19     A      There was no reason to doubt her.  I signed

20     the documents as a witness in the meeting.

21     Q      So is that your testimony then, Ms. Weiger,

117

1   that you only signed as a witness at the meeting, not

2   that you have specific knowledge of the errors in this

3   document?

4            MR. NICCOLINI:  Objection.  Are you asking

5   about personal knowledge of that one incident or

6   anything in the exhibit?

7            MR. SULEMAN:  All the alleged errors in this

8   document, Ms. Weiger.

9            THE WITNESS:  I heard about them.  But the

10  "I's" in here are Ms. Kinch.

11           BY MR. SULEMAN:

12       Q    Okay.  When you said you heard about them,

13  from whom?

14       A    Ms. Kinch.

15       Q    Between you and Ms. Kinch, who is the

16  senior employee?

17       A    I've been there longer.  There's a time

18  the job duties were intertwined.  I'm not exactly sure

19  what you mean by senior.

20       Q    I know that both of you are a lead tech in

21  the microbiology lab.  Right?

125

1       were the clinical errors for which you had Ms. Lauture

2       suspended for?

3           A     The errors from the previous warning plus

4       the additional ones.  She was having problems with the

5       PCP and AFB procedures.  Her QC, documenting various

6       QC's, corrective action temperatures, possibly

7       mislabeling specimens, processing specimens not

8       according to protocol.

9           Q     Anything else?  As best as you can recall,

10      was there any other reason or any other job

11      performance issue that led to Ms. Lauture being

12      suspended?

13          A     The various different -- it's documented,

14      the different procedures that she didn't follow.

15          Q     Okay.  So you and Ms. Kinch, you went to

16      talk to the people at HR.  Is that correct?

17          A     Correct.

18          Q     And was it then your recommendation for Ms.

19      Lauture to be suspended?

20          A     It was the group's decision.

21          Q     But I know it was, or I heard you testify

126

1       that it was a group decision.  But did anybody make

2       the initial recommendation?

3            A    I don't remember who it was.  I know Ms.

4       Kinch and I went to HR to see how to proceed next.

5            Q    Okay.  And the issues that you brought to

6       HR, it was you and Ms. Kinch who brought those issues

7       to them?

8            A    Correct.

9            Q    And sitting here today, do you recall the

10      specific clinical error that led to Ms. Lauture being

11      suspended?

12           A    It was the collection of errors.

13           Q    A collection of errors.  Do you recall the

14      dates that you had this meeting with the HR people?

15           A    It was either February 6 or 7.  I don't

16      remember the exact date.

17           Q    But is it your testimony then that it was

18      the date that you signed this document or before?  Was

19      it the day before February 7 or February 7, or when

20      was it that you had this meeting with HR?

21           A    I believe it was the 7th.

131

1      She didn't seem to understand that there was the

2      same -- positive and negative slide was used for both

3      staining techniques because they were both looking for

4      the same organism.

5           Q     And it is your position that that cannot

6      be corrected by training?

7           A     I don't know.  She didn't stay long enough

8      to let us finish training.

9           Q     So Ms. Lauture was suspended.  Is that

10     correct?

11          A     Yes.

12          Q     To the best of your recollection, for how

13     many days?

14          A     Three days, I believe.

15          Q     Okay.  And was she paid for that period of

16     time, do you know, for the three days suspension?

17          A     I don't think so.

18          Q     Okay.

19          A     I don't believe so, but I don't --

20          Q     Did you have any discussions with Ms.

21     Lauture before she was suspended?

150

1          A     It was the week before she resigned.

2          Q     Before Ms. Lauture resigned?

3          A     Yes.

4          Q     The week before?

5          A     During that week.  I don't remember if it

6     was Wednesday or Thursday.

7          Q     Okay.  And who was at this meeting?

8          A     Myself, Ms. Kinch, Jo Oliver, Aimee

9     Ringgold, Colleen Meagen.  I can't remember if there

10    was another HR person there or not.

11         Q     Anybody else?

12         A     And then they met with Ms. Lauture first,

13    because they had heard Stephanie's complaint the day

14    before, which we had not heard, to give her a chance

15    to talk.  And then they called Stephanie into the

16    room.  That's all I can remember being there for sure.

17         Q     So do you remember anything that Ms. Rutter

18    said was the base of her complaint?

19         A     She didn't like that Geraldine called her a

20    secretary.  It's more the same complaints that -- I

21    don't remember the specific complaints in the meeting.

158

1        least put a time frame on it?

2                BY MR. SULEMAN:

3        Q    During the time when Ms. Lauture was still

4    working at St. Agnes, do you know if she made a

5    complaint of discrimination against you to HR?

6        A    At that time?

7        Q    Yes.

8        A    No.  I did not.

9                        (Whereupon, the document was

10                       marked as Weiger Deposition

11                       Exhibit Number 21, for

12                       identification.)

13               MR. NICCOLINI:  I'm sorry.  Did you mean to

14   hand me two?

