# EXHIBIT
# 31

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MARYLAND

 3   GERALDINE LAUTURE,

 4            Plaintiff,              Civil No.

 5       vs.                         CCB-08-943

 6   ST. AGNES HOSPITAL,

 7            Defendant.

 8   _____/

 9

10

11            Pursuant to Notice, the deposition of

12   MARGARET J. KINCH was taken on Monday, January

13   5th, 2009, commencing at 10:23 a.m., at the

14   offices of McGuireWoods, LLP, 7 St. Paul

15   Street, Suite 1000, Baltimore, Maryland 21202,

16   before Kathryn M. Benhoff, Notary Public.

17

18

19

20            Corbin & Hook Reporting, Inc.

21              Annapolis, MD 21401-9996
```

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
1                  A P P E A R A N C E S

2       ON BEHALF OF THE PLAINTIFF:

3             FATAI A. SULEMAN, ESQUIRE

4             Amity, Kum & Suleman, PA

5             7474 Greenway Center Drive - Suite 650

6             Greenbelt, Maryland  20770

7             301-982-3434

8       ON BEHALF OF THE DEFENDANT:

9             ROBERT R. NICCOLINI, ESQUIRE

10            McGuireWoods, LLP

11            7 St. Paul Street - Suite 1000

12            Baltimore, Maryland  21202

13            410-659-4400

14      ALSO PRESENT:

15            Warren Bray, Videographer

16            Geraldine Lauture

17

18

19

20

21
```

1   cancer, and I'm on medical disability for some

2   surgeries.

3        Q.   Well, we very much appreciate your time

4   today, Miss Kinch.

5        A.   Thank you.

6        Q.   Prior to going out on long-term

7   disability, what was your position at St. Agnes

8   Hospital?

9        A.   I am the lead technologist or one of the

10  lead technologists for the microbiology laboratory.

11       Q.   Okay.  And when did you first become lead

12  technologist for the microbiology laboratory at

13  St. Agnes Hospital?

14       A.   In June, the very end of June in 2005.

15       Q.   And what were your job duties as lead

16  technologist in the microbiology department?

17       A.   One of my main duties was to make sure

18  that the laboratory was going to pass its

19  accreditation inspection, to write procedures, to

20  hire people, to create processes for the functioning

21  of the microbiology department.  I also had, there

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1    manuals and that stuff, and you know, they are

2    available, and what we would also do, because you

3    don't want to get up and walk over to these manuals,

4    you would print it out and stick it where you were

5    working, you know, so it's readily available.

6        Q.   Okay.  Following February 2nd, 2006, did

7    Miss Lauture have some other clinical performance

8    issues?

9        A.   Yes, there were several other issues.

10        Q.   And did you write her up for those issues?

11        A.   Again, yes, we documented and talked with

12    her about them.

13        Q.   All right.  Let me hand you what's marked

14    as Defendant's Exhibit 3, and I'll ask you if you

15    can identify that document.

16        A.   This was a counseling report for Geraldine

17    dated February 7th, 2006, and at this point, we had

18    asked for suspension, and again, all of this had to

19    go down to HR to be reviewed, and they, they

20    actually make that decision, not us, and again,

21    there were several performance issues that had

1    refrigerator was actually working properly, so you

2    put the probe back in and again, it read, you know,

3    properly, but what Geraldine had done, she just

4    recorded it as 21, no documentation, not even

5    recognition that it was out of range, nothing.

6            So when I first became lead, the

7    recording of QC and what you do was very sloppy.

8    The techs just, you know, weren't doing it, and so

9    in meetings, we discussed this.  You know, hey,

10   folks, we're going to be inspected.  You need to do

11   this.  It is a legal document, you know.  You know,

12   if you see something wrong, you got to say what you

13   did and follow up on it, like if the refrigerator

14   was broken, you got to call maintenance or the

15   refrigerator guy to come up and fix it, so you know,

16   so the techs were well aware of that, and what we

17   ended up doing was, or what I ended up doing when I

18   reviewed the QC, I just started writing people up

19   and saying you failed to document, blah, blah, blah,

20   blah, blah, blah, blah, and it took about two

21   months, and people got on board, and we don't have

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1    saying that this was incorrect, we regret that we

2    had sent this.

3        Q.    Well, let me hand you what's marked as

4    Defendant's Exhibit 4.

5        A.    Okay.

6        Q.    And I'll ask you if you can identify that

7    document.

