**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

GERALDINE LAUTURE     :
            :
  v.         :    Civil Action No. CCB-08-943
            :
ST. AGNES HOSPITAL.     :
            :
       …o0o…

**MEMORANDUM**

  Now pending before the court are the plaintiff's motion for leave to file an amended complaint and the defendant's motion for summary judgment.  Plaintiff Geraldine Lauture sued defendant St. Agnes Hospital (hereinafter "St. Agnes") alleging discrimination, hostile work environment and constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (hereinafter "Title VII").  After the completion of discovery, Ms. Lauture filed a motion for leave to amend her complaint to add claims for breach of contract and intentional infliction of emotional distress.  The defendant opposed Ms. Lauture's motion and moved for summary judgment on all claims.  The issues in this case have been fully briefed and no oral argument is necessary.  For the reasons set forth below, the court will grant both the plaintiff's motion for leave to amend[1] and the defendant's motion for summary judgment.

---

[1] Pursuant to Federal Rule of Civil Procedure 15(a), a plaintiff may amend her complaint once as a matter of course before a responsive pleading has been filed.  Once a responsive pleading has been filed, however, a plaintiff may amend her complaint only by leave of the court or by written consent of the defendant. Fed. R. Civ. P. 15(a).  Leave to amend should be freely given. *Id.*; *Steinburg v. Chesterfield County Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Only where amendment would prejudice the defendant, there has been bad faith by the moving party, or where amendment would be futile should leave to amend be denied. *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (internal citation omitted).  Here, Ms. Lauture seeks to amend her complaint after the completion of discovery to add claims for breach of contract and intentional infliction of emotional distress. The defendant argues that such claims could have been alleged earlier, and that it has been prejudiced because it had very little time to respond to Ms. Lauture's new claims given the pending dispositive motions deadline.  Nevertheless, the defendant adequately responded to Ms.

## BACKGROUND

Ms. Lauture, a black female born in Haiti, is a trained medical laboratory technician.  She holds an associate degree in Medical Laboratory Technology and a Certificate of Achievement for completing training in the areas of Chemistry, hematology and Microbiology.  In July 2004, the defendant employed Ms. Lauture in its Microbiology Lab as a Medical Laboratory Technician on the Monday through Friday evening shift.  Sally Ondiek served as Ms. Lauture's supervisor on the evening shift, but generally, Ms. Lauture worked alone without any direct supervision.  The parties debate whether Ms. Lauture's performance on the evening shift was entirely satisfactory.  (*See* Lauture Dep. at 46-47, Dec. 2, 2008; Kinch Dep. at 10, Jan. 5, 2009.) In December 2005 the defendant granted Ms. Lauture's request to be transferred to the day shift so that she could spend more time with her children after school.  Thereafter, Margaret ("Peg") Kinch and Jane Weiger, the Microbiology Laboratory's co-Lead Technologists, assumed full responsibility for Ms. Lauture's supervision.  Ms. Kinch and Ms. Weiger were also the ones responsible for granting Ms. Lauture's request to transfer.  (Lauture Dep. at 52: 1-4.)  They are both white and American-born.

Shortly after Ms. Lauture's transfer to the day shift she and another employee, Stephanie Rutter, a white, American-born Lab Assistant, began to experience interpersonal problems.  As a result of these problems, both women were issued a documented verbal warning in the form of a Counseling Report on approximately January 4, 2006.  The report indicated that Ms. Lauture's and Ms. Rutter's inability to get along interrupted their and other employees' work as well as patient care.  (Jan. 4, 2006 Counseling Report, attached to Pl.'s Opp'n Mem. as Ex. 11 & Def.'s

---

Lauture's additional claims in its motion for summary judgment, suggesting that no prejudice resulted.  Accordingly, the court will grant plaintiff's motion for leave to amend.

Summ. J. Mem. as Ex. D.)  The report also stated that the two women were "dragging other co-workers into their Mexican stand-off" and violating the "Code of Conduct policy . . . by not treating co-workers with respect."  (*Id*.)  In addition to this warning, Jo Oliver, the Laboratory Director at St. Agnes, met with Ms. Lauture and Ms. Rutter about their inability to get along.  (Lauture Dep. at 89: 13-20; 91: 3-5.)  Ms. Lauture felt that Ms. Oliver took Ms. Rutter's side.  (*Id*. at 93: 16-21.)  She also testified that she was not the only Medical Technician who complained about or had problems with Ms. Rutter.  (*Id*. at 95: 2-18.)