15               MR. SULEMAN:  I'm sorry.

16               THE WITNESS:  That one, I think you already

17   gave us.  I think that was 20.

18               MR. NICCOLINI:  Don't worry about it.

19               MR. SULEMAN:  That was an extra one.  I'm

20   giving you a preview.

21               MR. NICCOLINI:  It was hard to see the

162

1    you and tell you that Ms. Lauture has made a complaint

2    of discrimination against you?

3         A    No.

4         Q    So when was the first time that you had any

5    idea that Ms. Lauture is alleging that you are

6    discriminating against her?

7         A    Well, there was this letter.  And then after

8    she resigned, we were contacted by HR that the lawyer

9    wanted to speak to us.

10        Q    Okay.  So when you say about this letter,

11   you are referring to Deposition Exhibit Number 21?

12        A    Yes.  Correct.

13        Q    And when you received that letter,

14   Deposition Exhibit Number 1 (sic), you understood it

15   to mean that Ms. Lauture is accusing you of

16   discrimination.  Is that correct?

17             MR. NICCOLINI:  Objection.  Do you mean

18   Exhibit 21?

19             MR. SULEMAN:  Yeah.

20             MR. NICCOLINI:  You said Exhibit 1.

21             BY MR. SULEMAN:

1     Q    I'm sorry.  Number 21.  Do you understand

2     Exhibit Number 21 to indicate that Ms. Lauture was

3     accusing you of discrimination?

4     A    And that she felt she had been treated

5     unfairly.

6     Q    Okay.  Please go ahead.

7     A    I did not know of any -- HR never contacts

8     about any specifics until later.

9     Q    Okay.

10     A    She was no longer working there.

11     Q    Okay.  Thank you.

12                              (Whereupon, the document was

13                              marked as Weiger Deposition

14                              Exhibit Number 22, for

15                              identification.)

16     BY MR. SULEMAN:

17     Q    Now, Exhibit Number 22, Ms. Weiger, do you

18     recognize that document?  (Handing document.)

19     A    (Perusing document.)  Yes.

20     Q    What is it?

21     A    It's Geraldine Lauture's resignation letter.

COMPOFELICE REPORTING SERVICES     (301) 596-2019

1    knowledge -- you've met Ms. Meagen, right?

2           A    (Nodding head.)

3           Q    Is she black, or is she white?

4           A    She's white.

5           Q    And to the best of your knowledge, was she

6    born in the U.S.?

7           A    I have no knowledge of that.

8                                (Whereupon, the document was

9                                marked as Weiger Deposition

10                               Exhibit Number 23, for

11                               identification.)

12          BY MR. SULEMAN:

13          Q    Can you take a look at the document marked

14   as Deposition Exhibit Number 23?   (Handing document.)

15   Do you recognize that document?

16          A    (Perusing document.)   Was there a question?

17          Q    Oh, I'm sorry.   I thought you heard me.   I

18   said, do you recognize that document.

19          A    I have not seen it before because this is

20   all done electronically.   But I do know what it is.

21          Q    Okay.   What is it?

1    Agnes, was there ever, to the best of your knowledge,

2    any employee from micro lab that resigned, gave St.

3    Agnes two weeks' notice, and that employee was told,

4    no.

5         MR. NICCOLINI:  An objection.  She did just

6    give you an answer and a specific example to the best

7    of her knowledge, which is exactly what you're asking

8    for, so --

9         BY MR. SULEMAN:

10        Q    Apart from -- because it is not clear.

11   You are not sure whether Ms. Ondiek, what happened in

12   that case.  So to the best of your knowledge, that's

13   what I'm asking.  If you are not sure, don't mention

14   any names, if you are not sure.  The question is, to

15   the best of your knowledge, are you aware of any

16   employee who gave two weeks' notice of resignation and

17   was asked to go immediately.

18        A    No.

19        Q    Thank you.  And also to the best of your

20   knowledge, for all the employees who worked at the

21   micro lab, to the best of your knowledge, was there

1       any employee who resigned and was escorted out of the

2       building?

3              A     Not that I know of.

4              Q     Now, with respect to all the employees

5       under your supervision, Ms. Weiger, I need you to tell

6       me if at any time you had made a recommendation for

7       any of the employees under your supervision to be

8       suspended?

9              A     Did I ever recommend?

10             Q     Yes.

11             A     Personally?

12             Q     Uh-huh.

13             A     Suspension has to be -- is an action that

14      takes place in conjunction with HR.  I have not

15      specifically asked for anybody to be suspended.

16             Q     What about to the best of your knowledge?

17      Ms. Kinch, to the best of your knowledge, has she ever

18      asked for any employee to be suspended?

19                   MR. NICCOLINI:  Objection.

20                   MR. SULEMAN:  To the best of her knowledge.

21                   MR. NICCOLINI:  Oh, now to the best of her

1        supervision that you have documented any clinical

2        errors against?