8        A.    Yes, this is, this is what we wrote.  It

9    was the amended document in reference to this

10   counseling report.  We said we had correctly stated

11   the mishandling of the 56 degree water bath.

12   Adjustments caused the delay in performing this

13   test.  That was wrong.  In fact, the test that was

14   delayed was the cryptococcal antigen test.  It was

15   totally different.  Two different benches were doing

16   those.  One was blood cultures for the meningitidis,

17   and the Cryptococcus was another tech, another

18   bench, immunology bench, so again, we apologized for

19   implying that she was involved with the safety issue

20   and -- but again, the issue still remained that she

21   did not do the proper documentation for the bath,

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
 1   schedule and I wrote all these people up, gave it to

 2   them, you know, and they came back and said I wasn't

 3   working that day, and I thought okay, you know, and

 4   so I have documentation of counseling for people

 5   who, you know, had made mistakes, had not done their

 6   QC, that kind of things.

 7                  There was -- because Human Resources

 8   was kind of in chaos, too, and the counsel -- they

 9   were reviewing and changing their policies on

10   counseling, because it used to be different as to

11   when you, when you went from verbal to written to,

12   to suspension.  It was other steps, so I recommended

13   that we create a lab counseling form, too, and so we

14   did that as like an internal form that like here, it

15   was yes, you forgot to do something, but the

16   seriousness of what you did did not warrant a

17   hospital counseling report.

18        Q.   And when, when was this?  When did you

19   make that recommendation?

20        A.   Oh.  I, I don't know.  Probably pretty

21   close to when I first became lead tech, and we used
```

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
1       A.    Same -- I don't know with Ryan.

2       Q.    How about Ryan?

3       A.    Not that I can recall.  Mainaki, yes.

4  Christina, yes.

5       Q.    Okay.  Just give me one second to write

6  this down.

7       A.    I'm sorry.

8       Q.    So your testimony is that you did write up

9  Miss Mainaki?

10      A.    Yes.

11      Q.    As far as you can recall --

12      A.    As far as I can recall, and again, I don't

13  know how many times.  This would have been for a lot

14  of QC documentation, not recording things.  There

15  were people who actually had made, made errors, you

16  know, and it would be documented, like I know

17  offhand like with Debbye Sanchez, there were panic

18  values that were not called.

19      Q.    Okay.

20      A.    And more than one.

21      Q.    All right.
```

1    counseling thing.

2        Q.   Okay.  Now, on these occasions that you

3    wrote up these employees that you mentioned,

4    Miss Weiger also signed along, too; is that correct?

5        A.   Yes, I think so.  Well, yes, I think so.

6        Q.   Now, does -- now, with respect to

7    Miss Rutter, I almost missed her.  Did you ever have

8    occasion to document any errors or mistakes by

9    Miss Rutter?

10       A.   I, we did what I recall is mostly the

11   incidents with Geraldine and her, the personnel

12   stuff.  I don't recall writing up any clinical error

13   with her.  I don't recall.  If I did, I did.  I

14   don't recall it offhand.  The main issue that I

15   recall with her were lack of attendance.  She would,

16   you know, there were those issues that she did

17   not -- she'd call out.  You know, she, in a 12-week

18   period, there would be problems with her calling

19   out.  There was also issues with HIPAA violations.

20       Q.   What?

21       A.   HIPAA.

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1      Q.   Well, I'm talking about the period before

2   Miss Lauture left St. Agnes.  Did you have any

3   occasion to document any errors by Miss Rutter apart

4   from what's just mentioned, apart from --

5      A.   Not that I can recall.

6      Q.   What about Miss Weiger?  To the best of

7   your knowledge, do you know if she ever document any

8   errors by Miss Rutter?

9      A.   I don't, don't know, no.

10      Q.   I think this would be best time for us to

11   take a break.

12           VIDEOGRAPHER:  We're now off the record at

13      12:35 p.m.  This the end of tape one.

14           (Lunch recess.)

15           VIDEOGRAPHER:  We're now back on the

16      record at 1:25 p.m.  This is the beginning of

17      tape two.  You may proceed.

18   BY MR. SULEMAN:

19      Q.   Thank you.  Now, Miss Kinch, you are

20   saying you remember the name of the --

21      A.   Yes.

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1    interpret the word Mexican stand-off to have racial

2    undertones?