Besides her personal difficulties with Ms. Rutter, Ms. Lauture also experienced performance-related problems following her transfer to the day shift.  Apparently, some of the procedures she was expected to perform on the day shift had not been assigned to her during the evening shift.  (*Id*. at 43: 10-19.)  On February 2, 2006, Ms. Finch and Ms. Weiger issued Ms. Lauture a documented verbal warning for various clinical errors she had made in the lab.  (Feb. 2, 2006 Counseling Report, attached to Pl.'s Opp'n Mem. as Ex. 12 & Def.'s Summ. J. Mem. as Ex. E.)  The report documented eight particular clinical mistakes made by Ms. Lauture between January 2, 2006 and January 23, 2006, and stated that: "There has [sic] been instances that show [Ms. Lauture] does not have a basic understanding of certain microbiology lab procedures."  (*Id*.)  To improve Ms. Lauture's laboratory skills, the report indicated that she would be retrained by an experienced technologist from February 16, 2006 through March 3, 2006.  (*Id*.)  Ms. Lauture acknowledged and signed the report, but wrote: "I do not agree with everything that was said on these comments" above her signature.  (*Id*.)  In her deposition, Ms. Lauture also denied or did not recall all but two of the eight enumerated errors.  (Lauture Dep. at 101-120.)  She seemed to acknowledge the remaining two as mistakes but did not necessarily see them as errors.  (*Id*. at 102-104, 118: 11-21 - 119: 1-4.)

A few days later, on February 7, 2006, Ms. Lauture was suspended from work for three days for approximately nine additional performance issues, including an error that her supervisors feared had exposed staff to meningitis by delaying the testing of a specimen because she incorrectly overheated a water bath.  (Feb. 7, 2006 Counseling Report, attached to Pl.'s Opp'n Mem. as Ex. 14 & Def.'s Mot. for Summ. J. as Ex. G.)  It is St. Agnes' position that Aimee Ringgold, an Employee Relations Consultant at St. Agnes who is a black female, made the final decision to suspend Ms. Lauture.  (Harrid Dep. at 48: 11-17, March 17, 2009.)  The parties debate whether the suspension was with or without pay, but St. Agnes conceded that there is, at the very least, an "open question" as to this issue.  (*See* Def.'s Reply at 5.)  Ms. Finch and Ms. Weiger later amended the counseling report because they discovered further information indicating that they had been wrong about the meningitis exposure.  (Lauture Dep. at 122-23; Feb. 21, 2006 Amendment, attached to Pl.'s Opp'n Mem. as Ex. 15 & Def.'s Summ. J. Mem. as Ex. I.)  In fact, the test that was delayed by Ms. Lauture's overheating of the water bath was a Cryptococcal antigen.  (Pl.'s Opp'n Mem. at Ex. 15 & Def.'s Summ. J. Mem. at Ex. I.)  But they still found that the three-day suspension was valid because Ms. Lauture "did not perform proper corrective action for the maintenance of the 56ºC water bath."  (*Id*.)  Ms. Lauture did not agree with the allegations made in the report, however, and instead of signing her name on the report, she wrote, "Refused to Sign", dated "2/8/06".  (*See* Pl.'s Opp'n Mem. Ex. 14 & Def.'s Summ. J. Mem. Ex. G.)

Ms. Lauture met with Sherry Beubendorf, St. Agnes' Diversity Manager and also a black female, on February 8, 2006, to complain about the warnings she had received, as well as about her difficulties with Ms. Rutter.  (Lauture Dep. at 140: 8-16.)  She told Ms. Beubendorf that she thought she had been treated unfairly.  (*Id*. at 140: 14-21.)  Ms. Beubendorf and Ms. Ringgold

investigated the matter by interviewing Ms. Kinch and Ms. Weiger.  (*See* Employee Relations

Investigation Report dated Feb. 14, 2006, attached to Pl.'s Opp'n Mem. as Ex. 13 & Def.'s

Summ. J. Mem. as Ex. K.)  In her report, Ms. Beubendorf determined that she was unable to

state that there were any instances of discrimination against Ms. Lauture.  (*Id*.)  Ms. Lauture

alleges that no one responded to her complaint, however.  (Lauture Aff. at ¶ 19.)  Ms. Weiger

also testified that she was unaware that Ms. Lauture had complained of discrimination until later.

(Weiger Dep. at 158: 1-21, Feb. 23, 2009.)

As part of Ms. Lauture's February 7, 2006 counseling report and suspension, Ms. Finch

and Ms. Weiger developed an action plan for her, including the previously recommended two

weeks of retraining.  (*See* Action Plan, attached to Def.'s Summ. J. Mem. as Ex. J.)  By March 9,

2006, Ms. Lauture completed her retraining with Mainaki Parikh, the technician selected to

retrain her.  (*See* Parikh Report, attached to Pl.'s Opp'n Mem. as Ex. 17.)  Ms. Parikh's report

noted that Ms. Lauture "knows her duties well", but also that "[s]he is extremely slow", "cannot

perform a couple of tasks at the same time", and "has a hard time understanding when a doctor

calls for results."  (*Id*.) (emphasis omitted).  It further stated that, "[s]he has the potential to

perform her duties adequately, if she could take them responsibly and seriously", and that she did

not ask many questions during the training.  (*Id*.)  On March 14, 2006, Ms. Finch wrote a note

summarizing the results of Ms. Lauture's action plan.  (Finch Dep. at 54-55; *see* March 14, 2006

Note, attached to Def.'s Mot. Summ. J. Mem. as Ex. L.)  According to Ms. Finch, Ms. Lauture

made many errors during retraining and did not provide documentation that she had completed

the reading required by her action plan.  (Def.'s Summ. J. Mem. at Ex. L.)  Ms. Lauture appears

not to dispute that she made errors, but stated that no one told her about them.  (Lauture Dep. at

152-53.)