3                A       Sally Turner.

4                Q       Okay.   Who else?

5                A       That's the main one that comes to mind.

6                Q       And when did you document that clinical

7        error against Ms. Turner?

8                A       I don't know specific dates.   There were

9        several.   She was put on an action plan in August or

10       September 2008.

11               Q       Okay.   And what was the nature of the

12       clinical error that she made, if you can recall?

13               A       I don't remember the specifics, but it was

14       not following the departmental policies.

15               Q       And was it you or Ms. Kinch or both of you

16       who documented this clinical error you just talked

17       about?

18               A       Both of us.

19               Q       Okay.   Do you recall specifically what it

20       was about?

21               A       Not specifically.   There were several.

177

1          Q     And what was the action plan that Ms.

2     Turner was put on?

3          A     That she would follow the protocol.  And if

4     she had any objections to how the protocol was, she

5     had to present it in writing with references.  And we

6     would present it to our medical director.

7          Q     Ms. Turner, was she suspended?

8          A     Not at that time.

9          Q     Was Ms. Turner asked to be retrained?

10         A     No.

11         Q     Does Ms. Turner still work for St. Agnes?

12         A     No.

13         Q     When did she stop working for St. Agnes?

14         A     She resigned in November 2008.

15         Q     And do you know why she resigned?

16         A     Because she received a sub-standard

17    evaluation, which resulted in no raise.

18         Q     Who did the evaluation?

19         A     Ms. Kinch, I, along with input from our

20    supervisors, Rob SanLuis and Jo Oliver.

21         Q     Okay.  So apart from Ms. Turner, can you

188

1          A    I don't know, specifically.

2               MR. SULEMAN:  Okay.  I guess I'm almost near

3      the end.  So let's go off the record.

4               (Off the record.)

5               MR. SULEMAN:  Back on the record.  We're

6      almost done.

7               BY MR. SULEMAN:

8          Q    Now, apart from Ms. Lauture, to the best of

9      your knowledge, did any other employee at the micro

10     lab ever complain against you for racial

11     discrimination?

12         A    Not that I'm aware of.

13         Q    Okay.  Apart from Ms. Lauture, did any other

14     employees under your supervision ever complain against

15     you in terms of national origin discrimination?

16         A    Not that I'm aware of.

17         Q    Did you attend any training with St. Agnes

18     with respect to non-discrimination in the work place?

19         A    I attended a diversity training program.

20         Q    Okay.  When was this?

21         A    In the spring of 2005.

1          Q     And where was it?

2          A     It was hosted by the St. Agnes Hospital.

3     And we used base at Cardinal Gibbons High School,

4     across the street.

5          Q     Okay.  So it was organized by St. Agnes.  Is

6     that what you're saying?

7          A     Yes.

8          Q     So what was the training about?

9          A     Dealing with everybody, diversity.

10    Everybody is different for different reasons.

11         Q     Okay.  Do you have any documentation of that

12    training?

13         A     I probably have a certificate in my drawer.

14         Q     Okay.  So it was a live training?

15         A     Yes.  It was two days --

16         Q     You have to go to that location?

17         A     Yes.  It was a two day training session.

18         Q     Who was there, to the best of your

19    recollection?

20         A     I think Sherry Bougandorf (phonetic) was the

21    host.  I do not remember the name of the lady they

191

```
 1          A    Not that I can recall.  There was a talk

 2     that Kerwin did on -- more dealing with sexual

 3     harassment, but --

 4          Q    Who did that?

 5          A    Kerwin.  I think his name is Thompson.

 6               MR. NICCOLINI:  If you remember.

 7               THE WITNESS:  Oh.  Kerwin, who was the

 8     current -- was the diversity manager after Sherry

 9     Bougandorf left.

10               BY MR. SULEMAN:

11          Q    Okay.  And that was on sexual harassment?

12     Is that what you're saying?

13          A    That was just like an hour long talk that

14     he gave that mainly dealt with sexual harassment.

15          Q    Okay.  And where did that take place?

16          A    St. Agnes campus.

17          Q    Do you recall when this was?

18          A    No.

19          Q    Do you recall the year?

20          A    No.

21          Q    Okay.  Was it before Ms. Lauture started
```

COMPOFELICE REPORTING SERVICES    (301) 596-2019

192

1    working at St. Agnes?

2         A    No.  I believe it was after she left.

3         Q    Did you take any on-line training for non-

4    discrimination in the work place?

5         A    I know -- not that I remember.

6         Q    To the best of your knowledge, is there

7    anything like that?

8         A    I think there is one on our training for

9    this year.  But I can't testify for sure.

10        Q    Okay.  So apart from training on non-

11   discrimination, did you attend any supervisory

12   training with St. Agnes?

13        A    What kind of training?

14        Q    How to train, how to deal with employees.

15   That kind of issues.

16        A    There was one course that -- one day course

17   that HR gave -- I do not remember the title or when it

18   was -- on dealing with employee relations.  But I

19   cannot remember the details of it without looking at

20   my notes.

21        Q    Okay.  And what notes are you talking about?