3              MR. NICCOLINI:   Objection.

4        A.    I don't know what they would interpret.

5        Q.    Okay.

6        A.    You know, it certainly was not a

7    professional terminology, but I think when people

8    read it, they absolutely understood what was going

9    on.

10       Q.    Well, strike that.   Now, if you go, if you

11   go further on your Defendant Exhibit No. 1, you

12   stated that a code of conduct --

13       A.    Yes.

14       Q.    -- being violated --

15       A.    Yes.

16       Q.    -- is what?

17       A.    Is what?

18       Q.    Yeah.   What, what code of conduct was Miss

19   Lauture --

20       A.    There's a code of conduct for the

21   employees at St. Agnes, and there's quite a bit of

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1        Q.    So my question is you mentioned that she,

2    Miss Lauture called Miss Rutter a secretary --

3        A.    Yes, she did that.

4        Q.    -- in your presence.  What was --

5        A.    As to what date she did that and how often

6    she did that, I could only testify to the time when

7    I heard her actually say that.

8        Q.    Okay.  Now --

9        A.    And what date that was, I could not say.

10       Q.    Okay.  So I go back to my question again.

11       A.    How did she treat her with disrespect?

12       Q.    Exactly, before this, before the date of

13   this exhibit.

14       A.    Okay.  She treated her with disrespect by

15   the two of them not getting along, not talking to

16   each other, not answering questions, accusing her of

17   not doing her job.  She would come to me and say

18   that Geraldine, she'd say she's supposed to answer

19   the phone.  I told her to do something ten minutes

20   ago, and it's still not done.  Okay, except that

21   Geraldine is not her boss.  They are co-workers.

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
1    same thing.  All I did was on the top, I put

2    Stephanie Rutter and changed wherever Stephanie was

3    to Geraldine and wherever Geraldine was was to

4    Stephanie.  It was exact -- because it was an

5    argument or whatever it was, it was between the two

6    of them.  If I may be allowed to expound a little

7    bit, I asked --

8         Q.   Well, ma'am, there is no question pending.

9    Wait for the question --

10        A.   Okay.

11        Q.   -- and then you may answer.  Now, I need

12   to be specific.  Do you at any time receive any

13   complaint from Miss Lauture against Miss Rutter?

14        A.   Yes.

15        Q.   Okay.  What was the first complaint that

16   you received from Miss Lauture against Miss Rutter?

17        A.   Oh, I couldn't say what the first one was,

18   but she came to me several times complaining

19   Stephanie did not answer the phone, Steph -- I told

20   her to do something.  Stephanie didn't do it.  It's

21   been ten minutes.  Both of them would come and they
```

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
 1        A.   Yes.  That's what they, that's what the

 2   people from HR told us, and, and this is when they

 3   also told us the -- this part changed.  It used to

 4   be a verbal warning, a written warning, a second

 5   warning, a third warning and a suspension.  They

 6   changed that, also.  It wasn't -- I think it goes on

 7   later on, you can see here, it's on No. 2 --

 8        Q.   Are you referring to, what exhibit number

 9   are you referring to?

10        A.   Exhibit No. 2.

11        Q.   No. 2?

12        A.   Okay.

13             MR. NICCOLINI:  Defendant's Exhibit 2.

14        Q.   Defendant Exhibit No. 2.

15        A.   You can see right on the bottom, they've

16   already changed it by February.  It's a verbal, a

17   written, a suspension, a termination.  On the first

18   one when we did this in January, there were more

19   written chances.  You see chances?

20        Q.   Okay.

21        A.   Okay?  So this was part of the meeting
```

1    thing was done either the day before because I

2    wouldn't have kept it.  I would have, you know,

3    typed it and talked to her like the next day or if

4    she was not there, you know, the next day when she

5    came in, but all of these reports had to go to HR.

6    They made the decision as to what the outcome or

7    consequence were, not us.  If we had asked to have

8    somebody suspended and they didn't agree to that,

9    they did not get suspended.  It was based on HR's

10   decision as to what happened, so as to when all of

11   this was typed up, I could not say.  I'd have to go

12   back to my computer to see, you know, when the file

13   was made.

14        Q.   See, that is, that is my precise concerns,

15   my concern, Miss Kinch, because you had entries in

16   Defendant Exhibit No. 2 --

17        A.   Uh-huh.

18        Q.   -- for incidents that happened as early as

19   January 2nd of '06?

20        A.   Yeah.

21        Q.   So I guess my question to you is this,

1    different occasions?