On February 17, 2006, while she was completing retraining, Ms. Lauture submitted a six-page written complaint to the defendant addressing what she believed to be unfounded allegations of performance issues against her.  She wrote that: "I have been discriminated against and my human rights have been seriously violated."  (Feb. 17, 2006 Letter, attached to Pl.'s Opp'n Mem. as Ex. 16.)  It is Ms. Lauture's position that no one at St. Agnes responded to her letter or investigated the matter.  (Lauture Aff. at ¶ 19.)

Finally, on March 9, 2006, after an apparent complaint by Ms. Rutter that Ms. Lauture was ignoring her since she returned from an absence, St. Agnes Human Resources staff convened a meeting to address the problem, including Ms. Lauture, Ms. Rutter, Ms. Finch, Ms. Weiger, Ms. Ringgold, and Colleen Meegan, a Human Resources employee.  Ms. Lauture felt intimidated by this meeting and cried during it.  (Lauture Dep. at 173: 16-17.)  The next day, March 10, 2006, Ms. Lauture submitted her two-week notice to the defendant, resigning from her position because she felt that she could not work there anymore.  In her resignation letter, she wrote: "This unpleasant situation at work is taking a toll on my health in the form of insomnia, anxiety and overwhelming stress."  (March 10, 2006 Resignation Letter, attached to Pl.'s Opp'n Mem. as Ex. 21.)  She further stated that: "It is unfortunate that this hospital . . . allows certain of its employees to show a lack of [brotherly love] to myself, another employee of a different skin color who comes from a different place of birth."  (*Id.*)

Although Ms. Lauture gave her two-week notice, Ms. Meegan, the Human Resources employee that accepted her resignation, determined it would be best for all involved if Ms. Lauture resigned immediately given that she was a disgruntled employee.  Accordingly, Ms. Lauture was escorted from the building by a security guard that same day.  The parties dispute

whether Ms. Lauture was paid in full for the following two weeks.  (*See* Lauture Aff. at ¶ 27;

Harrid Dep. at 52: 9-11.)

Ms. Lauture filed a charge of discrimination against St. Agnes with the Baltimore

Community Relations Commission on approximately April 7, 2006.  The United States Equal

Employment Opportunity Commission issued Ms. Lauture a Notice of Right to Sue Letter on

February 5, 2008, and she filed the present matter on April 15, 2008.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

"should be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Supreme Court has clarified

that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this

standard provides that the mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all

reasonable inferences in her favor without weighing the evidence or assessing the witnesses'

credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but

the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

A.      *Discrimination Based on Race and/or National Origin*

Ms. Lauture alleges that St. Agnes discriminated against her because of her race and/or national origin.  The basis for her claim is that she was disciplined more harshly than were similarly situated employees not within her protected classes.  For the following reasons, the court will grant the defendant's motion for summary judgment on Ms. Lauture's discrimination claim.

Where, as in this case, there is no direct evidence of discrimination, such claims are analyzed under the three-pronged burden shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, to defeat a defendant's motion for summary judgment a plaintiff must first make out a *prima facie* case of discrimination.  If the plaintiff succeeds in carrying out this initial burden, then "the burden shifts to the employer . . . 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)).  Once such a reason is provided, the burden shifts back to the plaintiff to demonstrate that the given reason was a pretext for unlawful discrimination.  *Id*.

To establish a *prima facie* case of race and/or national origin discrimination in the context of allegedly disparate discipline, the plaintiff must show: "(1) that [she] is a member of the class protected by Title VII, (2) that the prohibited conduct in which [she] engaged was comparable in

seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against [her] were more severe than those enforced against those other employees." *Cook v. CSX Trans. Co.*, 988 F.2d 507, 511 (4th Cir. 1993); *see also Lightner v. City of Wilmington*, 545 F.3d 260, 264-65 (4th Cir. 2008) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985)).[2]  The plaintiff must show that her comparators were similarly situated in all respects, and although other employees need not have engaged in "precisely the same set of work-related offenses occurring over the same period of time under the same set of circumstances", *Cook*, 988 F.2d at 511, the similarly between the "seriousness of their respective offenses must be clearly established." *Lightner*, 545 F.3d at 265.  Moreover, when determining whether non-minority employees were disciplined more severely, the court must examine the "entire record before making its decision", rather than merely look at isolated incidents within it. *Cook*, 988 F.2d at 512. Accordingly, where the record shows that non-minority employees were subjected to a "range of discipline" for similarly prohibited conduct, it is appropriate for the court to consider that range and whether the disciplinary actions taken against the plaintiff fell within it. *Id.*