2        A.   Oh, yes, it would have been typed up all

3    at once, and it would have been obviously after

4    January 23rd because that's the date that, you know,

5    is on there.  You know, it's bing, bing, bing, bing,

6    bing.  Then after that, it would have gone down to

7    HR --

8        Q.   Okay.

9        A.   -- to look at it for their decision as to

10   what to do.

11       Q.   Okay.  So going through Defendant Exhibit

12   No. 2, you, you wrote about an incident on January

13   2nd of 2006.  What was the clinical error that was

14   involved in that incident?

15       A.   That clinical error was that when she

16   inoculated plates and made the smear from a spinal

17   fluid, she used the supernatant after spinning it

18   down, so you have a fluid that has many white cells

19   in it and bacteria.  She puts it in the centrifuge.

20   She spins it.  All of that goes to the bottom of the

21   tube.  What she used to make the slide and to

Deposition of Margaret Kinch
Taken on January 5, 2009

1    inoculate the plates was the top of the fluid.  She

2    had questions herself and came -- I would not have

3    known this had she not asked me, okay.  She came

4    because she thought there were two different types

5    of bacteria, which is unusual, but it could be, and

6    then when I saw the slide and said, you know, where

7    are all the white cells, because this lady had

8    greater than 8000 white cells.  It should have been

9    loaded, okay, so that was the error, that she had

10   not set up the specimen properly, not made the smear

11   properly, and had she reported it out, it would have

12   been inaccurate.

13        Q.   Okay.  So it was Miss Lauture herself who

14   came to ask you about that --

15        A.   Because of the --

16        Q.   -- incident?

17        A.   -- of the, of the two different bacteria,

18   yes.

19        Q.   Okay, fine.  And then the incident of

20   January 23 of 2006, as you indicated on Defendant

21   Exhibit No. 2?

1   tell that it's her, not somebody else, based on the

2   time that these were accessioned and came in.

3        Q.   Okay.

4        A.   Okay?

5        Q.   Did you talk to Miss Lauture as to the

6   issue of that specimen being left under that hood?

7   Did you talk to her about it, No. 7 on Exhibit

8   No. 2?

9        A.   If I did, I don't know.  I probably did.

10  I don't have documentation if I talked to her.  Did

11  I talk to you?  I don't know.

12       Q.   Okay.  All right.  No. 8 --

13       A.   Uh-huh.

14       Q.   -- on Defendant Exhibit No. 2.  What was

15  the clinical error that was involved in that

16  incident?