---

[2] St. Agnes argues that the plaintiff must show slightly different elements to establish a *prima facie* case.  Instead, the defendant asserts the plaintiff must show: "(1) [she] is a member of a protected class; (2) [she] was qualified for [her] job and [her] job performance was satisfactory; (3) [she] was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances." *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002).  But the scheme of proof adopted in *McDonnell Douglas* is "not a precise, mechanically-imposed formulation". *Cook*, 988 F.2d at 512. Rather, "[i]n each set of circumstances, the burden is on the plaintiff to prove a set of circumstantial facts, which in the absence of a legitimate non-discriminatory explanation, leads one to conclude with reasonable probability that the action taken against [her] was the product of discrimination." *Cook*, 988 F.2d at 512.  Here, the crux of Ms. Lauture's discrimination claim is that she was disciplined for poor performance more harshly than her colleagues because of her race and/or national origin. Given these allegations, the elements set forth in *Cook* and *Lightner* are more applicable in this case.

Although it is undisputed that Ms. Lauture is a member of a protected class, she is unable to show a *prima facie* case of discrimination because, even if she could show that employees outside her protected classes engaged in misconduct of comparable seriousness, she cannot demonstrate that they were disciplined less severely than she was.  Ms. Lauture alleges that several employees were disciplined less severely than she was: Deborah Sanchez, Therese Dalrmple, Christina Graves, Sally Turner, Ms. Rutter, Jackie Wilson, Ms. Weiger and Ms. Finch.[3]  As an initial matter, Ms. Finch, Ms. Weiger and Ms. Rutter are not sufficiently comparable to Ms. Lauture because of the differences in their employment positions.  *See Lightner*, 545 F.3d at 265 (holding that a comparison of two police officers was not sufficient because only one held a commander position).  Unlike Ms. Lauture, who was a Medical Technician, Ms. Finch and Ms. Weiger are co-Lead Medical Technicians and are supervising employees.  Ms. Rutter, by contrast, is a Lab Assistant who is expected to assist the Medical Technicians with their work and who has different responsibilities and duties than Ms. Lauture.  Accordingly, Ms. Lauture cannot state a claim of discrimination by comparing herself to Ms. Finch, Ms. Weiger or Ms. Rutter.  The remaining five employees to which Ms. Lauture compares herself, however, are all Medical Technicians.

Nevertheless, a consideration of the whole record, and not simply of individual cases within it, shows that Ms. Lauture has not established a *prima facie* case of discrimination by comparing herself to Ms. Sanchez, Ms. Dalrmple, Ms. Graves, Ms. Turner and Ms. Wilson. Other than Ms. Wilson, who is black and American-born,[4] all four women are white and

---

[3] Ms. Lauture's January 4, 2006 counseling report for failing to cooperate with Ms. Rutter does not form the basis for her claim, as Ms. Rutter was disciplined in the same manner for the same conduct.

[4] Ms. Lauture compares herself to Ms. Wilson solely for the purpose of her national origin discrimination claim.  (*See* Pl.'s Opp'n Mem. at 17.)

American-born.  (List of Microbiology Associates, attached to Pl.'s Opp'n Mem. as Ex. 43.)  Ms.

Lauture alleges that each of these women committed laboratory errors equivalent in seriousness

to her own.[5]  But even if Ms. Lauture could show that these women engaged in similarly

prohibited conduct, her own discipline falls within the range of disciplinary measures imposed

on her comparators, given that at least two of Ms. Lauture's fellow employees who are outside of

her protected classes were terminated due to laboratory errors and/or ability to perform

laboratory functions.[6]  *Cook*, 988 F.2d at 512 (stating that "the district court correctly concluded

that [the defendant] imposed a range of discipline for Rule 500-type violations within which [the

plaintiff's] discharge fell and that therefore there was no disparity of treatment from which one

could conclude that his discipline was the product of racial discrimination.")  Although other

comparators may have been treated more favorably than Ms. Lauture, her own verbal warning,

retraining and three-day suspension certainly fall short of termination, and place her squarely

within the range of discipline imposed by the defendant on Medical Technicians committing

laboratory errors.[7]  Furthermore, Ms. Lauture alleges that Ms. Wilson, also a black employee,

---

[5] St. Agnes argues that several of the exhibits relied on by Ms. Lauture are inadmissible because they have not been authenticated. Assuming without deciding that Ms. Lauture's evidence is admissible, however, she has still not met her burden of showing that other employees outside of her protected class who engaged in similarly prohibited conduct were disciplined less severely than she was.  Accordingly, the court will not rule on the admissibility of the contested evidence.

[6] *See* Def.'s Reply at 9-10.  This fact is verified by exhibits filed under seal because they regard the private personnel records of third parties.