17       A.   This was not recording the eye wash check

18  for January.  We have two different eye washes in

19  case somebody gets something in their eye, and

20  you're required to squish the, you know, to let the

21  water run through them each day, and you check off

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
 1    that you did this.  This is a duty that's assigned
 2    to the planter bench to check this off.  She --
 3    there was no chart, and she blamed Stephanie for not
 4    putting up a chart.  I asked her when were you going
 5    to let me know, you know, it's been weeks.  I review
 6    my QC monthly, and I was upset, also, like why do
 7    you not know where the charts are kept.  You've been
 8    working here, you know, in the evening shift, too.
 9    Everything's over, you know, it's all labeled with
10    all the manuals and everything, you know, QC charts,
11    all of that is there.
12                    So then she asked me well, should I
13    fill it in, and I said did you actually do the
14    checks.  She said yes.  I said well, then you should
15    fill it in that you actually did them.  That, I
16    should not have let her do that.  The reason for
17    that is it's backdating even though she -- I
18    believed her.  I believe she did do that.  What I
19    should have done was document on the QC chart no
20    recording.
21         Q.   So did St. Agnes, did they get to know
```

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1    that you instructed to Miss Lauture about that?

2         A.    Yes, they did know that.

3         Q.    Okay.

4         A.    I talked with -- apparently, Geraldine had

5    talked with a woman named Sherry Bubendorf to I

6    guess discuss issues of discrimination, or I don't

7    know whatever, but Sherry talked with me, and I

8    talked to her about that, yes.

9         Q.    So was it proper procedure for you to

10   instruct Miss Lauture to backdate the report?

11        A.    No, it was not.

12        Q.    Were you disciplined for that?

13        A.    No, I was not.

14        Q.    Okay.  And Miss Lauture told you that

15   Stephanie, Miss Rutter failed to put up the chart?

16        A.    It's not her duty to do that.  Anybody

17   could have put up the chart.

18        Q.    Okay.

19        A.    If you're doing something and you're going

20   to go record it and you don't have a chart, you go

21   get one.

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
1        A.    Uh-huh.

2        Q.    -- in both of those exhibit?

3        A.    Yes.

4        Q.    And I'm telling you that the 56 degree

5   bath issue that you mention in Defendant Exhibit

6   No. 3 --

7        A.    One, one of the reasons why it may not

8   have been done, I review the QC monthly, and it

9   depends on when I reviewed it.  I may not have

10  reviewed it by the 2nd.  It's back, you know, like

11  if it's the beginning of the month, I go back and

12  do, you know, the month, so it depends on when I

13  would have looked at it.

14       Q.    Okay.

15       A.    I'm guessing that may be why it wasn't

16  mentioned.  I'm not sure.

17       Q.    Okay.  Now, also, looking at Defendant

18  Exhibit No. 3, you stated that you informed

19  pathology about the meningitis scare?

20       A.    Yes.

21       Q.    Who did you inform at pathology?  Who did
```

```
 1          unionized environment, as to whether or not

 2          there's any legal basis of requiring some sort

 3          of progressive discipline, that's well beyond

 4          the scope of this witness' ability to answer,

 5          so I'm going to object.

 6          Q.   Well, I'm going to ask you this, then.

 7    Are you familiar with the disciplinary process of

 8    St. Agnes?

 9          A.   I know they have a policy.  I'd have to

10    review it again, and again, I believe that the

11    policy states depending on what the person does, it

12    can go immediately, just not even a warning, just to

13    being fired.  Like let's say you were stealing from

14    them or something, you know, they just, you know.

15          Q.   And did you, did you make the

16    recommendation for Miss Lauture to be suspended?

17          A.   No, we did not.

18          Q.   You did not recommend --

19          A.   No.

20          Q.   -- HR for suspending?

21          A.   No, because, and again, because we were
```

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1          Q.   Well, they are the same.  If you read, if

2     you read Plaintiff Exhibit No. 1, it also contains

3     complaints of racial discrimination in that, so if

4     that the way you want to take it --

5               MR. NICCOLINI:  And that's, that's why I'm

6          objecting because I --

7          Q.   I take it down if that's what you want us

8     to do.

9          A.   Well, as far as I know, Geraldine did not

10    make a complaint about anything that I had done to

11    her or not done to her to Human Resources aside from

12    receiving this letter, and that's when I discovered

13    that we had made the mistake, and then again, I

14    don't know later on that she did file a complaint

15    for discrimination, and I don't know when that was.

16    We met with the hospital lawyer, and then

17    subsequently, we met with the lady from the

18    Baltimore EEOC.

19         Q.   Okay.

20         A.   Am I answering --

21         Q.   That's fine, so let me just try and break

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1    it down so we don't get confused here.  For the

2    period of time when Miss Lauture was still working

3    at St. Agnes, did anybody from HR came to you and

4    told you that we have a complaint against you for

5    discrimination from Miss Lauture?

6           MR. NICCOLINI:  Objection.

7       Q.    Okay.  Answer the question.  Did

8    anybody --

9       A.    No.

10      Q.    -- from HR came to you and tell you that

11   we have a complaint against you from Miss Lauture?

12      A.    Sherry Bubendorf called me when Geraldine

13   had talked with her.  She didn't say anything about

14   discrimination as I recall.  She asked about the,

15   the chart, the eye wash chart.  She asked other

16   questions.  I talked to her.  I guess there were

17   some other people in the room.  Maybe Geraldine was

18   there, too.  I don't know.  Asked some more

19   questions.  Again, I don't know what about, but I do

20   remember about, you know, the chart, and I said yes,

21   that was a mistake on my part.  I should not have

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1    conversation.

2        Q.    Do you recall if it was before or after

3    Miss Lauture's suspension?

4        A.    No, I don't.

5        Q.    So for the period of time when

6    Miss Lauture was with St. Agnes, nobody talked to

7    you about any complaint from Miss Lauture --

8            MR. NICCOLINI:  Objection.

9        Q.    -- about the discrimination?

10           MR. NICCOLINI:  Objection.  Answer to the

11           best of your ability.