[7] Ms. Lauture alleges that St. Agnes has failed to provide four of its relevant personnel files. (Pl.'s Opp'n Mem. at 18.)  St. Agnes responds that it has been unable to find this small number of files because they were likely lost when its Human Resources office moved during the summer of 2008.  (Def.'s Reply at 11.)  It also contends that Ms. Lauture was not prejudiced by these omissions because it produced other employee records showing that Ms. Lauture was treated in the same manner as her white, American-born co-workers.  (*Id*.)  The court agrees that no prejudice has resulted because the record shows that Ms. Lauture's treatment was within the range of discipline imposed by St. Agnes on all employees.

was treated better than she was for comparable conduct.  (*See* Pl.'s Opp'n Mem. at 17.)  Such allegations clearly undermine Ms. Lauture's race discrimination claim.

Even assuming that Ms. Lauture could present a *prima facie* case of discrimination, St. Agnes has met its burden of articulating a legitimate, non-discriminatory reason for disciplining Ms. Lauture: her poor performance in the laboratory.  Poor job performance is "widely recognized as [a] valid, non-discriminatory [basis] for any adverse employment decision," *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (internal citations omitted), and the court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation marks and citation omitted). Although Ms. Lauture disputes that she made many of the errors attributed to her, St. Agnes is not required to conclusively substantiate her poor performance, only that it reasonably believed her performance to be deserving of discipline, for "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans*, 80 F.3d at 960-61 (internal quotation marks and citation omitted).  Ms. Lauture's supervisors issued her a documented verbal warning on February 2, 2006, suspended her on February 7, 2006 and ordered that she be retrained because they believed that she had made a total of at least seventeen laboratory errors and were concerned that she did not possess the skills necessary to do her job.  Under such circumstances it was entirely reasonable, if not necessary, to discipline Ms. Lauture. Furthermore, although Ms. Finch and Ms. Weiger were mistaken when they believed that Ms. Lature had exposed hospital staff to meningitis, she had still erred by overheating the waterbath. (*See* Pl.'s Opp'n Mem. at Ex. 15 & Def.'s Summ. J. Mem. at Ex. I.)  Accordingly, they determined that her suspension remained valid.  (*Id.*)

But even if St. Agnes' perception of Ms. Lauture's performance was faulty, Ms. Lauture's self-assessment is insufficient to demonstrate pretext. She has not shown that St. Agnes' reason is false or that discrimination was the real reason for her discipline. *See DeJarnette*, 133 F.3d at 298 (stating that plaintiff must show that the defendant's reason is both false "*and* that discrimination was the real reason for the challenged conduct") (emphasis original). Thus, because the court is unable to infer that the discipline imposed on Ms. Lauture was the product of discrimination, it will grant the defendant's motion for summary judgment on count one.

B.    *Hostile Work Environment*

Ms. Lauture also alleges that she was subjected to a hostile work environment on the basis of her race and/or national origin in violation of Title VII. The basis for her allegation appears to be that St. Agnes: (1) disciplined her more harshly than similarly situated employees not within her protected classes; (2) failed to investigate her complaints of discrimination; (3) responded to the complaints of white employees with more attention; (4) falsely accused her of exposing patients to meningitis; and (5) used the phrase "Mexican stand-off" and told her she was untrainable. The court will grant the defendant's motion for summary judgment on this claim as well because, at the very least, Ms. Lauture has failed to show that the alleged discrimination was based on her race or national origin or that it was sufficiently severe or pervasive to alter her conditions of employment.

"When a workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). By contrast, the "mere

utterance of an . . . epithet which engenders offensive feelings in a employee" does not implicate Title VII. *Id.* (internal quotation marks and citation omitted). To survive summary judgment on her hostile work environment claim, a plaintiff must show that a reasonable jury could find that she was the subject of conduct that was: "(1) unwelcome; (2) based on race [or national origin]; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and that (4) there is some basis for imputing liability on the employer." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004).

To demonstrate a hostile work environment claim, Ms. Lauture must show that "but for" her race or national origin, she "would not have been the victim of the alleged discrimination." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998) (internal quotation marks and citation omitted). The fact that her supervisors may have "disliked" her and "made h[er] job more stressful as a result" does not establish a claim for hostile work environment, "absent some independent evidence of racial animosity." *Gilliam v. South Carolina Dep't of Juvenile Justice*, 474 F.3d 134, 143 (4th Cir. 2007). Where there is no direct evidence that the complained of conduct was based on racial animosity, a plaintiff may show that she was treated differently than similarly situated employees on the basis of race or national origin. *Id.* at 142. But unsupported, conclusory statements that the plaintiff was treated differently because of her race or national origin are insufficient to defeat summary judgment. *Id.*; *see also Hawkins*, *v. Pepsico, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) (upholding summary judgment on both discrimination and hostile work environment claims where allegations that a supervisor "did not subject any of [the plaintiff's] white peers to similarly poor treatment" were unsupported by facts tending to show the alleged disparate treatment was due to race and not simply to the supervisor's "admittedly low regard for [the plaintiff's] individual performance.")