12       A.    The only time that I talked with anybody

13   about discrimination that she had made that

14   complaint was from the lawyer, from the hospital

15   lawyer, Melissa Surrey (phonetic).

16       Q.    But that was after she left?

17       A.    Right.

18       Q.    I'm trying to, you know, restrict the time

19   frame here.  I'm talking about during the time of

20   Miss Lauture's employment with St. Agnes.  Let's

21   limit it to that time period first.

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
1        A.    Right.  Not that I know of.  I mean, I

2    talked with Sherry.  I know she was the diversity

3    lady, I think.

4        Q.    Uh-huh.

5        A.    And again, all I recall of that

6    conversation was about the chart.

7        Q.    Okay.  Now, after Miss Lauture left

8    St. Agnes, did anybody come to tell you that she's

9    filing charge of discrimination against you?

10       A.    Against me myself?

11       Q.    Yes.

12       A.    No.

13       Q.    Okay.  Do you recall talking to a lady

14    name Miss Monica Wilson with the office of -- am I

15    right?

16             MR. NICCOLINI:  Excuse me?

17       Q.    Miss Monica Wilson.

18       A.    I spoke with somebody from Baltimore.  I

19    don't remember her name.

20       Q.    Okay.  Did you have any interview with

21    anybody from the EEOC office --
```

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
 1              MR. NICCOLINI:  Objection.

 2        Q.    That would surprise you?

 3        A.    Yes.

 4        Q.    Why would that surprise you?

 5        A.    Because I'm not, and I was not party to

 6   any conclusion as to that meeting or decision.  That

 7   would greatly, greatly surprise me.

 8        Q.    Okay.  And did you tell Miss Monica Wilson

 9   of the efforts of Human Right in Baltimore that

10   Miss Sally Ondiek who provided an earlier evaluation

11   for Miss Lauture that she was not, that Miss Ondiek

12   was not qualified, either?

13        A.    Miss Ondiek was not qualified?

14        Q.    Yeah.  Did you tell Miss Monica Wilson

15   that?

16        A.    That Sally was not qualified?

17        Q.    Uh-huh.

18        A.    I don't think so.  I mean, not that I

19   recall.  She was my supervisor for several years.

20        Q.    Okay.  And did you also tell Miss Monica

21   Wilson that you never would have hired Miss Lauture
```

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1     in the first place?

2          A.    Me?

3          Q.    Yeah.   Did you tell Miss Wilson that?

4          A.    Oh, I don't know if I did that or not.

5     Looking back on it, I don't think I would have hired

6     her.

7          Q.    But you did testify today --

8          A.    I would testify today that --

9          Q.    -- that Miss Lauture is not qualified;

10    isn't that --

11         A.    That's correct.

12         Q.    Okay.   Did you know she has a degree in

13    medical technology, an associate degree?  Did you

14    know that?

15         A.    She has an associate degree, yes, sir.

16         Q.    And yet it is your conclusion she's not

17    qualified?

18         A.    That's correct.

19         Q.    Okay.   Now, are you familiar with

20    St. Agnes procedure or policy regarding resignation

21    by employees?

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1        Q.    And you checked that box, termination?

2        A.    Right.  She no longer works there.  I did

3    not terminate her.  She resigned.

4        Q.    For the time that you became a lead tech,

5    have you ever attended any training or seminar on

6    anti-discrimination for St. Agnes?

7        A.    I don't know if they have that.  I

8    don't --

9        Q.    Ma'am, I said did you ever attend any

10    training seminar for supervisors?

11        A.    I -- not like a formal conference, but we

12    have things that we have to do each year as part of

13    our jobs to go through discrimination.  I think

14    there's like a little course on line type of a

15    thing.  I have to do that.

16        Q.    Okay.

17        A.    But as far as like, you know, going to

18    someplace like an all day thing, no.

19        Q.    So can you tell me which one did you do?

20        A.    I would have done things on line.  They --

21        Q.    Like what?

Deposition of Margaret Kinch
Taken on January 5, 2009

1    HR that was there or somebody else was there?

2         A.    No, Colleen, also.

3         Q.    Okay.  Colleen was there?

4         A.    And Colleen kind of led that meeting.

5         Q.    Okay.  And Jo Oliver was there, also?

6         A.    Yes, as I recall.

7         Q.    As well as Miss Weiger?

8         A.    Yes.

9         Q.    So apart from Miss Lauture and

10   Miss Rutter, only one, two, three, five other people

11   were there; is that correct?