Furthermore, Ms. Lauture must show not only that she perceived her work environment to be abusive, but also that the conduct at issue was such that "a reasonable person in [her] position would have found the environment hostile or abusive." *Equal Employment Opportunity Comm'n v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (internal quotation marks and citation omitted).  This objective inquiry focuses on the totality of the circumstances and considers such factors as the "'frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Id*. (quoting *Harris*, 510 U.S. at 22).  Title VII does not establish a "general civility code for the American workplace", *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), and actionable conduct must be "so extreme as to amount to a change in the terms and conditions of employment."  *Sunbelt*, 521 F. 3d at 315 (internal quotation marks and citation omitted).  Thus, "'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'"  *Id*. (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  For instance, a defendant hospital's refusal to let the plaintiff, a Bangladeshi Muslim doctor, perform certain procedures without a report on his competency, along with instances of rude treatment by his Hindu colleagues, was insufficient to sustain a hostile work environment claim. *Baqir v. Principi*, 434 F.3d 733, 746-47 (4th Cir. 2006) (stating that the defendant's actions were "not suggestive of illegal harassment, but rather of a healthy concern for the safety of patients") (internal quotation marks omitted); *cf. Sunbelt*, 521 F.3d at 316-18 (holding that there was a triable issue of fact where co-workers called the Muslim plaintiff derogatory names such as "Taliban" and "towel head", mocked his appearance and his attendance at prayer sessions, hid his timecard and defaced his business card with terms such as

"dumb ass" when he went to prayer, but also observing that any of the alleged incidents of harassment, "viewed in isolation, would not have been enough to have transformed the workplace into a hostile or abusive one.")

Here, Ms. Lauture has not presented any direct evidence that the conduct about which she complains was motivated by animosity towards her race or national origin.[8]   (*See* Lauture Dep. at 206-211).   Nor, as discussed above, has she shown that she was disciplined more harshly than similarly situated white, American-born employees.   Thus, she cannot show that the alleged harassment was based on her race or national origin.   But even if she could, Ms. Lauture has also failed to show that the defendant's conduct was severe or pervasive enough to alter the conditions of her employment.   Ms. Lauture undoubtedly was hurt by feeling that her supervisors lacked confidence in her and favored other employees.   It is also unfortunate that she was mistakenly accused of exposing hospital staff to meningitis.   Nevertheless, the treatment she alleges does not rise to the abusive level needed to state a claim for hostile work environment. Her allegations are far more analogous to those in *Baqir*, where the Fourth Circuit found that even together co-workers' rudeness and supervisors' lack of confidence in the plaintiff's skills were not severe or pervasive, 434 F.3d at 746-747, than to those in *Sunbelt*, where the plaintiff was subjected to "constant and repetitive abuse".   *See* 521 F.3d at 316-18.   A reasonable person would not have found Ms. Lauture's situation hostile or abusive, even if she found it to be extremely uncomfortable.   Thus, because Ms. Lauture has failed to demonstrate all elements of a

---

[8] The fact that Ms. Lauture's January 4, 2006 counseling report stated that she and Ms. Rutter were in a "Mexican stand-off" (Pl.'s Opp'n Mem. at Ex. 11 & Def.'s Summ. J. Mem. at Ex. D), while perhaps an inappropriate choice of language, is not direct evidence of discrimination given Ms. Lauture's national origin and the common definition of the phrase.   (*See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1425 (Philip Babcock Gove et al. eds., 1986) (defining "mexican standoff" as "draw" or "deadlock").

hostile work environment claim, the court will grant the St. Agnes' motion for summary judgment on count two.

C.      *Constructive Discharge*

Ms. Lauture's final claim under Title VII is for constructive discharge.  She alleges that the same circumstances underlying her hostile work environment claim, plus the intimidation she felt at the March 9, 2006 meeting with Ms. Rutter and her supervisors, created intolerable working conditions that ultimately forced her to resign.  For the reasons that follow, St. Agnes is also entitled to summary judgment on this claim.

Where an employee is not actually terminated, she may nevertheless be able to state a claim for wrongful termination in violation of Title VII "if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit."  *Honor*, 383 F.3d at 186 (internal quotation marks omitted) (quoting *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353-54 (4th Cir. 1995)).  Thus, the plaintiff must show: "(1) the deliberateness of [the employer's] actions, motivated by racial [or national origin] bias, and (2) the objective intolerability of the working conditions."  *Id*. at 186-87 (internal citations omitted).  The Fourth Circuit has "insisted that [the claim of constructive discharge] be carefully cabined" because it is "so open to abuse by those who leave employment of their own accord".  *Id*. at 187 (internal quotation marks and citation omitted).  Accordingly, as a matter of law, "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."  *Id*.  (internal quotation marks and citation omitted).

A reasonable jury could not find that Ms. Lauture's working conditions were intolerable. While there is no doubt that Ms. Lauture subjectively found her working environment at St.