12        A.    Well, Aimee, Colleen, me, Jane, Jo.  Yeah,

13   seven all together.

14        Q.    Okay.  And Miss Ringgold, what is, what is

15   her color?  Is she white, or is she black?

16        A.    She's black.

17        Q.    Okay.  And Colleen?

18        A.    White.

19        Q.    And Jo Oliver?

20        A.    White.

21              MR. NICCOLINI:  White.

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
 1        A.   I don't know if Sally was or not.  She was

 2   packing things up, but she was, her access to things

 3   in the computer was just like oop, can't do that

 4   one, oop, can't do that one, you know, bing, bing,

 5   bing.  I do know that Debbye Sanchez was escorted

 6   out of the building.

 7        Q.   Okay.  Did Debbye Sanchez, did she resign

 8   or was she --

 9        A.   She was terminated.

10        Q.   Okay.  But Miss Ondiek, she resigned, and

11   according to you, her resignation was turned to

12   termination, right?

13        A.   No, it was -- no, no, she resigned --

14        Q.   Okay.

15        A.   -- and gave her notice, and the next day,

16   she had a meeting with us saying that she had turned

17   in her resignation, and then later that day, she had

18   been in HR and they just said effective now instead

19   of three weeks.

20        Q.   Okay.

21        A.   Now, whether or not she was escorted
```

Deposition of Margaret Kinch
Taken on January 5, 2009

1   also make the decision is there a pathogen there, is

2   there something significant, or is it normal.

3                    They perform and process the AFB

4   specimens, acid fast specimens.  They would stain

5   and read the acid fast smears.  That's not done on

6   the evening shift.  Same with the PCP or the

7   Legionella smears.  Those were all -- again, if the

8   specimen came in, the evening person would put the

9   specimen in, like in a bucket in a place, and then

10  around 10:30, eleven o'clock, the day shift person

11  would get all of those and then process them.

12                   All of the fungal cultures are read

13  during the day shift.  All of the acid fast cultures

14  and tubes in media are read during the day shift.

15  We also did all the hepatitis testing, the HIV

16  testing.  Chlamydia and GC testing were all done

17  during the day shift.  The primary duties, you know,

18  depending on how the micro labs are and how big they

19  are, generally in the evening is primarily plating,

20  reading the smear, doing stat type work.

21       Q.   Okay.  So according to your testimony,

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

1    then, Miss Lauture coming from the evening shift to

2    the day shift would not be familiar with this day --

3        A.   Correct.

4        Q.   -- day shift tasks?

5        A.   Correct, and that we would have to train

6    her, and since we had more people there, plus, you

7    know, she could be there and she'd have people to go

8    to to ask.  On the evening shift, it was just her.

9    She didn't have, you know, somebody immediately

10    there to ask.  She could call us on the phone, you

11    know, but you know, right, there was nobody else

12    there.  It was just her and, and all.

13        Q.   Okay.  Now, did you also know to the best

14    of your knowledge that there was a time when

15    Miss Lauture was asked to train other employees?

16        A.   Yes.

17        Q.   Okay.  Is that true or not?

18        A.   Yes, that's true.

19        Q.   Okay.  And who are the employees that were

20    trained by Miss Lauture?

21        A.   Employees that, what she did was we had --

*Deposition of Margaret Kinch*
*Taken on January 5, 2009*

```
 1        A.    She would sign off on the training

 2   checklist, yes, she did do that.  Ben lost his

 3   several times.

 4        Q.    Okay.  Do you know who those employees

 5   were?

 6        A.    Pardon?

 7        Q.    Those employees that were trained --

 8        A.    It was Ben Roberts and Oye Oyebode, and

 9   when I looked at the deposition and stuff, I looked

10   at his, the training checklist because I said wait a

11   minute, no, they were trained during the day, not

12   during the evening, and I said but, I said Ben kept

13   losing his checklist, and I think we printed out at

14   least three different ones, so Geraldine would check

15   off yes, he can do these things, but as far as

16   actually training him to do them, it was more of

17   like yes, you can do it, not training them, and I

18   think in Oye's case, I don't think she trained him

19   at all or checked off any of the stuff.

20        Q.    Does Ben Roberts still work for St. Agnes?

21        A.    Yes, they both do.
```