Agnes uncomfortable because she felt that she was unfairly disciplined and that her complaints went unheard, her frustration with being criticized is not, as a matter of law, evidence of intolerable working conditions sufficient to survive the defendant's motion for summary judgment.  *See id.* (holding that the plaintiff's "mere frustration with his inability to accomplish his professional goals does not constitute an intolerable work condition for the purposes of establishing constructive discharge"); *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (holding that the plaintiff's allegations that "her supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of her customers, and once required her to work with an injured back", even if true, did "not establish the objectively intolerable working conditions necessary to prove a constructive discharge").  Unlike in *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995), a case cited by Ms. Lauture, where the Fourth Circuit found that the plaintiff's testimony that his co-workers "subjected him to epithets about his Iranian origin almost daily and tried to embarrass him in public" and that he developed an ulcer as a result was sufficient to create a factual issue about the intolerability of his working conditions, here, Ms. Lauture has simply alleged that she was disciplined for making laboratory errors and failing to cooperate with a fellow employee, was intimidated during a meeting to discuss her behavior, and that her complaints of discriminatory discipline were ignored, even though the record shows that Ms. Lauture's February 8, 2006 complaint was investigated.[9]  (*See* Pl.'s Opp'n Mem. at Ex. 13 & Def.'s Summ. J. Mem. at Ex. K.)  Thus, Ms. Lauture's allegations are far more analogous to those in *Honor* and *Williams* and do not, as a matter of law, constitute objectively intolerable working conditions.

---

[9] That Ms. Lauture was unaware of this investigation and Mr. Weiger did not know of her complaint does not mean that an investigation did not occur.

Furthermore, even if Ms. Lauture could show that the conditions at St. Agnes were objectively intolerable, there is scant evidence that the defendant deliberately intended to induce her to quit as the result of bias based on race and/or national origin.  As noted above, Ms. Lauture has neither presented any direct evidence of race or national origin discrimination, nor has she presented circumstantial evidence from which the court can infer such bias.  There is simply no evidence that the disciplinary actions taken against her were part of an effort to force her to resign.  In fact, the meetings Ms. Lauture's supervisors held with her and Ms. Rutter and the action plan and retraining that she was given, appear to have been part of an effort to improve Ms. Lauture's ability to do her job and to work peacefully with her co-workers.  St. Agnes is, therefore, entitled to summary judgment on Ms. Lauture's constructive discharge claim.

D.      *Breach of Contract*

Ms. Lauture also alleges that St. Agnes is liable for breach of contract because it violated its employee handbook by suspending her and terminating her immediately upon her resignation. St. Agnes argues that the handbook was not a binding contract.  The court agrees, and will grant the defendant's motion for summary judgment.

Although in Maryland an employee handbook may give rise to a breach of an implied contract claim by an at-will employee, an employer may also "expressly disclaim such contractual liability."  *Mayers v. Washington Adventist Hosp.*, 131 F. Supp. 2d 743, 751 (D. Md. 2001) (citing *Bagwell v. Pennisula Reg'l Med. Ctr.*, 665 A.2d 297, 309 (Md. App. 1995); *Castiglione v. Johns Hopkins Hosp*., 517 A.2d 786, 793 (Md. App. 1986)); *see also Zahodnick v. Int'l Business Machines Co.*, 135 F.3d 911, 914 (4th Cir. 1997) (finding that an employer avoided contractual liability by placing an "unambiguous disclaimer" in its employee handbook). For instance, in *Lambert v. Washington Suburban Sanitary Comm'n*, the court found that

disclaimers in an employee handbook and policy manual that respectively stated in part, "[t]his

handbook is not a legal document", and "[t]his handbook is not a contract and is not an implied

contract", meant that the employee handbook was not a contract under Maryland law.  93 F.

Supp. 2d 639, 643 (D. Md. 2000).  Similarly, in *Mayers*, the court found that a disclaimer in an

employee handbook reading in part, "[t]his contract is not a contract or legal document", was

sufficient to avoid liability.  131 F. Supp. 2d at 751.

Here, Ms. Lauture was an at-will employee (Lauture Employment Application, attached

to Def.'s Summ. J. Mem. as Ex. U), and upon her employment with St. Agnes in July 2004 she

signed an acknowledgement when she received an employee handbook.  (Harrid Aff. at ¶ 4;

Lauture Acknowledgement, attached to Def.'s Summ. J. Mem. as Ex. V.)  Although it was

unclear from her amended complaint, Ms. Lauture's opposition memorandum indicates that she

bases her breach of contract claim on the St. Agnes 2005 Associate Handbook, and not the 2004

Handbook.  (*See* Pl.'s Opp'n Mem. at 35.)  Nevertheless, both handbooks included disclaimers

that relieve St. Agnes from any contractual liability.  The acknowledgement attached to the 2004

Handbook which Ms. Lauture signed on July 21, 2004 stated in full:

> This Handbook is intended as a general guide to the personnel policies and employee
> benefits available at St. Agnes Hospital.  It is the responsibility of each employee to read
> and be familiar with the contents of this Handbook.  <u>Neither the Handbook nor the
> personnel policies manual are intended to set forth either express or implied contractual
> obligations of the Hospital.</u>  The Hospital retains the right to change the provisions of this
> Handbook or the personnel policies at any time as circumstances warrant.

(Def.'s Summ. J. Mem. at Ex V) (emphasis added).  Moreover, the 2005 Associate Handbook

included a disclaimer stating that:

> <u>Neither the Handbook nor the personnel policies manual are intended to set forth either
> express or implied contractual obligations of St. Agnes.  Any implication to the contrary
> is expressly disclaimed.</u>  St. Agnes retains all rights to change the provisions and contents
> of this Handbook, including personnel policies, procedures, benefits, or any other
> conditions of employment at any time as circumstances warrant.

(2005 Associate Handbook at 5, attached to Pl.'s Opp'n Mem. as Ex. 36 & Def.'s Reply as Ex. M) (emphasis added).  Such language unambiguously disclaims the existence of a contract and is comparable to similar language found by other courts to be sufficient to avoid contractual liability.  *See Mayers*, 131 F. Supp. 2d at 751; *Lambert*, 93 F. Supp. 2d at 643.  Thus, neither the 2004 nor 2005 Associate Handbook created a contract between St. Agnes and Ms. Lauture. Accordingly, Ms. Lauture cannot succeed in a breach of contract claim, and the court will grant the defendant's motion for summary judgment.

E.      *Intentional Infliction of Emotional Distress*

Finally, Ms. Lauture argues that St. Agnes is liable for intentional infliction of emotional distress (hereinafter "IIED") because she was escorted from the building by security guards on March 10, 2006 after her resignation became immediate.  St. Agnes is also entitled to summary judgment on this claim.

To establish a *prima facie* case of IIED, a plaintiff must allege and prove facts showing that: (1) the alleged conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress was severe.  *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977).  All four elements must be shown.  *Batson v. Shiflett*, 602 A.2d 1191, 1216 (Md. 1992) (internal citation omitted.)  In Maryland, "the tort of intentional infliction of emotional distress is rarely viable."  *Arbabi v. Fred Meyers, Inc.*, 205 F. Supp. 2d 462, 466 (D. Md. 2002) (internal quotation marks and citation omitted).  Rather, "Maryland courts have cautioned that the tort of intentional infliction of emotional distress should be imposed sparingly, and its balm reserved for those wounds that are truly severe and incapable of healing themselves."  *Id.* (internal quotation marks omitted) (quoting *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 75 (Md. 1991)).

To be extreme and outrageous, conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris*, 380 A.2d at 614 (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 46 comment d (1965)).  For instance, the few successful IIED claims upheld by the Maryland Court of Appeals involved such facts as a psychologist having sexual relations with the plaintiff's wife while treating them as their marriage counselor, and an employer attempting to convince its employee to commit suicide. *Batson*, 602 A.2d at 1216 (internal citations omitted) (listing the only three cases where the Maryland Court of Appeals upheld IIED claims).  By contrast, workplace harassment "almost never rises to the level of outrageousness, and almost never results in such severely debilitating emotional trauma, as to reach the high threshold invariably applicable to a claim of intentional infliction of emotional distress under Maryland law." *Arbabi*, 205 F. Supp. 2d at 466.  Furthermore, to demonstrate that she suffered severe emotional distress, a plaintiff must show that the distress inflicted was "so severe that no reasonable [person] could be expected to endure it." *Harris*, 380 A.2d at 616. "The intensity and duration of the distress are factors to be considered in determining its severity." *Id.*

At the very least, Ms. Lauture has failed to meet her burden of establishing that St. Agnes' conduct was extreme and outrageous or that she experienced severe emotional distress. Having a security guard escort an employee out of the building, while very likely uncomfortable for the employee, does not rise to the level of egregiousness required for a claim of IIED.  Even if such conduct could be called "workplace harassment", which the court declines to do in this case, workplace harassment rarely rises to the level of outrageousness. *See Arbabi*, 205 F. Supp. 2d at 466.  Furthermore, Ms. Lauture has not demonstrated that the distress she experienced was

so severe that no reasonable person could endure it.  Her complaint merely alleges that she

suffers "severe and extreme emotional distress" (Am. Compl. at ¶ 60), and her opposition

memorandum states that she has had to seek acupuncture for her distress.  (Pl.'s Opp'n Mem. at

37.)  Such allegations are simply too conclusory to establish severe emotional distress for

purposes of an IIED claim.

Thus, Ms. Lauture has not presented any facts from which a reasonable juror could find

that she has established a *prima facie* case of IIED.  The court, therefore, will grant the

defendant's motion for summary judgment.

## <u>CONCLUSION</u>

For the foregoing reasons, the court will grant both the plaintiff's motion for leave to file

an amended complaint and the defendant's motion for summary judgment.


|  December 29, 2009  |  /s/  |
| :---: | :---: |
| Date | Catherine C. Blake |
| | United States District Judge |